UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Civil Division

| | |
|---|---|
| **RONALD WOOD,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | Case No. 1:06-cv-1616 CKK |
| **v.** ) | |
| ) | |
| **DYNCORP,** *et al.*, ) | |
| ) | |
| **Defendants**. ) | |

## DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION AND MOTION FOR JUDGMENT ON THE PLEADINGS

COME NOW, Defendants DynCorp, DynCorp International LLC ("DI LLC"), and

DynCorp International, Inc. ("DI Inc."), [hereinafter collectively referred to "Defendants"], by

and though counsel, Wilson, Elser, Moskowitz, Edelman & Dicker LLP, and hereby move this

Honorable Court for an Order pursuant to Rule 12(b)(1) of the Federal Rules dismissing this case

for lack of subject matter jurisdiction and/or Rule 12(c) of the Federal Rules granting judgment

based on the pleadings ("Motion"). If this Honorable Court determines that the Complaint

should not be dismissed for lack of subject matter jurisdiction or that judgment on the pleadings

should not be granted, Defendants respectfully request that the Court enter an Order establishing

an abbreviated discovery schedule for the issues presented in Defendants' Motion and set a

briefing schedule for an anticipated motion for summary judgment. The grounds for Defendants'

Motion are set forth in detail in the accompanying Statement of Points and Authorities in

Support of Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction and Motion

for Judgment on the Pleadings.

WHEREFORE, Defendants seek an Order Dismissing Plaintiffs' Complaint in its entirety and with prejudice.

October 26, 2006                                    Respectfully submitted,

                                                   WILSON, ELSER, MOSKOWITZ,
                                                   EDELMAN & DICKER LLP


                                                   _____/s/_____
                                                   Robert B. Wallace (D.C. Bar No. 108571)
                                                   Kevin Farrell (D.C. Bar No. 492142)
                                                   Yoora Pak (D.C. Bar. No. 467007)
                                                   The Colorado Building
                                                   1341 G Street, N.W., 5th Floor
                                                   Washington, D.C. 20005
                                                   (202) 626-7660 (telephone)
                                                   (202) 628-3606 (facsimile)

                                                   *Attorney for Defendants*

244130.1

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the **DEFENDANTS' MOTION TO DISMISS  FOR LACK OF SUBJECT MATTER JURISDICTION AND MOTION FOR JUDGMENT ON THE PLEADINGS** was served via ECF on this 26th day of October, 2006, to:

> Nathan I. Finkelstein, Esq.
> Laurie B. Horvitz, Esq.
> Robert J. Goldman, Esq.
> Finkelstein & Horvitz, P.C.
> 7315 Wisconsin Avenue
> Suite 400 East
> Bethesda, MD 20814
>
> *Attorneys for Plaintiff*

_____/s/_____
Robert B. Wallace

244130.1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**Civil Division**

| | |
|---|---|
| **RONALD WOOD,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | Case No. 1:06-cv-1616 CKK |
| **v.** ) | |
| ) | |
| **DYNCORP,** *et al.*, ) | |
| ) | |
| **Defendants**. ) | |

**DEFENDANTS' STATEMENT OF POINTS AND AUTHORITIES**
**IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT**
**MATTER JURISDICTION AND MOTION FOR JUDGMENT ON THE PLEADINGS**

October 26, 2006

Respectfully submitted,

WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP

_____/s/_____
Robert B. Wallace (D.C. Bar No. 108571)
Kevin Farrell (D.C. Bar No. 492142)
Yoora Pak (D.C. Bar. No. 467007)
The Colorado Building
1341 G Street, N.W., 5th Floor
Washington, D.C. 20005
(202) 626-7660 (telephone)
(202) 628-3606 (facsimile)

*Attorney for Defendants*

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... iii

NATURE AND STAGE OF THE PROCEEDING..................................................... 1

FACTUAL BACKGROUND ......................................................................................... 2

SUMMARY OF ARGUMENT ..................................................................................... 3

ARGUMENT .................................................................................................................. 4

A.      STANDARD OF REVIEW ................................................................................. 4

        1.   Rule 12(b)(1) Motion to Dismiss for Lack of Subject Matter
             Jurisdiction ..............................................................................................4

        2.   Rule 12(c) Motion for Judgment on the Pleadings ................................5

B.      PLAINTIFF IS COVERED BY THE DEFENSE BASE ACT AND THUS
        JUDGMENT ON THE PLEADINGS SHOULD BE GRANTED PURSUANT
        TO RULE 12(c) ....................................................................................................5

        1.   Plaintiff Is Covered by the DBA .............................................................6

        2.   Defendants Are Immune From All Claims Because of the
             Exclusivity Provision of the DBA ...........................................................7

        3.   Plaintiff Has Not Pleaded an Intentional Tort........................................8

        4.   The Benefits Under the LHWCA Are the "Exclusive Remedy" for
             Covered "Injuries" ..................................................................................9

C.      PLAINTIFF'S CLAIMS ARE NONJUSTICIABLE DUE TO THE POLITICAL
        QUESTION DOCTRINE AND THUS THE CASE SHOULD BE DISMISSED
        FOR LACK OF SUBJECT MATTER JURISDICTION PURSUANT TO RULE
        12(b)(1) ...............................................................................................................10

        1.   Political Question Doctrine....................................................................11

        2.   Historical Background and Policy Statements of the United States .....13

        2.   Defendant DynCorp International LLC and its MNSTC-I Contract .....17

        3.   The Accident on September 3, 2004.......................................................19

        4.   The Issues Raised by Plaintiff Are Constitutionally Committed to
             the Political Branches ...........................................................................22

        5.   The Issues Raised by Plaintiff Are Not Susceptible of Resolution
             by Judicially Discoverable Standards ...................................................26

        6.   The Issues Raised by Plaintiff Cannot Be Decided Without an
             Initial Policy Determination Reserved for the Political Branches........30

7.  The Issues Raised by Plaintiff Cannot Be Resolved Without Disrespecting the Policy Decisions of the DOD and the Executive Branch ..................................................................................................30

D.  PLAINTIFF'S CLAIMS ARE PRE-EMPTED BY THE GOVERNMENT CONTRACTOR DEFENSE AND THUS JUDGMENT ON THE PLEADINGS SHOULD BE GRANTED PURSUANT TO RULE 12(c) .............................................. 32

1.  The Government Contractor Defense ...................................................32

2.  The Government Contractor Defense Applies to Military Service Contracts ...............................................................................................33

3.  The Government Contractor Defense Applies to Nonmilitary Service Contracts ...................................................................................34

4.  The Government Contractor Defense Applies in This Case.................................36

CONCLUSION ................................................................................................. 38

244130.1

# TABLE OF AUTHORITIES

## Cases

Baker v. Carr,
369 U.S. 186 (1962) ................................................................. 12, 26, 30, 31

*Bancoult v. McNamara,
445 F.3d 427 (D.C. Cir. 2006) ............................................. 11, 12, 23, 24, 26, 30, 31

Berven v. Fluor Corp.,
171 F. Supp. 89 (S.D.N.Y. 1959) .......................................................... 7

Conley v. Gibson,
355 U.S. 41 (1957) ................................................................................ 5

*El-Shifa Pharm. Indus. Co. v. United States,
402 F. Supp. 2d 267 (D.D.C. 2005) ..................................... 12, 23, 29, 30, 31

Fagans v. Unisys Corp.,
945 F. Supp. 3 (D.D.C. 1996) ............................................................. 35

Fisher v. Halliburton, Inc.,
2006 U.S. Dist. LEXIS 68413 (S.D. Tex. Sept. 22, 2006) ............................. 12, 13, 26

Flying Tigers Lines, Inc. v. Landy,
370 F.2d 46 (9th Cir. 1966) ............................................................... 7

Haltiwanger v. Unisys Corp.,
949 F. Supp. 898 (D.D.C. 1996) .......................................................... 35

Houston v. Bechtel Assoc. Prof. Corp.,
522 F. Supp. 1094 (D.D.C. 1981) ....................................................... 8, 9

Hudgens v. Bell Helicopters/Textron,
328 F.3d 1329 (11th Cir. 2003) ........................................................... 36

Ibrahim v. Titan Corp.,
391 F. Supp. 2d 10 (D.D.C. 2005) .................................... 30, 33, 34, 35, 36

Industria Panificadora, S.A. v. United States,
763 F. Supp. 1154 (D.D.C. 1991), aff'd, 957 F.2d 886 (D.C. Cir.),
cert. denied, 506 U.S. 908 (1992) ........................................................ 32

Japan Whaling Ass'n v. Am. Cetacean Soc'y,
478 U.S. 221 (1986) ............................................................................ 11

iii

Luftig v. McNamara,
373 F.2d 664 (D.C. Cir. 1967), cert. denied, 387 U.S. 945 (1967)................................. 23

Newdow v. Bush,
391 F. Supp. 2d 95 (D.D.C. 2005) ...................................................................... 4

Pulley v. Peter Kiewit Son's Co.,
223 F.2d 191 (7th Cir. 1955) ........................................................................ 7

Richland-Lexington Airport Dist. v. Atlas Prop., Inc.,
854 F. Supp. 400 (D.S.C. 1994)..................................................................... 36

Robinson v. District of Columbia,
403 F. Supp. 2d 39 (D.D.C. 2005) .................................................................... 5

*Ross v. DynCorp,
362 F. Supp. 2d 344 (D.D.C. 2005) ............................................................... 6, 7

Sadowski v. Bush,
293 F. Supp. 2d 15 (D.D.C. 2003) .................................................................... 4

