LEXSEE 2006 US DIST LEXIS 68413

**INGRID FISHER, INDIVIDUALLY AND AS SUCCESSOR IN INTEREST TO DECEDENT, STEVEN FISHER, ET AL, Plaintiff, v. HALLIBURTON, INC., ET AL, Defendants.**

**[REDACTED VERSION FOR CM/ECF FILING], CIVIL ACTION H-05-1731**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION**

*2006 U.S. Dist. LEXIS 68413*

**September 22, 2006, Decided**
**September 22, 2006, Filed**

**SUBSEQUENT HISTORY:** Motion granted by, Complaint dismissed at *Fisher v. Halliburton, Inc., 2006 U.S. Dist. LEXIS 70048 (S.D. Tex., Sept. 27, 2006)*

**PRIOR HISTORY:** *Fisher v. Halliburton, 2006 U.S. Dist. LEXIS 26971 (S.D. Tex., May 8, 2006)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, injured truck drivers and the families and personal representatives of deceased truck drivers, filed suit against defendant civilian contractors, seeking to recover damages in connection with an anti-American attack on two convoys that the truck drivers were operating in Iraq as part of a U.S. Army mission to deliver fuel. The contractors moved for dismissal.

**OVERVIEW:** Plaintiffs alleged that the contractors misrepresented the safety risks of working in Iraq and that the contractors exercised complete control over the decisions concerning the convoys' departures and routes. The contractors argued that the court lacked jurisdiction to entertain the suit because it presented a non-justiciable political question. The court agreed, reasoning that (1) the prominent issues of the case dealt with the Army's decisions in directing the convoy and providing security for it, and the authority for directing military decisions had been constitutionally committed to the President under U.S. Const. art. II, § 2, cl. 1; (2) there was a lack of judicially discoverable and manageable standards for resolving the issues of the case because it was impossible for the court to extricate the contractors' acts from the Army's acts where the contracts and Army regulations showed that the Army was responsible for the security of the convoys and chose routes for the convoys; and (3) in order to hear the case, the court would have to substitute its judgment for that of the Army, and the Army's wartime decisions presented an inappropriate question for judicial examination.

**OUTCOME:** The court granted the contractors' motion to dismiss and dismissed the suit with prejudice.

**LexisNexis(R) Headnotes**

*Civil Procedure > Justiciability > Political Questions > Separation of Powers*
*Constitutional Law > The Judiciary > Case or Controversy > Political Questions*
[HN1] A case may meet every other jurisdictional and justiciability hurdle and still be barred by the presence of a political question. Sometimes, the law is that the judicial department has no business entertaining the claim of unlawfulness. The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch. Based on the concept of the separation of powers, political questions are addressed and redressed by the people through the political process.

*Civil Procedure > Justiciability > Political Questions > General Overview*
*Constitutional Law > The Judiciary > Case or Controversy > Political Questions*
[HN2] With regard to the presence of a political question, the United States Supreme Court has set out a list of six formulations to aid courts in a discrim[inating inquiry]

EXHIBIT 1

into the precise facts and posture of a particular case. (1) Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; (2) or a lack of judicially discoverable and manageable standards for resolving it; (3) or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; (4) or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; (5) or an unusual need for unquestioning adherence to a political decision already made; (6) or the potentiality of embarrassment from multifarious pronouncements by various departments on one question. One of these formulations must be inextricable from the case at bar.

*Civil Procedure > Justiciability > Political Questions > Foreign Affairs*
*Civil Procedure > Justiciability > Political Questions > National Security*
*Constitutional Law > Congressional Duties & Powers > Raising Revenue*
*Constitutional Law > The Presidency > Commander in Chief*
*Constitutional Law > The Judiciary > Case or Controversy > Political Questions*
[HN3] The Constitution allocates the power of Commander in Chief of the United States Army and Navy to the executive branch. U.S. Const. art II, § 2, cl. 1. Additionally, the Constitution gives the power to raise and support Armies, provide and support a Navy, and to make Rules for the Government and Regulation of the land and naval Forces to Congress. U.S. Const. art. 1, § 8, cls. 12-14. Of the legion of governmental endeavors, perhaps the most clearly marked for judicial deference are provisions for national security and defense. Moreover, making war in a foreign land also implicates another equally compelling executive branch power, foreign policy. Not only does resolution of foreign policy issues frequently turn on standards that defy judicial application, or involve the exercise of a discretion demonstrably committed to the executive or legislature; but many such questions uniquely demand a single-voiced statement of the Government's views. In the realm of foreign relations, policy considerations render issues incompetent for a decision by the court.