Saleh v. Titan Corp.,
436 F. Supp. 2d 55 (D.D.C. 2006) ............................................................... 33, 35

Schneider v. Kissinger,
412 F.3d 190 (D.C. Cir. 2005), cert. denied, 126 S. Ct. 1768 (2006).......................... 30

Sharp v. Elkins,
616 F. Supp. 1561 (W.D. La. 1985).................................................................. 10

Smith v. Halliburton Co.,
2006 U.S. Dist. LEXIS 61980 (S.D. Tex. Aug. 30, 2006)......................................... 13

Sparks v. Wyeth Lab., Inc.,
431 F. Supp. 411 (W.D. Okla. 1977) ................................................................. 7

Whitaker v. Kellogg Brown & Root, Inc.,
2006 U.S. Dist. LEXIS 45708 (M.D. Ga. Jul. 6, 2006) ........................................ 13, 30

Yearsley v. W.A. Ross Constr. Co.,
309 U.S. 18 (1940)................................................................................... 35

244130.1

**Statutes**

Authorization for Use of Military Force Against Iraq Resolution of 2002,
    Pub. L. No. 107-243 (2002) ................................................................. 13
*Defense Base Act, 42 U.S.C. § 1651 ........................................................ 6
*Defense Base Act, 42 U.S.C. § 1651(a) ................................................... 6
*Defense Base Act, 42 U.S.C. § 1651(a)(4) .............................................. 6
*Defense Base Act, 42 U.S.C. § 1651(b)(1) .............................................. 6
*Defense Base Act, 42 U.S.C. § 1651(c) ................................................... 8
*Defense Base Act, 42 U.S.C. § 1651(d) ................................................... 8
Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901 *et seq.* ........................... 6
Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 902(1) ................................. 10
Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 902(2) ................................. 10
Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 905(a) ................................. 8

**Other Authorities**

Government Accounting Office, Rebuilding Iraq: Actions Needed to Improve Use of Private
    Security Providers, Report No. 05-737 (2005) ........................................ 16, 17, 37
Government Accounting Office, Rebuilding Iraq: Status of Funding and Reconstruction Efforts,
    Report No. 05-876 (2005) ........................................ 14, 15, 16, 17, 18, 37
Government Accounting Office, Stabilizing Iraq:  An Assessment of the Security Situation,
    Report No. 06-1094T (2006) ........................................................ 17, 29

**Rules**

Federal Rule of Civil Procedure 12(b)(1) ........................................... 1, 3, 4, 13, 32, 38
Federal Rule of Civil Procedure 12(c) ................................................... 1, 5, 6, 10, 38

COME NOW, Defendants DynCorp, DynCorp International LLC ("DI LLC"), and DynCorp International, Inc. ("DI Inc."), [hereinafter collectively referred to "Defendants"], by and though counsel, Wilson, Elser, Moskowitz, Edelman & Dicker LLP, and hereby move this Honorable Court for an Order, pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, dismissing this case for lack of subject matter jurisdiction and/or pursuant to Rule 12(c) of the Federal Rules granting judgment on the pleadings ("Motion"). If this Honorable Court determines that the Complaint should not be dismissed or that judgment should not be entered on the pleadings, Defendants respectfully request that the Court enter an Order establishing an abbreviated discovery schedule for the issues presented in this Motion and setting a briefing schedule for an anticipated motion for summary judgment. As grounds for Defendants' Motion, Defendants state as follows:

<u>**NATURE AND STAGE OF THE PROCEEDING**</u>

This action arises out of alleged personal injuries sustained by Plaintiff Ronald Wood ("Plaintiff") while working for Worldwide Network Services, LLC ("WWNS") on a United States government contract project in Iraq on September 3, 2004. Complaint, ¶ 5. It is alleged that WWNS was a subcontractor to Defendants, who were the prime contractors. Id. ¶ 8.

Plaintiff originally filed this action in the Superior Court for the District of Columbia on or about August 14, 2006. Defendants removed the action to this Honorable Court on September 18, 2006. On October 6, 2006, the Court issued a Scheduling Order setting the Initial Scheduling Conference for October 27, 2006.

## FACTUAL BACKGROUND

It is alleged that in August 2004, Defendants were primary government contractors for a project in Iraq. Id. ¶ 8. It is further alleged that WWNS had a subcontract with Defendants with respect to certain activities under this government contract. Id. Plaintiff alleges that he was employed by WWNS in August 2004 and that he was sent to Iraq shortly thereafter to work on WWNS's subcontract with Defendants. Id. ¶¶ 19, 20.

It is alleged that on September 3, 2004, Plaintiff and a co-worker were assigned to a work site in or around Trebil, Iraq.[1] Id. ¶ 20. Plaintiff alleges that he and the co-worker were transported to Trebil from Baghdad in a vehicle driven by two security personnel, James McCants and Mark Greenlee.[2] Id. ¶ 22. Plaintiff alleges that these two security personnel were employed by one or more of the Defendants. Id. ¶ 22. Plaintiff wore body armor for this trip between Baghdad and Trebil. Id. ¶ 31.

It is alleged that the trip from Baghdad to Trebil took more than three (3) hours. Id. ¶ 26. Plaintiff alleges that Mr. McCants drove the vehicle when they left Baghdad, and that, after about three (3) hours, Mr. McCants and Mr. Greenlee switched positions so that Mr. Greenlee could complete the trip to Trebil. Id. ¶ 26.

During this trip from Baghdad to Trebil, Plaintiff alleges that both of "the DynCorp driver[s]" traveled at speeds in excess of 160 kilometers per hour (approximately 99 miles per hour) and swerved in and out of traffic. Id. ¶¶ 23, 27.

---

[1] Plaintiff refers to Arbil, Iraq in his Complaint. See, e.g., Complaint, ¶ 20. The work site to which Plaintiff was traveling was actually located at Trebil, Iraq on the Jordanian border of Iraq. See Exhibit 9 (Declaration of David M. Moore), ¶¶ 16-17. Accordingly, Defendants will refer to Trebil, Iraq hereinafter.

[2] Plaintiff identifies the other driver only as "Mark." In another case arising out of the same accident, the other driver is positively identified as Mark Greenlee. See Potts v. DynCorp, Civil Action No. 3:06-00124-WHA-CSC (M.D. Ala.).

2

Plaintiff alleges that he and his co-worker worked on a communications project in Trebil "for the benefit of WWNS and the Defendant(s)" for about eight-and-a-half hours. Id. ¶ 28.  Upon completion of their work in Trebil, Plaintiff alleges that he and his co-worker got back into the vehicle driven by Messrs. McCants and Greenlee to return to Baghdad.  Id. ¶ 29.  On their trip back to Baghdad, Plaintiff alleges that a dog crossed the highway on which their vehicle was traveling and that Mr. McCants, who was driving, "swerved to miss the dog and lost control of the vehicle."  Id. ¶ 30.  It is alleged that the vehicle flipped over "several times," went off the road, and "caught fire."  Id. ¶¶ 30, 34. Plaintiff alleges that he sustained various personal injuries as a result of the accident.  Id. ¶¶ 32-41.

## SUMMARY OF ARGUMENT

1.    Plaintiff has failed to state a claim upon which relief may be granted because, by virtue of the circumstances of his employment in Iraq under a government contract, the disability benefits provided by the Defense Base Act, 42 U.S.C. § 1651, are the exclusive remedy for Plaintiff.  Thus, judgment on the pleadings should be granted and this case dismissed under Rule 12(c) of the Federal Rules of Civil Procedure.

2.    This case should be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure pursuant to the political question doctrine because: (1) resolution of Plaintiff's claims will require the Honorable Court to review the decisions and policies of the Executive Branch regarding the use of U.S. military forces; (2) there are no judicially discoverable and manageable standards by which this Court could adjudicate Plaintiff's claims; (3) the Court may have to make a policy determination that is otherwise committed to the nonjudicial discretion of the

Executive Branch to resolve Plaintiff's claims; and (4) the Court may have to "second guess" the Executive Branch's decisions to resolve Plaintiff's claims.

3.     Plaintiff has failed to state a claim upon which relief may be granted because Plaintiff's claims are preempted by the government contractor defense.  Thus, judgment on the pleadings should be granted and this case dismissed under Rule 12(c) of the Federal Rules of Civil Procedure.

## ARGUMENT

A.     STANDARD OF REVIEW

1.     Rule 12(b)(1) Motion to Dismiss for Lack of Subject Matter Jurisdiction

When a motion to dismiss pursuant to Rule 12(b)(1) is filed, "the plaintiff bears the burden of establishing the factual predicates of jurisdiction by a preponderance of the evidence."  Newdow v. Bush, 391 F. Supp. 2d 95, 99 (D.D.C. 2005); Sadowski v. Bush, 293 F. Supp. 2d 15, 17 (D.D.C. 2003).  "Although a court must accept as true all of the factual allegations contained in the complaint when reviewing a motion to dismiss pursuant to Rule 12(b)(1), . . . 'plaintiff[s'] factual allegations in the complaint . . .will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim."  Newdow, 391 F. Supp. 2d at 99 (citations omitted).  The Court must also draw all favorable inferences in the plaintiff's favor.  Id.  However, the Court does not have to "accept inferences unsupported by the facts alleged or legal conclusions that are cast as factual allegations."  Sadowski, 293 F. Supp. 2d at 17.  Moreover, the Court may consider material outside the complaint and may resolve disputed facts in order to determine whether it has proper jurisdiction over the case.  Newdow, 391 F. Supp. 2d at 99; Sadowski, 293 F. Supp. 2d at 17 (stating that the court

does not have to "limit itself to the allegations of the complaint" to resolve a Rule 12(b)(1) motion to dismiss).