*Civil Procedure > Justiciability > Political Questions > Foreign Affairs*
*Civil Procedure > Justiciability > Political Questions > National Security*

*Constitutional Law > The Presidency > Commander in Chief*
*Constitutional Law > The Presidency > Foreign Affairs*
*Constitutional Law > The Judiciary > Case or Controversy > Political Questions*
[HN4] The Constitution mandates that war and foreign policy are the provenance of the Executive. In recognition of this, courts have consistently held that issues involving war, and actions taken during war, are beyond judicial competence. Judicial intrusion into military matters is to be most cautiously and charily approached. The strategy and tactics employed on the battlefield are clearly not subject to judicial review.

*Civil Procedure > Justiciability > Political Questions > Separation of Powers*
*Constitutional Law > The Judiciary > Case or Controversy > Political Questions*
[HN5] Whether an issue presents a non-justiciable political question cannot be determined by a precise formula. The inquiry requires a court to posit whether a political question will arise during the course of the trial, not whether it is evident from the face of the complaint. The political question doctrine is designed to restrain the judiciary from inappropriate interference in the business of the other branches of government; the identity of the litigant is immaterial to the presence of these concerns in a particular case.

*Civil Procedure > Justiciability > Political Questions > National Security*
*Constitutional Law > The Judiciary > Case or Controversy > Political Questions*
[HN6] With regard to whether a case presents a non-justiciable political question, one of the most obvious limitations on a court is that judicial action must be governed by standard, by rule. Army decisions are an area not subject to judicial second-guessing.

*Military & Veterans Law > Civilian Employees*
[HN7] An Army publication entitled "Contractors on the Battlefield" states that: Contractor Management in the Military Environment. The regional combatant commander is responsible for accomplishing the mission and ensuring the safety of all deployed military, government civilian, and contractor employees in support of U.S. military operations. To fully integrate contractor support into the theater operational support structure, proper military oversight is imperative.

*Military & Veterans Law > Civilian Employees*

Case 1:06-cv-01616-CKK    Document 10-2    Filed 10/26/2006    Page 3 of 10

Page 3
2006 U.S. Dist. LEXIS 68413, *

[HN8] Under the Force Protection chapter, an Army publication entitled "Contractors on the Battlefield" states: Roles and Responsibilities. 6-4. Protecting contractors and their employees on the battlefield is the commander's responsibility. When contractors perform in potentially hostile or hazardous areas, the supported military forces must assure the protection of their operations and employees. The responsibility for assuring that contractors receive adequate force protection starts with the combatant commander, extends downward, and includes the contractor. 6-6. Protection for contractors involves active use of armed military forces to provide escort or perimeter security, and passive measures that include protective military equipment, training, and equipping of contractor employees in self-protection.

*Military & Veterans Law > Civilian Employees*
[HN9] Army Reg. 715-9 provides that contracted support service personnel shall not be supervised or directed by military or Department of the Army civilian personnel. A closer examination of the regulations demonstrates that the Army is, at the very least, significantly involved in transportation and force protection decisions. The regulations state: The Commander, AMC will coordinate transportation (i.e., to, from and within the theater), quality of life issues and force protection of deployed AMC contractors with the Army Service Component Command. Contractor employees will be expected to adhere to all guidance and obey all instructions and general orders issued by the Theater Commander.

*Civil Procedure > Justiciability > Political Questions > National Security*
*Civil Procedure > Justiciability > Political Questions > Separation of Powers*
*Constitutional Law > The Judiciary > Case or Controversy > Political Questions*
[HN10] The U.S. Army's decisions during a time of war present a particularly inappropriate question for judicial examination. It would be unseemly for a democracy's most serious decisions, those providing for common survival and defense, to be made by its least accountable branch of government.

*Civil Procedure > Justiciability > Political Questions > Separation of Powers*
*Constitutional Law > The Presidency > Commander in Chief*
*Constitutional Law > The Judiciary > Case or Controversy > Political Questions*
[HN11] The textual commitment of military decisions to coordinate branches has an inverse relationship to the lack of judicially discoverable and manageable standards for resolving the case. The more a decision is committed to another branch or branches of government, the less likely a court will find judicially discoverable and manageable standards to apply. The Constitution specifically gives the Executive Branch the role of Commander in Chief of the Army. U.S. Const. art II, § 2, cl. 1.

*Governments > Courts > Authority to Adjudicate*
[HN12] Courts are not tribal wisemen dispensing divinely or theoretically inspired judgments, but are limited to the application of predetermined law.