    2.    <u>Rule 12(c) Motion for Judgment on the Pleadings</u>

The standard of review for a motion for judgment on the pleadings pursuant to Rule 12(c) is virtually the same as that for a motion to dismiss under Rule 12(b)(6). <u>Robinson v. District of Columbia</u>, 403 F. Supp. 2d 39, 47 (D.D.C. 2005). A court may grant judgment on the pleadings pursuant to Rule 12(c) only if "it appears beyond doubt, based on the allegations contained in the complaint, that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." <u>Robinson</u>, 403 F. Supp. 2d at 47 (citing <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957)). The facts alleged in the Complaint must be construe in the light most favorable to Plaintiff, the non-moving party. <u>Robinson</u>, 403 F. Supp. 2d at 47. In its review, the Court may only consider the facts alleged in the Complaint, documents attached to or incorporated into the Complaint, matters of which the court may take judicial notice, and matters of public record. <u>Id.</u> While the Court must construe the allegations in the Complaint in Plaintiff's favor, the Court does not have to accept inferences that are not supported by the facts alleged in the Complaint and is not required to accept Plaintiff's legal conclusions. <u>Id.</u> (citations omitted).

B.    <u>PLAINTIFF IS COVERED BY THE DEFENSE BASE ACT AND THUS JUDGMENT ON THE PLEADINGS SHOULD BE GRANTED PURSUANT TO RULE 12(c)</u>

Plaintiff was covered by the DBA and is therefore entitled to its benefits. Consequently, Defendants are immune from any tort or other liability asserted by Plaintiff based on the plain language of the DBA and the LHWCA. In addition, Plaintiff

has not pleaded any intentional torts that may or may not have been a exception to the DBA/LHWCA exclusivity of remedies. Thus, judgment should be granted on the pleadings and the Complaint dismissed pursuant to Rule 12(c) of the Federal Rules.

1.    Plaintiff Is Covered by the DBA

The Defense Base Act ("DBA"), 42 U.S.C. § 1651, extends the death and disability benefits coverage of the Longshore and Harbor Workers Compensation Act ("LHWCA"), 33 U.S.C. §§ 901 *et seq.*, to employees who are employed under a government contract or subcontract: (1) entered into with the United States or an applicable department or agency thereof; (2) that is to be performed outside the continental United States; and (3) entered into for the purpose of engaging in public work. See 42 U.S.C. §§ 1651(a) and (a)(4); Ross v. DynCorp, 362 F. Supp. 2d 344, 352-353 (D.D.C. 2005).

In this case, there is no dispute that Plaintiff was covered under the DBA. First, Plaintiff was working for WWNS pursuant to a subcontract to a government contract entered into by Defendants with a U.S. Government agency, thus satisfying the first criterion. Complaint, ¶ 8, 13. Second, Plaintiff was employed by WWNS in Iraq under the purported Subcontract, thus satisfying the second criterion. Complaint, ¶ 20. The third and last criterion is satisfied because Plaintiff was assigned to a project related to the government contract and subcontract. Complaint, ¶ 21. Specifically, Plaintiff was working on a "communications project for the benefit of WWNS and the Defendant(s)." Complaint, ¶ 28. Because the "communications project" was done under a "service contract[] or project[] in connection with the national defense or with war activities" for the "public use of the United States or its allies," it was a "public work" as defined by 42

244130.1

U.S.C. § 1651(b)(1).  Accordingly, Plaintiff was covered by the DBA.  See Ross, 362 F. Supp. 2d at 352.

As recognized by the courts, if an employee is covered by the DBA, the death and disability benefits provided by the DBA are his exclusive remedy.  See Ross, 362 F. Supp. 2d at 358 (granting judgment as a matter of law on the ground that the DBA provided the exclusive remedies to plaintiffs who brought wrongful death and survivorship actions based on the death of an employee working under a government contract in Columbia, South America).  See also Flying Tigers Lines, Inc. v. Landy, 370 F.2d 46, 52 (9th Cir. 1966) (holding that the DBA evidenced Congress' intent that the LHWCA compensation scheme is to be the employee's sole remedy); Pulley v. Peter Kiewit Son's Co., 223 F.2d 191, 194 (7th Cir. 1955) (holding that the remedies provided by the LHWCA were exclusive as long as the employer complied with the mandates of the statute); Sparks v. Wyeth Lab., Inc., 431 F. Supp. 411, 417 (W.D. Okla. 1977) (holding that the DBA "makes the exclusive remedy of an employee of a covered government contractor against that contractor a compensation remedy under the [LHWCA]"); Berven v. Fluor Corp., 171 F. Supp. 89, 90 (S.D.N.Y. 1959) (dismissing complaint based on exclusivity of LHWCA benefits pursuant to the DBA).

2.    Defendants Are Immune From All Claims Because of the Exclusivity Provision of the DBA

The exclusivity provision of the DBA provides:

> Liability as exclusive.  The liability of an employer, *contractor (or any subcontractor or subordinate subcontractor with respect to the contract of such contractor) under this Act shall be exclusive and in place of all other liability of such employer, contractor, subcontractor, or subordinate contractor to his employees (and their dependents*) coming within the purview of this

7

> Act, under the workmen's compensation law of any Sate,
> Territory, or other jurisdiction, irrespective of the place
> where the contractor hire of any such employee may have
> been made or entered into.

42 U.S.C. § 1651(c) (emphasis added).  As the plain language of the DBA states, a

contractor's liability is limited to those remedies available under the DBA and its DBA

liability "shall be exclusive and *in place of <u>all</u> other liability*."  <u>Id.</u> (emphasis added).

The immunity from "all other liability" goes to the three claims -- negligence, gross

negligence, and breach of contract -- brought by Plaintiff.  <u>See</u> <u>id.</u>  Thus, Defendants,

who Plaintiff concedes are contractors (Complaint, ¶ 8), are immune from the claims

brought by Plaintiff based on injuries he allegedly sustained while employed by WWNS

in Iraq pursuant to a Subcontract under Section 1651(c) of the DBA.

Moreover, the DBA provides that a contractor shall have "the rights, obligations,

liability and duties *of the employer* under such Longshoremen's and Harbor Workers'

Compensation Act."  42 U.S.C. § 1651(d) (emphasis added). Thus, the DBA expressly

provides that a contractor is also an employer for purposes of "the rights, obligations,

liability and duties" under the LHWCA.  Consequently, because Defendants are deemed

to be employers under the LHWCA by the DBA, Defendants are entitled to the immunity

provided to an employer under the LHWCA as well.  Accordingly, Defendants are not

liable to the employee, his legal representative, husband or wife, parents, dependents,

next of kin or anyone else who may be entitled to recover damages against Defendants as

an employer under the LHWCA.  33 U.S.C. § 905(a).

       3.      <u>Plaintiff Has Not Pleaded an Intentional Tort</u>

As held by this Court, there is an exception to Section 905(a) of the LHWCA for

injuries caused by intentional acts.  <u>Houston v. Bechtel Assoc. Prof. Corp.</u>, 522 F. Supp.

244130.1

1094, 1096 (D.D.C. 1981). However, in <u>Houston</u>, the court held that "[n]othing short of a specific intent to injure the employee falls outside the scope of § 905(a)." <u>Id.</u> at 1096. In addition, "[k]nowledge and appreciation of a risk is not the same as the 'intent' to cause injury." <u>Id.</u> Moreover, "[n]either knowingly permitting a hazardous work condition to exist, . . . nor willfully failing to furnish a safe work place to work, . . . nor even willfully violating a safety statute, . . . constitutes requisite intent." <u>Id.</u> (citations omitted). Thus, the court in <u>Houston</u> held that an allegation that the employer acted "willful[ly], wanton[ly], reckless[ly], and unlawful[ly] . . . is barred by § 905(a) of LHWCA." <u>Id.</u> Consequently, Plaintiff's gross negligence claim in this case -- that Defendants acted "with gross negligence and a wanton and reckless disregard" (Complaint, Count II) -- as well as his negligence claim (Complaint, Count I) do not allege an intentional tort and must be dismissed.

      4.    <u>The Benefits Under the LHWCA Are the "Exclusive Remedy" for Covered "Injuries"</u>

Moreover, the LHWCA does not allow for third party lawsuits for injuries covered by the statute. Specifically, Section 902(2) of the LHWCA defines an injury as an "accidental injury or death arising out of and in the course of employment, . . . and includes such injury caused by the willful act of a third person directed against an employee because of his employment." LHWCA, 33 U.S.C. § 902(2). A "person" is defined as an "individual, partnership, corporation, or association." <u>Id.</u> § 902 (1). Because Defendants are corporations, they are "persons" under the LHWCA. Because Defendants were never Plaintiff's employer, they would be a "third person." Therefore, Section 902(2) also immunizes Defendants from lawsuits based even on "willful acts," including negligence, gross negligence and breach of contract. Again, the benefits

9

provided under the LHWCA are the exclusive remedy for Plaintiff's purported injuries and Plaintiff is precluded from bringing any action against Defendants.  See Sharp v. Elkins, 616 F. Supp. 1561 (W.D. La. 1985) (holding that Section 902(2) "[c]learly . . . exhibits a Congressional intent to include within the remedies of the LHWCA torts caused by the intentional acts of third persons").

In summary, because Plaintiff was covered by the DBA and is therefore entitled to the benefits provided by the LHWCA, Defendants are immune from the tort and breach of contract claims asserted by Plaintiff based on the plain language of the DBA and the LHWCA.  In addition, Plaintiff has not pleaded any intentional torts that may or may not have been a exception to the DBA/LHWCA exclusivity of remedies.  Thus, judgment should be granted on the pleadings and the Complaint dismissed pursuant to Rule 12(c) of the Federal Rules.