**COUNSEL:** [*1] For Ingrid Fisher, individually and as successor in interest to decedent Steven Fisher, Kristen Fisher, individually and as successor in interest to decedent Steven Fisher, S.F. Jr, a minor, individually and as successors in interest to decedent Steven Fisher by and through newt friend Ingrid Fisher, K.F., a minor individually and as successors in interest to decedent, Steven Fisher, by and through Next Friend Ingrid Fisher, Marjorie Bell-Smith, individually and as successor in interest to decedent Timothy Bell, C.S.T., a minor, individually and as successor in interest to decedent Timothy Bell by and through her Next Friend Jacqueline Tunstall, Andrew Jackson Bradley, individually and as successor in interest to decedent William Bradley, Hollie Hulett, individually and as successor in interest to decedent, Steven Hulett, Alexandria Slingerland, individually and as successor in interest to decedent Steven Hulett, Jack Slingerland, individually and as successor in interest to decedent, Steven Hulett, Lois Parker, individually and as successor in interest to decedent, Jeffrey Parker, Michael Brezovay, Nelson Howell, Betsy Montegue, individually and as successor in interest to decedent, [*2] Jack Montegue, J M, a minor, individually and as successor in interest to decedent Jack Montegue, by and through her Next Friend, Betsy Montegue, Donna Howell, Jackie Lester, Naomi Lester, William J Peterson, Edward Sanchez, Jr, Dana Sanchez, Calvin Keith Stanley, Raymond T Stannard, Ricky L Tollison, Danny R Wood, Lisa Hulett, individually and as successor in interest to decedent Steven Hulett, April Johnson, individually and as successor in interest to decedent Tony Johnson, James Blackwood, Joann Blackwood, N. T. C., a minor, individually and as successor in interest to decedent Timothy Bell by and through his next friend Karen Caffey, Timothy E Caffey, individually and as successor in interest to decedent Timothy Bell, Plaintiffs: Christina Anne Fountain, Newport Beach, CA; Jennifer R Johnson, Vincent D Howard, Lopez, Hodes et al -, Newport Beach, CA; Jennifer Lee Thompson, Ramon Rossi Lopez, Lopez, Hodes, Restaino, Milman & Skikos, Newport Beach, CA; Samuel Ainsworth Houston, Jennifer Bickham Swick,

Case 1:06-cv-01616-CKK   Document 10-2   Filed 10/26/2006   Page 4 of 10

Page 4
2006 U.S. Dist. LEXIS 68413, *

Cruse Scott et al, Houston, TX; Tobias A Cole, Midani Hinkle Cole, Houston, TX; Kenneth T Fibich, W Michael Leebron, II, Fibich Hampton, Houston, TX; Mary Katherine Bedard.

For [*3] Halliburton, a Corporation, Defendant: David Kasanow, McKenna Long et al, Washington, DC; Herbert Lawrence Fenster, Raymond B Biagini, McKenna Long & Aldridge, Washington, DC; James Stanley Teater, Katie J Colopy, Jones Day, Dallas, TX; Thomas A Rector, Jones Day, San Francisco, CA; James H Hall, Jones Day, Houston, TX.

For Kellogg Brown & Root Inc, a Corporation and Wholly Owned Subsidiary of Halliburton and KBR Holdings LLC, Service Employees International Inc., a Foreign Corporation and Wholly Owned Subsidiary of Halliburton and Kellogg Brown & Root International Inc, Defendants: Herbert Lawrence Fenster, Raymond B Biagini, McKenna Long et al, Washington, DC; James Stanley Teater, Katie J Colopy, Jones Day, Dallas, Tx; Thomas A Rector, Jones Day, San Francisco, CA; James H Hall, Jones Day, Houston, TX.

Does 4 through 10, Defendant, Pro se.

For Kellogg Brown & Root Services Inc, a Corporation and a Wholly Owned Subsidiary of Kellogg Brown & Root Inc, Kellogg Brown & Root International Inc, a Corporation and a Wholly Owned Subsidiary of Kellogg Brown & Root Inc, a Corporation, Defendants: James H Hall, Jones Day, Houston, TX.

For DII Industries LLC, a Wholly Owned [*4] Subsidiary of Halliburton Energy Services Inc, a Corporation, Defendant:Herbert Lawrence Fenster , Raymond B Biagini, McKenna Long et al, Washington, DC; James H Hall, Jones Day, Houston, TX.

Strategic Ecomm Inc, Defendant, Pro se.

Webrecruiter, Defendant, Pro se.

For KBR Holdings LLC, Halliburton Energy Services Inc, a corporation, Brown & Root Services, a Division of Kellogg Brown & Root Inc, a Corporation, Defendants: Katie J Colopy, Jones Day, Dallas, Tx.