C.    PLAINTIFF'S CLAIMS ARE NONJUSTICIABLE DUE TO THE POLITICAL QUESTION DOCTRINE AND THUS THE CASE SHOULD BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION PURSUANT TO RULE 12(b)(1)

This Court lacks subject matter jurisdiction over Plaintiff's claims under the political questions doctrine.  Specifically, this case involves the Executive Branch's decisions regarding the use of its military force, there are no judicially discoverable standards by which this Court could determine reasonable conduct when driving through a possible "kill zone" during wartime hostilities, the Court would have to make a policy determination about how all U.S. civilian government agencies and reconstruction contractors should be protected, and the Court would have to judge whether the U.S. Government's policy regarding the use of the military is rational.  According, the case should be dismissed with prejudice pursuant to Rule 12(b)(1).

1.    <u>Political Question Doctrine</u>

It is well established that "courts lack jurisdiction over political decisions that are by their nature committed to the political branches to the exclusion of the judiciary." <u>Bancoult v. McNamara</u>, 445 F.3d 427, 432 (D.C. Cir. 2006) (citations and quotations omitted). The political question doctrine is "one aspect of the concept of justiciability, which expresses the jurisdictional limitations imposed on the federal courts by the 'case or controversy' requirement of Article III of the Constitution." <u>Id.</u> (citations and quotations omitted). This doctrine "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch.'" <u>Id.</u> (quoting <u>Japan Whaling Ass'n v. Am. Cetacean Soc'y</u>, 478 U.S. 221, 230 (1986)).

In <u>Baker v. Carr</u>, 369 U.S. 186 (1962), the Supreme Court articulated six factors to be considered in determining the presence or absence of a nonjusticiable political question:

   (1)    a textually demonstrable constitutional commitment of the issue to a coordinate political department; or

   (2)    a lack of judicial discoverable and manageable standards for resolving it; or

   (3)    the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or

   (4)    the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or

   (5)    an unusual need for unquestioning adherence to a political decision already made; or

(6)    the potential for embarrassment from multifarious pronouncements by various departments on one question.

Id. at 217, cited and quoted by Bancoult, 445 F.3d at 432.  The Court need only conclude that one factor applies and "is inextricable from the case at bar" in order to dismiss the claims as nonjusticiable.  Bancoult, 445 F.3d at 432.

The "jurisdictional bar posed by the political question doctrine is not avoided by framing the claims using common tort principles."  El-Shifa Pharm. Indus. Co. v. United States, 402 F. Supp. 2d 267, 274 (D.D.C. 2005).  See also Fisher v. Halliburton, Inc., 2006 U.S. Dist. LEXIS 68413 (S.D. Tex. Sept. 22, 2006) (dismissing complaint under the political question doctrine in action alleging wrongful death and other claims brought on behalf of civilian employees in Iraq under contract with the U.S. Army) (attached hereto as Exhibit 1); Smith v. Halliburton Co., 2006 U.S. Dist. LEXIS 61980 (S.D. Tex. Aug. 30, 2006) (dismissing complaint under the political question doctrine in an action alleging negligence related to a suicide bomb attack on a military base in Iraq) (attached hereto as Exhibit 2); Whitaker v. Kellogg Brown & Root, Inc., 2006 U.S. Dist. LEXIS 45708 (M.D. Ga. Jul. 6, 2006) (dismissing complaint under the political question doctrine in an action alleging soldier's death was caused by negligence of a government contractor's employee) (attached hereto as Exhibit 3).

In Fisher, Smith, and Whitaker, the respective district courts held that the political question doctrine was implicated even though the defendants in all three cases were government contractors.  The district courts recognized that "[w]hen the military seeks to accomplish its mission by partnering with government contractors who are subject to the military's orders . . . the use of those civilian contractors to accomplish the military objective does not lessen the deference due to the political branches in this area."  Smith,

12

2006 U.S. Dist. LEXIS 61980 at *21 (quoting <u>Whitaker</u>, 2006 U.S. Dist. LEXIS 45708 at *11).  The "private character of the actions do not preclude the application of the political question doctrine."  <u>Fisher</u>, 2006 U.S. Dist. LEXIS 68413 at *15.

      2.     <u>Historical Background and Policy Statements of the United States</u>[3]

      a.     <u>The War in Iraq</u>

The allegations in this case must be considered in the context in which they occurred.  Congress authorized the use of the United States Armed Forces against Iraq on October 16, 2002, and the United States entered into a war with Iraq in March 2003.  <u>See</u> Ex. 4 (Authorization for Use of Military Force Against Iraq Resolution of 2002, Pub. L. No. 107-243 (2002)).  A review of the daily paper clearly shows that since toppling Saddam Hussein's regime in April 2003, the United States military and nonmilitary agencies continue extensive operations and face an increasingly violent insurgency in Iraq.  <u>See, e.g.</u>, Ex. 5 (Ibon Villelabeitia, *U.S. Reviews Baghdad Strategy as Troop Deaths Mount*, The Washington Post, Oct. 19, 2006, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2006/10/19/AR2006101900 276.html).

      b.     <u>Coalition Provisional Authority in Iraq</u>

After Saddam Hussein was removed from power in April 2003, the Coalition Provisional Authority ("CPA"), led by the United States and the United Kingdom, was recognized by the United Nations as the temporary governing body of Iraq responsible for supervising, directing and coordinating the international reconstruction effort.  <u>See</u> Ex. 6, at 4 (Government Accounting Office ("GAO"), <u>Rebuilding Iraq: Status of Funding</u>

---

[3] As stated above, for purposes of a Rule 12(b)(1) motion to dismiss, the Court may consider materials outside of the pleadings and resolve disputed facts in order to determine whether it has proper jurisdiction over the case.  <u>See</u> <u>Newdow</u>, 391 F. Supp. 2d at 99.

and Reconstruction Efforts, Report No. 05-876, at 4 (2005)).  The CPA undertook these responsibilities from May 2003 through June 2004.  Id. at 4.  The role of the United States in the CPA was under the leadership of the U.S. Department of Defense ("DOD"). Id.

        c.      DOD transfers reconstruction responsibilities to U.S. Department of State

In June 2004, pursuant to National Security Presidential Directive 36 issued by President Bush, the CPA transferred power to a sovereign Iraqi interim government and was officially dissolved.  Id. at 4.  The National Security Presidential Directive also provided that the U.S. Ambassador to Iraq would become the U.S. Chief of Mission, and that the U.S. Department of State ("State" or "State Department") would be responsible for all U.S. reconstruction activities in Iraq after the transition of power -- except U.S. efforts related to security and military operations, which would remain the responsibility of the DOD although under State leadership.  Id.  Thus, since the transition of power from the CPA to the Iraqi interim government occurred, the DOD's role is to support the Iraqi government as an ally and friend under the leadership of the State Department.  Id.

Since July 2004, the U.S. reconstruction efforts in Iraq have been managed by State through the creation of the Iraq Reconstruction Management Office.  Id. at 5.  The Project and Contracting Office ("PCO") was also created at the same time to provide contracting support to U.S.-funded reconstruction projects.  Id.  The PCO was established as a temporary organization within DOD.  Id. at 7 n.6.  It is funded, staffed, and supervised by the U.S. Department of the Army.  Id. at 4.  Army personnel staffed at the PCO are permanently or temporarily assigned under the Chief of Mission (State) authority.  Id. at 7 n.6.

244130.1

Because the PCO reports to the State Department and the U.S. Ambassador to Iraq is the Chief of Mission, reconstruction contracts are issued under the State Department's authority.

> d.     Private Security Providers

While there are a number of civilian government agencies in Iraq in support of its reconstruction program, the three principal agencies are State, DOD, and the U.S. Agency for International Development (USAID).  Id. at 2.  The U.S. Army Corp of Engineers (USACE) also plays a large role in the Iraqi reconstruction programs by providing engineering and technical services to the PCO, USAID, and military forces. Id. at 5.

The United States determined that it is was not the role of the U.S. military to provide security to civilian government agencies, such as State, USAID, and USACE, or reconstruction contractors in Iraq.[4]  See Ex. 7, at 3 (GAO, Rebuilding Iraq: Actions Needed to Improve Use of Private Security Providers, Report No. 05-737 (2005)).  Thus, both U.S. civilian government agencies and reconstruction contractors have had to contract with private security providers (PSPs) for security services.  Id. at 10.  In some cases, by the terms of their government contracts, reconstruction contractors are required to provide their own security, which they typically do by awarding subcontracts to PSPs. Id.

PSPs provide a number of security services, including static security (security for housing areas and work sites), personal security details (security for high-ranking U.S.

---

[4] The U.S. military does provide security services to DOD contractors who support combat operations.  Ex. 6, at 10.  The military does not use PSPs to provide security for DOD contractors who support combat operations because it is concerned that PSPs would be considered illegal combatants under international armed conflict laws, thus losing the protections granted to contractors under international law.  Id. at 10-11.

officials), security escorts (security for government employees, contractor employees, or others as they move through Iraq), convoy security (security for vehicles and their occupants as they make their way into Iraq or within Iraq), and security advice and planning.  Id. at 9.  As of 2005, DOD estimated that there were at least 60 PSPs working in Iraq with approximately 25,000 employees.  Id. at 8.  Between August 2003 and May 2004, State, USAID, USACE, and the CPA had obligated almost $456 million in contracts with PSPs.  Id. at 13.