For Reginald Cecil Lane, Linda Marlene Lane, Intervenor Plaintiff: Kenneth T Fibich, W Michael Leebron, II, Fibich Hampton, Houston, TX.

For Keith Richard, Non-Party, Movant: Robin P Hartmann, A Michael Warnecke, Haynes & Boone, Dallas, TX.

For United States of America, Amicus: Daniel David Hu, US Attorneys Office, Houston, TX.

For Los Angeles Times, T. Christian Miller, Interested Partys: Charles L Babcock, Jackson Walker LLP, Houston, TX.

**JUDGES:** Gray H. Miller, United States District Judge.

**OPINION BY:** Gray H. Miller

**OPINION:**

### MEMORANDUM AND ORDER

Pending before the court is defendants' motion to dismiss. n1 Dkt. 135. n2 After considering the parties' arguments, exhibits, and the applicable law, the [*5] court concludes that the case presents anon-justiciable political question. Accordingly, the court lacks jurisdiction to hear this case. As such the defendants' motion to dismiss is GRANTED.

> n1 The defendants filing the motion are Halliburton Company; Kellogg, Brown & Root, Inc., Service Employees International, Inc.; Kellogg, Brown & Root Services, Inc.; DII Industries, LLC; and Kellogg, Brown & Root International, Inc.

> n2 The memoranda in support and in opposition to the motion are filed with the court under seal. Dkts. 139, 140, 141, 149, 153, 155, 156, and 159. Additionally, the defendants filed a notice of supplemental authority, and plaintiffs responded, both not under seal. Dkts. 160 and 161.

### BACKGROUND

In 1985, as part of a program to augment Army forces, the United States Army implemented the Logistics Civil Augmentation Program or LOGCAP. n3 Under LOGCAP, n4 the Army awarded Brown & Root Services (KBR) contract No. DAAA09-02-D-0007 to provide essential services in support of the military [*6] in Iraq. n5 Military Task Orders 43 and 59 defined KBR's specific tasks, including the transportation services at issue in this case. To fill the jobs created by the contract, KBR recruited civilian personnel. KBR hired the plaintiffs n6 as part of a group to provide transportation services. After terminating their current employment, the plaintiffs were transported to Iraq and assigned to Camp Anaconda. n7

Case 1:06-cv-01616-CKK    Document 10-2    Filed 10/26/2006    Page 5 of 10

Page 5
2006 U.S. Dist. LEXIS 68413, *

n3 Dkt. 141, Exhibit B, at 1-1. The purpose of LOGCAP was to replace some services currently performed by Army personnel with civilian contractors. *Id.* Those Army personnel would then be available for other missions. *Id.*

n4 The court used definitions of Army terms and acronyms from the Records Management and Declassification Agency website. This database is available to the public at http://www2.arims.army.mil/abbreviation/MainMenu.asp.

n5 Dkt. 141, Exhibit C.

n6 The plaintiffs are the personal representatives of the deceased drivers, Steven Fisher, Timothy Bell, William Bradley, Steven Hulett, Jack Montegue, Jeffrey Parker and Tony Johnson; the injured drivers, Michael Brezovay, Nelson Howell, Jackie Lester, William Peterson, Edwards Sanchez Jr., Calvin Keith Stanley, Raymond T. Stannard, Ricky L. Tollison, Danny R. Wood, and James Blackwood; and their families. Although not all of the plaintiffs were truck drivers in Iraq, the court will use the term "the plaintiffs" throughout to mean either the truck drivers or those bringing the action according to context.

[*7]

n7 *See*, Dkt. 74.

On the morning of April 9, 2004, upon arriving at the convoy staging area, the plaintiffs learned the planned route for that day had been changed. The new route called for the convoys to deliver fuel to Baghdad International Airport (BIAP). BIAP was an unfamiliar destination for the drivers. n8 Many drivers merely followed the vehicle directly in front of them, who in turn, followed the Army's local Iraqi guide. n9 According to the Army report of the incident, military personnel, including six gunners, accompanied the plaintiffs' convoy. n10 Even so, the plaintiffs were the majority of the KBR manpower for the first of two convoys. The first convoy was attacked by anti-American forces and sustained heavy casualties. Six men were killed, eleven more were seriously wounded, and one man is still missing and presumed dead. n11

n8 Dkt. 141, Exhibit A-A, at 3-9.

n9 *Id.*

n10 *Id.*

n11 Dkt. 74, at 26.