The CPA issued orders and directives regulating the conduct and scope of duties of a PSP.  For instance, CPA Order Number 3 (revised and amended) describes the types of weapons that can be used by PSPs, CPA Order Number 17 (revised) states that contractors (including PSPs) will be immune from the Iraqi legal process for acts performed in accordance with their MNSTC-I Contracts, and CPA Memorandum Number 17 requires PSPs and their employees to be registered and licensed by the Government of Iraq.  Id. at 9.

The Regional Security Officer ("RSO") at the U.S. Embassy in Iraq is the "focal point for security issues and as such establishes specific security policies and procedures for all executive branch personnel who fall under the Chief of Mission's security responsibility."  Id. at 12.  PSPs must comply with the RSO's instructions (such as, increasing the number of cars required for moving people within Iraq) even if the contract was not awarded by the State Department and even if the company did not provide security for State Department personnel.  Id. at 13.

16

e.    Escalating Violence in Iraq

The United States Government acknowledged the "difficult environment" in Iraq due to the growth in "size, complexity, and intensity" of the insurgency in Iraq.  Ex. 6 at 2.  There was a "significant increase in insurgent activity in mid-2004."  Id. at 8.  From 2004 to 2005, there was a 23 percent increase in the number of enemy-initiated attacks against coalition forces, civilians, and Iraqi security forces.  See Ex. 8, at 5 (GAO, Stabilizing Iraq:  An Assessment of the Security Situation, Report No. 06-1094T (2006)).  Between May 2003 and June 1, 2005, 200 contractor personnel were killed in Iraq, including four U.S. citizens working for a U.S. security provider who were killed in March 2004.  Ex. 7 at 1.  The United States Government acknowledges that "workers have been threatened, the ability to safely transport materials has been compromised, and access to work sites has been hindered."  Ex. 6 at 2.

f.    Rebuilding Iraq is a "U.S. national   security and foreign policy priority"

The United States Government considers the "[r]ebuilding [of] Iraq . . . a U.S. national security and foreign policy priority . . .[,]" and the United States Government's efforts in Iraq are "important to attaining U.S. military and political objectives in Iraq and helping Iraq achieve democracy and freedom."  Ex. 6 at 2.

2.    Defendant DynCorp International LLC and its MNSTC-I Contract

In November 2003, Defendant DynCorp International LLC ("DI LLC") entered into a contract with the CPA to provide security to truck convoys entering Iraq as part of the United Nation's Oil for Food program ("MNSTC-I Contract").  See Ex. 9, ¶ 3 (Declaration of David M. Moore) and Moore Decl. Ex. B, p. 4.  Under the original

MNSTC-I Contract issued on November 16, 2003, DI LLC was authorized to purchase $596,792 in weapons and ammunition.  Ex. 9, ¶ 15 and Moore Decl. Ex. B, p. 3.

The MNSTC-I Contract with the CPA sets forth a number of requirements.  PSP personnel were required to be armed with assault weapons and to be mobile to escort high priority convoys into and through Iraq.  Ex. 9, ¶ 11 and Moore Decl. Ex. B, p. 5. The MNSTC-I Contract required PSP personnel to be equipped with wireless communication equipment, vehicles, and anything else necessary to perform their security mission.  Id., ¶ 12 and Moore Decl. Ex. B, ¶ 6.  PSP personnel were required to have experience providing security, driving evasively, handling weapons, and controlling civil disturbances, among other things.  Id., ¶ 13 and Moore Decl. Ex. B, p. 6.  The MNSTC-I Contract dictated the formation of Liaison Teams, Support Teams, Convoy Tracking, the Command and Control Cell, and a Training program.  See Moore Decl. Ex. B, pp. 4-5.

In December 2003, the CPA authorized an increase in spending for weapons and ammunition by $97,023.  Ex. 9, Moore Decl. Ex. C, p. 2.  In this December 2003 modification, the CPA also stated that all equipment purchased under the MNSTC-I Contract would become the property of CPA at the end of the contract term.  Id., pp. 1, 3. More importantly, the scope of the MNSTC-I Contract was expanded to include the provision of border security by MNSTC-I Contract personnel at three border crossing points at Zakho near Turkey, Al Walid near Syria, and Trebil near Jordan, on a 24/7 basis.  Id., p. 4.  DI LLC established a site in Trebil, which was furnished with radio equipment as required by the MNSTC-I Contract.  Ex. 9, ¶ 16.  In addition, the CPA required a Maneuver Support Command Liaison, who would track each convoy and be

able to alert DOD's quick reaction forces or emergency medical support via military grid coordinates in the event of "enemy contact."  Id.

In January 2004, the MNSTC-I Contract was again modified.  See Ex. 9, Moore Decl. Ex. C.  The spending authorization for weapons and ammunition was decreased by $3,289 to $93,734.  Id., p. 2.  In addition, there was another change in the Scope of Work under the contract.  This time, DI LLC was required to provide up to sixteen unguarded OFF convoys with a two-man Observation & Facilitation Team (OFT), who were required to be Iraqi nationals.  Id.

On July 25, 2004, there was another MNSTC-I Contract modification.  As a result of the dissolution of the CPA after the transition of authority to the sovereign Iraqi interim government, references to the UN's OFF Program in the Security Contract were changed to "PCO and Office of Security Transition (OST)." [5]  Ex. 9, ¶ 10 and Moore Decl. Ex. F.

3.    The Accident on September 3, 2004

On the day of the accident, Plaintiff and his co-worker were traveling with a security convoy to Trebil so that they could install Codan high frequency radio equipment at the Trebil site.  Ex. 9, ¶ 17.  Mr. McCants was one of the drivers identified by Plaintiff in his Complaint.  See Complaint, ¶ 22.  Mr. McCants was a PSP in Iraq.  Ex. 10 at 63 (Deposition of James McCants).  He was employed by DynCorp International FZ-LLC (which is not a party to this case).  Id. at 139.

---

[5] OST was an arm of the Multi-National Security Transition Command-Iraq. Ex. 9, ¶ 10.  The Multi-National Security Transition Command-Iraq (MNSTC-I) is headed by U.S. Army Lieutenant General Martin E. Dempsey.  See MNSTC-I Leadership Biographies available at http://www.mnstci.iraq.centcom.mil/leaders.htm.  The mission of the MNSTC-I is to assist the Iraqi Government develop, organize, train, equip, and sustain an Iraqi Security Force.  See MNSTC-I Mission Statement, available at http://www.mnstci.iraq.centcom.mil/mission.htm.  Thus, it is clearly a program of the U.S. military.

244130.1

Mr. McCants completed a two-week PSP training course in July 2004. Id. at 66. This training course covered standard operating procedures for providing security for the individuals being escorted in different scenarios, including fire fights, accidents and vehicle immobilization; analyzing and evaluating surroundings to determine threat levels; recognizing car bombs, improvised explosive devices, and snipers; different weapons training; and driving techniques and speeds (including evasive maneuvers and driving in hostile areas or during fire fights). Id. at 66-69. PSPs received training on how to determine the number of appropriate vehicles needed for a mission, the formation of those vehicles and the sequence of those vehicles in a convoy, the speed at which security convoys should travel, and how to adjust travel speeds and plans based on the threat level. Ex. 10 at 69-84.

Plaintiff was traveling in a five-vehicle security convoy to Trebil. See Ex. 12, p. 2 (Serious Incident Report). There was an Armed Security Escort Team (ASET) consisting of four sedans and one Ford Expedition. Id. Plaintiff, his co-worker, Mr. McCants, Mark Greenlee, and a translator were traveling in the Ford Expedition. Ex. 10 at 110. The members of the ASET were Iraqi nationals who are part of the MNSTC-I. See Ex. 11, p. 2. Plaintiff wore body armour (Complaint, ¶ 31), and was armed with a 9mm handgun. See Ex. 12, p. 3 (Handwritten Report by Plaintiff dated September 6, 2004).

Before leaving Baghdad, the security convoy was given an intelligence briefing about the threat level for their route. Ex. 10, pp. 85-86, 93. The intelligence briefing was given by military officers as well as DynCorp commanders. Ex. 10 at 85; see Ex. 9, ¶ 19. While traveling, the security convoy received real-time intelligence updates on the

security threat level from the first vehicle that served as the observation vehicle, as well as from the Logistics Movement Command Center operated by the military.  Ex. 10 at 85-86.

Threat levels and security conditions in Iraq are very fluid and often changed in minutes.  Ex. 10 at 76.  The speed of road travel depended on a number of factors, but, as explained by Mr. McCants, "every moment is red," indicating danger, as soon as a security convoy leaves U.S. protected areas.  Id. at 79.  Road speed conditions depend not just on road conditions, which are mostly "blown up" anyway, but also on factors such as whether the security convoy was traveling "[d]uring or not during a fire fight[,] [g]etting shot at or not getting shot at[,] . . . [and] [h]aving cars blown up next to [you] or not have cars blown up next to [you]."  Id. at 80-81, 99.  In "heated" situations, which might include the threat of a car bomb or an IED [Improvised Explosive Devise], the security convoy "would increase speeds to whatever it took to get out of that situation."  Id. at 82.

After Plaintiff and his associate completed their work, the security convoy left Trebil.  Complaint, ¶ 29.  As the security convoy with Plaintiff was arriving in Rutbah, the security convoy was alerted by the observation vehicle that there were stationary trucks with people gathered around the trucks on the side of the road on which they were traveling.  Ex. 10 at 108, 141-143.  The trucks had not been at this location in the morning when the security convoy was traveling to Trebil.  Id. at 142.  The security convoy considered the presence of the trucks as a threat because the trucks might have contained explosives or the security convoy might have been targeted as they drove past the trucks.  Id. at 142-143.  Because of the alert, the entire security convoy increased their speed to about 150 kpm (or about 93 mph) as they approached these trucks.  Id. at 107.