[*8]

The plaintiffs originally filed their claim in Harris County District Court in April, 2005. Dkt. 1, Tab 2. The defendants timely removed the case to federal court on May 13, 2005. The plaintiffs' most recent complaint alleges, among other things, that (1) the defendants' recruitment activities included knowing fraudulent statements regarding the safety and nature of the civilian work in Iraq in order to induce plaintiffs to accept employment, (2) the defendants knowingly and intentionally deployed the first April 9th civilian convoy as a decoy into an area they knew to be under attack to ensure the safe passage of the second convoy, and (3) the defendants had complete control over the decisions of when, where and how to deploy civilian convoys. n12 Their causes of action include state law fraud claims, wrongful death, intentional infliction of physical and emotional distress, violations of civil rights under *§ 1983*, R.I.C.O., conspiracy, survivorship, and common law civil conspiracy. As a result they seek compensatory and exemplary damages.

n12 Dkt. 74, at 26.

[*9]

The defendants respond that the Army had control over the deployment and protection of convoys. n13 They argue that since their decisions are so interwoven with Army decisions, the court lacks jurisdiction over the case under the political question doctrine. n14 The court agrees.

n13 Dkt. 140.

n14 *Id.* They also argue that they are entitled to official immunity, and alternatively that the plaintiffs' only legal recourse is defined under the Defense Base Act, *42 U.S.C. § 1651 (a)*. *Id.* The court does not reach those issues, since its determination that it lacks jurisdiction renders them moot.

Case 1:06-cv-01616-CKK    Document 10-2    Filed 10/26/2006    Page 6 of 10

Page 6
2006 U.S. Dist. LEXIS 68413, *

**POLITICAL QUESTION**

[HN1] A case may meet every other jurisdictional and justiciability hurdle and still be barred by the presence of a political question. *Vieth v. Jubelirer, 541 U.S. 267, 277, 124 S.Ct. 1769, 1776, 158 L. Ed. 2d 546 (2004)*. "Sometimes, [] the law is that the judicial department has no business entertaining the claim of unlawfulness." *Id.* "The political question doctrine [*10] excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. American Cetacean Society, 478 U.S. 221, 230, 106 S.Ct. 2860, 2866, 92 L. Ed. 2d 166 (1986)*. Based on the concept of the separation of powers, political questions are addressed and redressed by the people through the political process. n15 *See Occidental of Umm Al Qaywayn v. Certain Cargo of Petroleum, 577 F.2d 1196, 1203 (5th Cir. 1978)*. [HN2] The Supreme Court has set out a list of six formulations to aid courts in a "discriminating inquiry into the precise facts and posture of the particular case." *Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L. Ed. 2d 663 (1962)*.

n15 The court notes that the political process has begun to address the very issues raised in this case. Congress has shown interest in contractor safety in Iraq. The Senate Democratic Policy Committee has just recently conducted "a hearing about contracting abuses." *See, e.g.,* David Ivanovich, *Halliburton Ignored Dangers, Drivers Say,* Houston Chronicle, Sep. 18, 2006, *available at* http://www.chron.com/disp/story.mpl/headline/biz/4196908.html.

[*11]

(1) Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department;

(2) or a lack of judicially discoverable and manageable standards for resolving it;

(3) or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion;

(4) or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government;

(5) or an unusual need for unquestioning adherence to a political decision already made;

(6) or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* "[O]ne of these formulations [must be] inextricable from the case at bar." *Id.* Here the nature of the litigation implicates several of the *Baker* formulations.

**1. Textual Constitutional Commitment to a Coordinate Branch.**

The first and arguably most important formulation is a "textually demonstrable constitutional commitment of the issue to a coordinate political department." [*12] *Id.* [HN3] The Constitution allocates the power of Commander in Chief of the United States Army and Navy to the executive branch. U.S. CONST. art II, § 2, cl. 1. Additionally, the Constitution gives the power "[t]o raise and support Armies . . . provide and support a Navy [and to] make Rules for the Government and Regulation of the land and naval Forces" to Congress. *Id.* at § 1, cls. 12-14. "Of the legion of governmental endeavors, perhaps the most clearly marked for judicial deference are provisions for national security and defense." *Tiffany v. United States, 931 F.2d 271, 277 (2d. Cir. 1991)*. Moreover, making war in a foreign land also implicates another equally compelling executive branch power, foreign policy. *Baker, 369 U.S. at 211, 82 S.Ct. at 707*. "Not only does resolution of [foreign policy] issues frequently turn on standards that defy judicial application, or involve the exercise of a discretion demonstrably committed to the executive or legislature; but many such questions uniquely demand [a] single-voiced statement of the Government's views." *Id. See also Occidental, 577 F.2d at 1203* ("[I]n the realm of foreign [*13] relations, policy considerations render issues incompetent for a decision by the court."); *Dickson v. Ford, 521 F.2d 234, 236 (5th Cir. 1975)* (per curium) (finding conduct of foreign relations to be constitutionally committed to the executive and legislative branches.). [HN4] The Constitution mandates that war and foreign policy are the provenance of the Executive.