Mr. McCants followed the lead vehicle in the security convoy by about three to four car lengths. Id. at 121, 122. The entire security convoy continued to travel at a high rate of speed and went into the center lane of the road as they approached the area where the trucks were located. Id. at 122. Mr. McCants saw a black object come into the road and he swerved to avoid the black object. Id. at 109. The vehicle flipped and landed on an embankment on the other side of the road. Id. at 110. The other vehicles in the security convoy quickly created a security circle around Mr. McCants' vehicle. Id. Mr. McCants commandeered an Iraqi taxi cab, an orange and white Suburban, and used it to transport Plaintiff and the others to a U.S. military base about a mile and a half down the road from where the accident occurred. Id. at 114-115. Plaintiff and the other injured occupants of the vehicle were treated immediately by military base staff. Id. at 116-117.

The ASET were not permitted on the military base because they were Iraqi nationals. Id. at 119. Thus, they were sent back to Trebil until "the Expats" (Messrs. McCants and Greenlee and Plaintiff and his co-worker) were released. Id. at 118-119. Mr. Greenlee, Plaintiff's co-worker, and the interpreter were "Medevaced" out. Id. at 118. Eventually, Mr. McCants, Plaintiff, and a Jordanian driver got back into the commandeered Suburban, reunited with the ASET, and drove back to Baghdad. Id. at 118-119.

4.     The Issues Raised by Plaintiff Are Constitutionally Committed to the Political Branches

As recognized by the courts, "[m]atters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention." Bancoult v. McNamara, 445 F.3d 427, 433 (D.C. Cir. 2006). Indeed, "[i]t is well established that decisions pertaining to national security, such as whether and how to use military forces,

are entrusted to the political branches." El-Shifa, 402 F. Supp. 2d at 274 (quotations and citations omitted).  "Thus, 'the fundamental division of authority and power established by the Constitution precludes judges from overseeing the conduct of foreign policy or the use and disposition of military power; these matter are plainly the exclusive province of Congress and the Executive.'"  Bancoult, 445 F.3d at 433 (quoting Luftig v. McNamara, 373 F.2d 664, 665-666 (D.C. Cir. 1967), cert. denied, 387 U.S. 945 (1967)(per curiam)).

As acknowledged by this Court in El-Shifa, the "text of the Constitution commits to the executive exclusively a decision to engage the military on foreign soil in protection of national security."  El-Shifa, 402 F. Supp. 2d at 274 (citing Article II, § 2 of the Constitution, which provides that "the president shall be Commander in Chief of the Army, and Navy of the United States, and of the Militia of the several States").  With respect to foreign policy, the President has "plenary and exclusive power in the international arena and acts as the sole organ of the federal government in the field of international relations."  Id. (citations and quotations omitted).   See also Bancoult, 445 F.3d at 433-434.

In this case, Defendant DI LLC was a government contractor providing private security services and border security services in Iraq.  The MNSTC-I Contract was initially entered into with the CPA.  Even though State became the Chief of Mission after the transition of authority from the CPA to the sovereign Iraqi interim government, DOD, under State leadership, continued to oversee the MNSTC-I Contract through PCO.  To that end, the MNSTC-I Contract was modified in July 2004 to reflect that the services provided by DI LLC would be in support of the PCO and a branch of the MNSTC-I (which was also led by U.S. military).  DI LLC continued to communicate with a DOD

contracting officer and it is subject to audit by the Defense Contract Auditing Agency, an agency of the DOD. Ex. 9, ¶ 20.

As described above, the U.S. military determined that it was not the policy of the military to provide security for U.S. civilian government agencies and reconstruction contractors. DOD's decision created a great void that the U.S. Government filled by entering into contracts with PSPs who were expected to be fully equipped with weapons, vehicles, radio communications, Global Positioning Systems, and any other material necessary to complete their security mission. The need for PSPs increased as the violence from the insurgencies in Iraq against the military, contractors, and civilians escalated. PSPs were expected to fulfill a wide range of roles, including the provision of static security (security for housing areas and work sites), personal security details (security for high-ranking U.S. officials), security escorts (security for government employees, contractor employees, or others as they move through Iraq), convoy security (security for vehicles and their occupants as they make their way into Iraq or within Iraq), and security advice and planning.

In essence, the MNSTC-I Contracts expanded the capability of the U.S. military and performed protective services that the military decided not to provide to U.S. civilian government agencies and reconstruction contractors. In addition, rather than assigning military personnel, the U.S. Government provided border security personnel at three border locations, including Trebil through DI LLC's MNSTC-I Contract. Finally, the MNSTC-I Contract required the inclusion of Iraqi nationals as part of the security teams. Thus, the U.S. Government used the MNSTC-I Contract to fulfill its military security and training needs.

24

The operation in which Plaintiff was involved as a subcontractor was in support of these military objectives. The radio communications equipment installed by Plaintiff and his co-workers was in furtherance of DOD's assignment of border security responsibilities to DI LLC under the MNSTC-I Contract as well as the convoy security responsibilities. See Ex. 9, ¶ 16. The radio equipment was also the property of the DOD since the equipment was required to be conveyed to DOD at the end of the contract.

Moreover, the MNSTC-I Contract reflects a policy decision of the military and the Executive not to provide military security services to U.S. civilian governmental agencies and reconstruction contractors, but to contract those services out to private security providers. By doing so, Defendants were an extension of the military, providing services that the military would not. The U.S. Government authorized expenditures on weapons and ammunition, provided intelligence briefings based on military intelligence sources, and authorized PSPs to use weapons and ammunition to protect themselves when necessary. In summary, if the Court "were to hold that the executive owed a duty of care toward" the contractors, or that the decision regarding the provision of security in Iraq to civilian government agencies and contractors "had to comport with some minimum level of protections, [the Court] would be meddling in foreign affairs beyond [its] institutional competence." Bancoult, 445 F.3d at 437. See also Fisher, 2006 U.S. Dist. LEXIS 68413 at *15-16 (holding that the court could not try a case "set on a battlefield during war-time without an impermissible intrusion into powers expressly granted to the Executive by the Constitution"). Thus, dismissal of the entire Complaint under the first Baker factor is warranted in this case.

5.    <u>The Issues Raised by Plaintiff Are Not Susceptible of Resolution by Judicially Discoverable Standards</u>

Dismissal under the second <u>Baker</u> factor is warranted here because there are no judicially discoverable and manageable standards to resolve the issues in this case. Specifically, Plaintiff alleges that Defendants acted in a negligent and reckless manner amounting to gross negligence and that Defendants allegedly breached a contract to which Plaintiff is allegedly a third party beneficiary because the drivers, alleged to be employees of Defendants, drove at high rates of speeds.

Plaintiff was being escorted by PSPs and an Iraqi security team when the accident occurred.   Ex. 9, ¶ 17; Ex. 11.   The PSPs were briefed by military and civilian commanders prior to and during their trip.  Ex. 10 at 85; <u>see</u> Ex. 9, ¶ 19.  By no means was Plaintiff's journey between Baghdad and Trebil one where he could "ride with the windows down waving at people."   Ex. 10 at 79.   To the contrary, Plaintiff himself acknowledged the possible danger associated with traveling through Iraq by wearing body armour and arming himself with a 9mm handgun.  Complaint, ¶ 31; Ex. 12, p. 3.

Mr. McCants, Mr. Greenlee, and the four sedans carrying the Iraqi security team (ASET) were trained to avoid and/or extract themselves and their clients from situations that might possibly place them in a "kill zone," such as a gathering of trucks and people on the side of the road.  <u>See</u> Ex. 10 at 82.  It was possible that there were explosives in the trucks or that the people on the side of the road would pull out guns and starting shooting or throwing bombs.  Ex. 10 at 142-143.  The Iraqi security team recognized the hazard and attempted to lead the entire security convoy in which Plaintiff was traveling through the "kill zone" as quickly as possible.  Ex. 10 at 107.

244130.1

Moreover, road speeds depended on a number of conditions, including the road itself (which in many cases were destroyed by bombings), the presence or absence of fire fights or gun shots or other artillery, and the presence or absence of any other threat, such as car bombs or IEDs. Ex. 10 at 80-81, 99. In certain circumstances, the security convoy traveled as quickly as possible at whatever speed necessary to remove themselves from potential danger. Id. at 82. In short, this was not an ordinary traffic accident. Given the escalating violence against coalition forces and civilian contractors in Iraq, the security convoy took evasive steps to avoid getting trapped in a "kill zone."

Accordingly, in order to resolve Plaintiff's negligence and breach of contract claims, this Court would have to determine what would have been a reasonable course of action in light of the fact that Plaintiff was traveling in a war zone, that Plaintiff was traveling in a coalition security convoy with Iraqi national security personnel that was likely to be, and have been, targeted for attacks by insurgents, and that it might have been possible for a dog to be strapped with explosives and used as a carrier to get the explosives as close to the coalition security convoy as possible for maximum damage. See Ex. 13 (Borzou Daragahi, Servants - and Weapons - of War, L.A. Times, Aug. 10, 2005, available at http://www.borzou.com/stories /2005/20050810.mht (reporting on the use of dogs rigged with explosives by insurgents in Iraq)); Ex. 14 (17 Killed in Violence Across Iraq, ABC Online, Aug. 16, 2005, available at http://www.abc.net.au/ news/newsitems/200508/s1438242.htm (reporting that Iraqi insurgents frequently use booby-trapped dogs in their attacks)); Ex. 15 (Terrorists tie bomb belt to dog in Iraq, Telegraph.co.uk, 5/27/05, available at http://www.telegraph.co.uk/core/ Content/displayPrintable.jhtml;jsessionid=ERV1F4A114RHQFIQMFSFGGAVCBQ0IV

0?xml=/news/2005/05/27/wirq27.xml&site=5&page=0).  Thus, the suggestion, as made by Plaintiff in this lawsuit, that he would not have been injured if Mr. McCants simply hit the dog instead of swerving to avoid the dog demonstrates the difficulty of this Court's task -- "reasonableness" is a difficult term to define when the actions occur in a war zone.