In recognition of this, courts have consistently held that issues involving war, and actions taken during war, are beyond judicial competence. *See, e.g., Rostker v.*

Case 1:06-cv-01616-CKK   Document 10-2   Filed 10/26/2006   Page 7 of 10

Page 7
2006 U.S. Dist. LEXIS 68413, *

*Goldberg*, 453 U.S. 57, 66, 101 S.Ct. 2646, 2652, 69 L. Ed. 2d 478 (1981) (selective service registration for men, but not women) ("The operation of a healthy deference to legislative and executive judgments in the area of military affairs is evident in several recent decisions of this Court."); *Gilligan v. Morgan*, 413 U.S. 1, 10, 93 S.Ct. 2440, 2446, 37 L. Ed. 2d 407 (1973) (training of National Guard troops) ("[I]t is difficult to conceive of an area of governmental activity in which the courts have less competence."); *Farmer v. Mabus*, 940 F.2d 921, 923 (5th Cir. 1991) (adjutant general's discharge after court-martial) ("[J]udicial [*14] intrusion into military matters is to be most cautiously and charily approached. . . . [T]he judicial process is manifestly ill-suited for the resolution of most of the myriad disputes which arise in that field."); *Bynum v. FMC Corp.*, 770 F. 2d 556, 562 (5th Cir. 1985) (government contractor defense) ("It has long been recognized that interference by civilian courts with military authority inevitably raises both questions about judicial competency in this area and separation of powers concerns."); *Tiffany*, 931 F.2d at 277 (military decision to shoot down potentially hostile aircraft) ("The strategy and tactics employed on the battlefield are clearly not subject to judicial review.").

If the Army were the defendant, then the commitment to a coordinate branch would be reasonably clear. However, the plaintiffs argue that the defendants may not shelter under the political question doctrine, because the plaintiffs' complaint (1) "involves claims by civilians, not military personnel," (2) "questions Defendants' actions as civilian contractors, not the Army's execution of a mission;" and (3) alleges that "Defendants, not the Army, [] deployed, directed, [*15] and controlled the civilian members of the Hamill Convoy, n16 thereby making inquiry into military decisions and rules of engagement unnecessary." n17 Even assuming the court found this statement to be true, the private character of the actions do not preclude the application of the political question doctrine. [HN5] "Whether an issue presents a nonjusticiable political question cannot be determined by a precise formula." *Saldano v. O'Connell*, 322 F.3d 365, 368 (5th Cir. 2003). The inquiry as laid out in *Baker* requires the court to posit whether a political question will arise during the course of the trial, not whether it is evident from the face of the complaint. *Occidental*, 577 F.2d at 1202. The political question "doctrine is designed to restrain the Judiciary from inappropriate interference in the business of the other branches of Government; the identity of the *litigant* is immaterial to the presence of these concerns in a particular case." *United States v. Munoz-Flores*, 495 U.S. 385, 394, 110 S. Ct. 1964, 1970, 109 L. Ed. 2d 384 (1990). Here, the court finds that it cannot try a case set on a battlefield during war-time without an impermissible [*16] intrusion into powers expressly granted to the Executive by the Constitution.

n16 Mr. Hammill was the lead KBR civilian truck driver for the first convoy on April 9th. He is not a party to this suit. Dkt. 74, at 26.

n17 Dkt. 149, at 34-35.

**2. Lack of Judicially Discoverable and Manageable Standards.**

The second *Baker* formulation is equally implicated. [HN6] "One of the most obvious limitations [on the court] is that judicial action must be governed by *standard, by rule*." *Vieth*, 541 U.S. at 278, 124 S.Ct. at 1777. Those standards are particularly elusive in the case at bar, where the court cannot escape an examination of Army decisions, an area "not subject to judicial second-guessing." *In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 204, 206 (2d. Cir. 1987). In the case at bar, the question becomes whether the court could extricate the defendants' acts from the Army's acts.