The Court might also have to review and evaluate the military's standard operational procedures for transporting civilian government contractors in Iraq; assess their validity and functionality in Iraq; determine if adequate protection is being provided for government contractors; consider whether the security procedures in place were adequate given the possibility of numerous factors, such as fire fights, gun shots and other artillery, bombs and IEDs; evaluate the strength of the military's intelligence gathering efforts; assess the soundness of the warnings given on that day and the responses made in reaction thereto; and determine the appropriateness of the reactions and actions taken that day.  For instance, instead of swerving without losing speed, the Court would have to determine whether the driver should have slowed down, which would have slowed the rest of the military convoy and exposed everyone in the convoy to a possible threat of harm from a bomb, IED or gun shots.

In addition, to determine whether Defendants were negligent, the Court would have to determine whether any negligence occurred while Defendants were performing security services that the military could have provided in a war zone.  The Court would have to consider whether the training received by Mr. McCants on the "standard operating procedures" as a PSP was adequate and sufficient to provide him with the knowledge and skills to respond to possible threats of violence on roadways in Iraq, whether the intelligence reports provided by the military were accurate, and whether the

U.S. military's decision to require Iraqi security teams instead of U.S. security teams was a contributing factor to the accident given the noted lack of preparedness and training by Iraqi nationals in security matters.  See Ex. 8 at 4.

Clearly, there are no standards by which this Court could judicially assess whether the standard operating procedures on the transport of civilian government contractors -- i.e., when faced with a possible threat, traveling at whatever speeds necessary to avoid the threat -- caused or contributed to Plaintiff's injuries.  This is not a "garden variety road wreck."  Whitaker, 2006 U.S. Dist. LEXIS 45708 at *12 (quotation and citation omitted).  It "occurred in a combat zone during wartime . . . ."  Id.  As acknowledged by this Court, an "attempt to decide such a matter without the necessary expertise and in the absence of judicially manageable standards would be to entangle the court in matters constitutionally given to the executive branch."  El-Shifa, 402 F. Supp. 2d at 274 (citation and quotation omitted).  Federal courts do not have "covert agents, . . . no intelligence sources, and  . . . no policy advisor" to evaluate the president's "policy decisions on issues of national security, foreign relations, or military engagement."  Id. at 274-75 (citations and quotations omitted).

In short, the "question here is not just what a reasonable driver would do - it is what a reasonable driver in a combat zone, subject to military regulations and orders, would do."  Whitaker, 2006 U.S. Dist. LEXIS 45708 at *12-13.  This Court should not "recast[] foreign policy . . . in tort terms" and "define the standard for the" PSP's and military's policies, procedures, and protocols.  Bancoult, 445 F.3d at 434 (quoting Schneider v. Kissinger, 412 F.3d 190, 197 (D.C. Cir. 2005), cert. denied, 126 S. Ct. 1768 (2006)); Ibrahim v. Titan Corp., 391 F. Supp. 2d 10, 18 (D.D.C. 2005) (noting

"Congressional acknowledgement that war is an inherently ugly business for which tort claims are simply inappropriate"). Accordingly, this case should be dismissed based on the second <u>Baker</u> factor.

> 6.    The Issues Raised by Plaintiff Cannot Be Decided Without an Initial Policy Determination Reserved for the Political Branches

Dismissal pursuant to the third <u>Baker</u> factor is warranted because to determine Defendants' liability, the Court would have to make a policy determination about how civilian government contractors should have been protected and transported in a country in which the United States is engaged in military operations. The Court may also have to determine whether it was sound policy of the U.S. Government, in essence, to create a civilian security force to provide armed protection to defend themselves against the enemy with weapons and ammunition. "A judicial inquiry into the reasonableness of the judgments made regarding" the transport of civilian government contractors "could properly interfere with the executive's role in commanding the country's military forces, and could require an inappropriate second-guessing of executive branch decisions." <u>El-Shifa</u>, 402 F. Supp. 2d at 275.

> 7.    The Issues Raised by Plaintiff Cannot Be Resolved Without Disrespecting the Policy Decisions of the DOD and the Executive Branch

Finally, dismissal pursuant to the fourth <u>Baker</u> factor is warranted because the Court's determination that Defendants were negligent would contravene the policy decision of the DOD and the Executive Branch to train and regulate private security providers to provide sufficient and adequate protection to the U.S. civilian government agencies and reconstruction contractors in lieu of equivalent military protection. In other words, a finding of negligence would improperly pass judgment on the efficacy of the

DOD's policy not to use military personnel for security convoys. See Bancoult, 445 F.3d at 435 (holding that the court "cannot second-guess the degree to which the executive was willing to burden itself by protecting the [people's] well-being while pursuing the foreign policy goals of the United States").

In summary, DOD and the Executive Branch decided that the military would not be used to provide security for civilian agencies or contractors. As a necessary result of this decision, DOD contracted with private security providers to provide the necessary security. PSPs were provided with weapons, vehicles, communications equipment, and any other equipment necessary to act as a stand-in for the military. In essence, PSPs were a civilian security force empowered by the U.S. Government to armed protection that was prepared to respond to enemy attacks. Decisions and policies about use and/or supplementing the military's resources are decisions pertaining to national security that are entrusted to DOD and the Executive. Industria Panificadora, S.A. v. United States, 763 F. Supp. 1154, 1159-1160 (D.D.C. 1991), aff'd, 957 F.2d 886 (D.C. Cir.), cert. denied, 506 U.S. 908 (1992). Plaintiff's claims would require judicial review "of a presidentially-directed military operation in a foreign country[,]" which "goes to the heart of the political question doctrine." Id. at 1161.

For all of the foregoing reasons, Defendants respectfully submit that the claims raised by Plaintiff in his Complaint are nonjusticiable under the political question doctrine and that this case should be dismissed in its entirety pursuant to Rule 12(b)(1) of the Federal Rules for lack of subject matter jurisdiction.

D.    PLAINTIFF'S CLAIMS ARE PRE-EMPTED BY THE GOVERNMENT CONTRACTOR DEFENSE AND THUS JUDGMENT ON THE PLEADINGS SHOULD BE GRANTED PURSUANT TO RULE 12(c)

At all times relevant to this Complaint, Defendants were government contractors pursuant to a hybrid military/nonmilitary government contract.  Defendants provided protective security services to other U.S. reconstruction contractors because the U.S. military had decided not to provide such security services and delegated such tasks to contractors such as Defendants.  According, any claims arising from or based on their activities are pre-empted by the government contractor defense

1.    The Government Contractor Defense

In Boyle v. United Tech. Corp., 487 U.S. 500 (1988), the Supreme Court held that a military government contractor that built the helicopter involved in the death of a U.S. Marine could not be held liable "when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States."  Boyle, 487 U.S. at 512.  In reaching its holding, the Supreme Court concluded that the procurement of equipment by the federal government was an "area of uniquely federal interest," id. at 507, and that there was a significant conflict between the application of state law to an exercise of discretionary authority by the federal government, id. at 511-512.  Specifically, the Supreme Court held:

> We think that the selection of the appropriate design for military
> equipment to be used by our Armed Forces is assuredly a discretionary
> function . . . .  It often involves not merely engineering analysis but
> judgment as to the balancing of many technical, military, and even social
> considerations, including specifically the trade-off between greater safety
> and greater combat effectiveness.  And we are further of the view that

permitting "second-guesses" of these judgments . . . through state tort suits against contractors would produce the same effect sought to be avoided by the [Federal Tort Claims Act discretionary function] exemption. . . . It makes little sense to insulate the Government against financial liability for the judgment that a particular feature of military equipment is necessary when the Government produces the equipment itself, but not when it contracts for the production.

Id. at 511.

> 2.    The Government Contractor Defense Applies to Military Service Contracts

In Ibrahim v. Titan Corp., 391 F. Supp. 2d (D.D.C. 2005), and in a related case, Saleh v. Titan Corp., 436 F. Supp. 2d 55 (D.D.C. 2006), this Court considered the application of the government contractor defense to civilian government contractors that provided interrogators and interpreters to the U.S. military. The government contractors in these two cases argued that the government contractor defense automatically preempted tort claims, including intentional tort claims, because their employees were "soldiers in all but name" who were engaged in combatant activities while providing services to the U.S. military at Abu Ghraib prison in Iraq pursuant to a government contract. Ibrahim, 391 F. Supp. 2d at 19.

District Judge James Robertson, who presided over both cases, drew a distinction between immunity and preemption, holding that the former was "not an affirmative defense that may ultimately be put to the jury, but a decision by the court at an early stage that the defendant is entitled to freedom from suit in the first place," and declined to extend federal immunity to nongovernment employees. Id. at 17 & n.5. Instead, Judge Robertson held that "preemption under the government contractor offense is an affirmative defense, with the burden of proof on the defendants." Id. at 17-18.