A review of the evidence submitted by the plaintiffs and the defendants shows [*17] the actions taken on April 9, 2004 were, at best, the result of a joint effort between the defendants and the Army. The contracts show that the Army, not the defendants, was responsible for the security of the convoys, up to and including the force protection for the trucks, n18 the intelligence regarding the possible routes, n19 the decision regarding which route to take, n20 and the manner in which the drivers were to operate. n21 The Army's investigative report regarding the incident amply demonstrates the Army's significant actual involvement in the events at issue. n22 Moreover, in a deposition taken by the plaintiffs, (

EXT REDACTED BY COURT], confirms that the Army chose the routes for the convoys and requested that they be sent. n23 Also, email among KBR employees during the time before, during and after the April 9th incident indicate that the Army had a significant role in the deployment of convoys. n24 Regardless of whether the evidence may show that KBR had any ability to deploy or recall convoys, it most certainly demonstrates that the Army was involved at each step in the process.

n18 LOGCAP Contract # DAAA09-02-D-0007 governing the relationship between the defendants and the Army states in relevant part: (

EXT REDACTED BY COURT],

Dkt. 141, Exhibit C, at 00004. For an identical provision under Task order 59, see Dkt. 141, Exhibit C, at 00076.

[*18]

n19 Task Order 59 dictates with regards to the transportation mission that (

EXT REDACTED BY COURT], Task Order 59, Dkt. 141, Exhibit C, at 00066.

n20 Under the Logistics Support Element of Task Order 59, the contract states that (

EXT REDACTED BY COURT] Task Order 59, Dkt. 141, Exhibit C, at 00075.

n21 (

EXT REDACTED BY COURT] Task Order 59, Dkt. 141, Exhibit C, at 00081.

n22 Dkt. 141, Exhibit A, at 3-9. (

EXT REDACTED BY COURT] Id. at 4. (

EXT REDACTED BY COURT] Id. at 5.

n23 Dkt. 147, Exhibit U, at 17-18. (

EXT REDACTED BY COURT] Id.

n24 Id., Exhibit O, at 1. (

EXT REDACTED BY COURT] Id.

The plaintiffs argue that the contract language required the defendants "to manage and direct their own convoys." n25 They point to the Army publication, "Contractors on the Battlefield" and quote it as follows:

> Management of contractor activities is accomplished through the responsible contracting organization, not the chain of command. Commanders do not have direct control over contractors or their employees (contractor employees are not [*19] the same as government employees); only contractors manage, supervise, and give directions to their employees. n26

However, this quote is malapropos. It was taken from the Overview section of the manual in a subsection entitled Contractor and Military Distinctions. n27 A review of the manual reveals other, more applicable passages.

n25 Dkt. 149, at 33.

n26 Id.

n27 Dkt. 149, Exhibit W, at 1-7.

[HN7] Contractor Management in the Military Environment

> [T]he regional combatant commander . . . is responsible for accomplishing the mission and ensuring the safety of all deployed military, government civilian, *and contractor employees* in support of US military operations. . . . To fully integrate contractor support into the theater operational support structure, proper military oversight is imperative. n28

n28 Id. (emphasis added).

[*20]

And later [HN8] under the Force Protection chapter, the manual states:

Roles and Responsibilities

6-4. Protecting contractors and their employees on the battlefield is the commander's responsibility. When contractors perform in potentially hostile or hazardous areas, the supported military forces must assure the protection of their operations and employees. The responsibility for assuring that contractors receive adequate force protection starts with the combatant commander, extends downward, and includes the contractor.

\* \* \*

6-6. Protection for contractors involves active use of armed military forces to pro-

vide escort or perimeter security, and passive measures that include protective military equipment, training, and equipping of contractor employees in self-protection. n29

n29 *Id.* at 6-2.

Far from supporting the contention that KBR had sole control over the safety of its convoys, the manual offers express proof that security started with the Army. The plaintiffs also quote from [*21] Army Regulation 715-9 to support the argument that under the governing contracts the Army was not allowed to direct KBR employees. n30 [HN9] "Contracted support service personnel shall not be supervised or directed by military or Department of the Army (DA) civilian personnel." n31 Again, a closer examination of the regulations demonstrates instead that the Army was, at the very least, significantly involved in transportation and force protection decisions.

n30 Dkt. 149, at 33.

n31 *Id.*

> The Commander, AMC will . . . [c]oordinate transportation (i.e., to, from and within the theater), quality of life issues and force protection of deployed AMC contractors with the ASCC [Army Service Component Command].
>
> * * *
>
> [C]ontractor employees will be expected to adhere to all guidance and obey all instructions and general orders issued by the Theater Commander. n32

The evidence shows overwhelmingly that the Army was an integral part of any decision to deploy and protect convoys.

n32 Dkt. 149, Exhibit X, at 14.