244130.1

Judge Robertson then applied the <u>Boyle</u> analysis, and concluded that the treatment of prisoners during wartime implicated "uniquely federal interests" and that "[s]tate law regulation of combat activity would present a significant conflict with this federal interest in unfettered military action," even with respect to intentional torts. <u>Id.</u> 18-19. Judge Robertson, however, could not conclude that the government contractor defense preempted the tort allegations in either case because the defendant government contractors did not provide sufficient facts regarding their contractual responsibilities, to whom they reported, how they were supervised, and the structures of command and control. <u>Id.</u> at 19. To that end, the government contractors had only provided a "Statement of Work" section from their contract to support their claim. <u>Id.</u> at 19. While he noted that "[i]f they were indeed soldiers in all but name, the government contractor defense will succeed," Judge Robertson held that the defendants did not produce enough information to satisfy its burden demonstrating that they were entitled to preemption. <u>Id.</u> Holding that full discovery was not appropriate at this stage, District Judge Robertson indicated that he would entertain a summary judgment motion after limited discovery on the preemption issue. <u>Id.</u> at 19; <u>Saleh</u>, 436 F. Supp. 2d at 57 (holding that there was "no reason to treat any of the claims and defenses asserted in this case differently from the way that they were treated in <u>Ibrahim</u>").

      3.      <u>The Government Contractor Defense Applies to Nonmilitary Service Contracts</u>

In <u>Ibrahim</u> and <u>Saleh</u>, Judge Robertson did not consider whether the government contractor defense applied to nonmilitary government contractors because the government contractors in those cases contracted directly with the U.S. military. <u>Ibrahim</u>, 391 F. Supp. 2d at 12; <u>Saleh</u>, 436 F. Supp. 2d at 56. Prior decisions in this

244130.1

Court, however, have applied the government contractor defense to nonmilitary government contractors in a product liability context. See Haltiwanger v. Unisys Corp., 949 F. Supp. 898, 901-907 (D.D.C. 1996) (holding that the "three Boyle standards -- approval, conformance, and relative knowledge -- form the substantive basis of the government contractor defense"); Fagans v. Unisys Corp., 945 F. Supp. 3, 5-6 (D.D.C. 1996) (applying the three-part Boyle test).

While it did not deem its holding as a "government contractor defense," the Supreme Court in Yearsley v. W.A. Ross Constr. Co., 309 U.S. 18 (1940), which involved government contractors who were performing work pursuant to a contract with the United States Government, under the direction of the Secretary of War and the Chief of Engineers, to improve the navigation of the Missouri River, held that a government contractor could not be liable where the "authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress, there is no liability on the part of the contractor for executing its will." Yearsley, 309 U.S. at 20-21. The Supreme Court held that a government contractor could only be found liable for acting on behalf of and pursuant to orders from the U.S. Government if it can be shown that the contractor "exceeded his authority or that it was not validly conferred." Id. at 21 (citations omitted). The Supreme Court in Boyle noted that the "federal interest justifying this holding surely exists as much in procurement contracts as in performance contracts." Boyle, 487 U.S. at 506. To that end, courts have recognized that the difference between a performance contract and a procurement contract is a "distinction without a difference because the federal interest in performance of a contract, as in Yearsley, [is] as equally compelling as the federal interest in the procurement contract, as

in <u>Boyle</u>.  Performance therefore is on an equal footing with procurement, provided that

there exists the uniquely federal interest . . . ."  <u>Richland-Lexington Airport Dist. v. Atlas</u>

<u>Prop., Inc.</u>, 854 F. Supp. 400, 422 (D.S.C. 1994) (holding that the government contractor

defense applied to service contracts and citing <u>Boyle</u>, 487 U.S. at 506-507).  <u>See</u> <u>also</u>

<u>Hudgens v. Bell Helicopters/Textron</u>, 328 F.3d 1329 (11th Cir. 2003) (holding that the

government contractor defense applied to a maintenance service contract).

  In summary, as the above cases demonstrate, the government contractor defense

is appropriate and proper whether the government contract at issue is with the military or

nonmilitary government entity and whether the government contract is for performance,

procurement or production.  The central focus is on the existence of a unique federal

interest and whether a significant conflict exists by regulating this uniquely federal

interest with state law.

  4.  <u>The Government Contractor Defense Applies in This Case</u>

  In this case, the MNSTC-I Contract is a hybrid military/nonmilitary government

contract.  The actual contracting government entity is the Department of State because

the U.S. Ambassador is Chief of Mission in Iraq pursuant to a Presidential Directive.  <u>See</u>

Ex. 6, at 4.  However, Defendants' activities are directed and supervised by the U.S.

Army, which, although under the jurisdiction of the State Department, oversees

Defendants' MNSTC-I Contract through the PCO.  <u>Id.</u>

  The nature of the MNSTC-I Contract also indicates that it is more military than

civilian.  To that end, PSPs supplement U.S. military forces by providing protective

services to U.S. civilian government agencies and U.S. reconstruction contractors that the

U.S. military might have otherwise provided, but for its decision not to.  <u>See</u> Ex. 7, at 3,

6, 10.  PSPs provide a number of security services, including static security (security for housing areas and work sites), personal security details (security for high-ranking U.S. officials), security escorts (security for government employees, contractor employees, or others as they move through Iraq), convoy security (security for vehicles and their occupants as they make their way into Iraq or within Iraq), and security advice and planning.  Id. at 9.  As of 2005, DOD estimated that there were at least 60 PSPs working in Iraq with approximately 25,000 employees.  Id. at 8.  Between August 2003 and May 2004, State, USAID, USACE, and the CPA had obligated almost $456 million in contracts with PSPs.  Id. at 13.

Without question, the use of private contractor security services is a "uniquely federal interest" because it is based on the U.S. military's decision not to provide security for contractors as well as U.S. civilian government agencies.  Moreover, there would be a significant conflict between this federal interest and state law adjudication of Plaintiff's claims because the application of a standard of care or the enforcement of a contract obligation will impede or interfere with the U.S. Government's foreign and military policies in a war zone.  Consequently, Defendants are entitled to assert the government contractor defense.

In summary, the government contractor defense applies to military and nonmilitary service contracts entered into by the United States Government.  Because Defendants provided security services otherwise provided by the U.S. Military after the U.S. military determined that it would not do so, they were supplementing the capabilities of the military.  Thus, Plaintiff's claims are pre-empted by the government contractor

defense.  Therefore, judgment should be granted on the pleadings and the Complaint dismissed pursuant to Rule 12(c) of the Federal Rules.

## **CONCLUSION**

In summary, for the foregoing reasons, Defendants respectfully submit that this case should be dismissed in its entirety for lack of subject matter jurisdiction based on the political question doctrine under Rule 12(b)(1).  Alternatively, Defendants respectfully submit that the Court should grant judgment on the pleadings under Rule 12(c).  In the event that this Court determines that the case should not be dismissed or that judgment should not be granted, Defendants respectfully request that the parties be permitted to engage in limited discovery on the issues presented in this Motion to Dismiss.

October 26, 2006                                   Respectfully submitted,

                                                  WILSON, ELSER, MOSKOWITZ,
                                                  EDELMAN & DICKER LLP


                                                  _____/s/_____
                                                  Robert B. Wallace (D.C. Bar No. 108571)
                                                  Kevin Farrell (D.C. Bar No. 492142)
                                                  Yoora Pak (D.C. Bar. No. 467007)
                                                  The Colorado Building
                                                  1341 G Street, N.W., 5th Floor
                                                  Washington, D.C. 20005
                                                  (202) 626-7660 (telephone)
                                                  (202) 628-3606 (facsimile)

244130.1

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of the **DEFENDANTS' MOTION**

**TO DISMISS  FOR LACK OF SUBJECT MATTER JURISDICTION AND**

**MOTION FOR JUDGMENT ON THE PLEADINGS** was served via ECF on this

26th day of October, 2006, to:


    Nathan I. Finkelstein, Esq.
    Laurie B. Horvitz, Esq.
    Robert J. Goldman, Esq.
    Finkelstein & Horvitz, P.C.
    7315 Wisconsin Avenue
    Suite 400 East
    Bethesda, MD 20814

    *Attorneys for Plaintiff*



            _____/s/_____
            Robert B. Wallace

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**Civil Division**

| | |
|---|---|
| **RONALD WOOD,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | Case No. 1:06-cv-1616 CKK |
| **v.** ) | |
| ) | |
| **DYNCORP**, *et al.*, ) | |
| ) | |
| **Defendants**. ) | |

## ORDER

Upon consideration of Defendants' Motion to Dismiss for Lack of Subject Matter

Jurisdiction, Plaintiffs' Opposition thereto, and Defendants' Reply, IT IS HEREBY

ORDERED THAT DEFENDANTS' MOTION TO DISMISS IS GRANTED IN ITS

ENTIRETY.  Plaintiffs' Complaint is hereby DISMISSED WITH PREJUDICE.


_____

United States District Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**Civil Division**

| | |
|---|---|
| **RONALD WOOD,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | Case No. 1:06-cv-1616 CKK |
| **v.** ) | |
| ) | |
| **DYNCORP,** *et al.*, ) | |
| ) | |
| **Defendants**. ) | |

## <u>ORDER</u>

Upon consideration of Defendants' Motion for Judgment on the Pleadings, Plaintiffs'

Opposition thereto, and Defendants' Reply, IT IS ORDERED THAT DEFENDANTS'

MOTION FOR JUDGMENT ON THE PLEADINGS IS HEREBY GRANTED.  Plaintiffs'

Complaint is hereby DISMISSED WITH PREJUDICE.


_____
United States District Judge

244130.1