[*22]

In order to hear this case, the court would have to substitute its judgment for that of the Army. For example, the court would need to determine what intelligence the Army gave to KBR about the route, whether that intelligence was sufficient, what forces were deployed with the convoys, whether they were sufficient, and whether they performed properly. n33 Even if KBR had authority to deploy or recall the convoys, the court would still need to determine whether the Army could or should have countermanded that order. No judicial standards exist for making these determinations. To accept the plaintiffs' contentions that the defendants were in complete control of military vehicles transporting military supplies through a combat zone would require the court both to suspend disbelief and to disregard the governing contracts and the army incident report. This feat the court is simply not prepared to attempt.

n33 *See*, Dkt. 74.

Even if the plaintiffs limited their arguments, to what KBR did or did not do, eventually [*23] the court would be forced to distinguish between KBR's actions and the Army's actions. Because the defendants present a colorable argument based precisely on this distinction, the court would inexorably be drawn into an examination of Army decisions. And, [HN10] the Army's decisions during a time of war present a particularly inappropriate question for judicial examination. *Tiffany, 931 F.2d at 276* ("It would [be] unseemly for a democracy's most serious decisions, those providing for common survival and defense, [to] be made by its least accountable branch of government.").

Finally, [HN11] the textual commitment of military decisions to coordinate branches, as discussed earlier, has an inverse relationship to the lack of judicially discoverable and manageable standards for resolving the case. *Nixon v. United States, 506 U.S. 224, 228-29, 113 S.Ct. 732, 735, 122 L. Ed. 2d 1 (1993)*. The more a decision is committed to another branch or branches of government, the less likely a court will find judicially discoverable and manageable standards to apply. *Id.* The Constitution specifically gives the Executive Branch the role of Commander in Chief of the Army. *U.S. CONST. art II,* [*24] *§ 2, cl. 1*. The Army's actions and decisions in Iraq set the stage for this case. Every issue, every claim the plaintiffs make must be examined against the backdrop of battle. They are inextricably intertwined. Accordingly, the court finds that it lacks the standards to hear this case.

**3. Nonjudicial Policy Determination and Lack of Respect.**

If the second formulation asks the court to determine what happened on April 9, 2004, then the third formulation requires an examination of why it happened. In the broadest sense, the Executive Branch policy of using civilian contractors to free up military personnel for military missions would be under scrutiny. In the narrowest sense, the question would become why the defendants and the military sent two convoys on the road to BIAP on that fateful day. Is it wise to use civilian contractors in a war zone? Was it wise to send the convoy along the route to BIAP on April 9, 2004? Answering either question and the many questions in between would require the court to examine the policies of the Executive Branch during wartime, a step the court declines to take. [HN12] Courts are "not tribal wisemen dispensing divinely or theoretically inspired [*25] judgments, but [are] limited to the application of predetermined law." *Occidental, 577 F.2d at 1203.*

### CONCLUSION

The court concludes that this case presents a non-justiciable political question. The case at bar meets not one, but three of the formulations described in *Baker v. Carr. See Baker, 369 U.S. at 217, 82 S.Ct. at 710.* Nor is the court alone in this conclusion. Two recent federal court cases involving suits against civilian contractors in Iraq were dismissed on similar grounds. In a case involving the bombing of a dining facility managed by KBR for the Army in Iraq, Judge Sim Lake dismissed the case for want of jurisdiction based on political question. *Smith v. Halliburton, 2006 U.S. Dist. LEXIS 61980, No. 4:06CV0462, 2006 WL 2521326, (S.D. Tex Aug. 30, 2006).* Also, in a Georgia case, the district court dismissed as non-justiciable a negligence case brought by the family of a U.S. soldier killed by a suicide bomber while escorting a KBR convoy. *Whitaker v. Kellogg Brown & Root, 2006 U.S. Dist. LEXIS 45708, No. 4:05-CV-78, 2006 WL 1876922, (M.D. Ga. July 6, 2006).*

For the foregoing reasons the court finds that it lacks jurisdiction to hear the above-styled [*26] case, because it presents a non-justiciable political question. Accordingly, the defendants' motion to dismiss is GRANTED. Dkt. 135. The case is DISMISSED for want of jurisdiction.

It is so ORDERED.

Signed at Houston, Texas on September 22, 2006.

Gray H. Miller

United States District Judge

### FINAL JUDGMENT

In accordance with the court's memorandum and order signed this date, the court now believes that final judgment should be entered. Therefore it is ORDERED that the plaintiffs' claims and causes of action are hereby DISMISSED with prejudice. Additionally non-party Keith Richard's motion for protective order, (Dkt. 129) and the defendants' motion to dismiss plaintiffs' R.I.C.O. claims, *section 1983* claims, and exemplary damage claims (Dkt. 137) are DENIED AS MOOT.

This is a FINAL JUDGMENT.

Signed at Houston, Texas on September 22, 2006.

Gray H. Miller

United States District Judge