LEXSEE 2006 U.S. DIST. LEXIS 45708

**ANTHONY WHITAKER and JACQUELINE, WILLIAMS, as Surviving Parents of Marquis A. Whitaker, Deceased, and ANTHONY WHITAKER, as Administrator of the Estate of Marquis A. Whitaker, Plaintiffs, vs. KELLOGG BROWN & ROOT, INC., ESTATE OF QUAISAR KAHN, and HUSSAIN KIZHIKKINAM, Defendants.**

CASE NO. 4:05-CV-78 (CDL)

UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF GEORGIA, COLUMBUS DIVISION

*2006 U.S. Dist. LEXIS 45708*

**July 5, 2006, Decided**
**July 6, 2006, Filed**

**SUBSEQUENT HISTORY:** Judgment entered by *Whitaker v. Kellogg Brown & Root, Inc., 2006 U.S. Dist. LEXIS 45717 (M.D. Ga., July 6, 2006)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In a negligence case, plaintiff surviving parents sued defendant defense contractor following the death of their son, a soldier in Iraq. The soldier was killed while escorting a military supply convoy operated by the contractor. The contractor moved to dismiss arguing that the case presented a nonjusticiable political question because the case turned on strategic and tactical military decisions made in a combat zone.

**OVERVIEW:** In support of its motion, the contractor pointed to regulations regarding convoy operations and the use of civilian contractors. At the time of his death, the soldier was working in cooperation with government contractor employees to achieve military objectives in a wartime convoy operation that was planned and executed by the military. He was killed due to the alleged negligence of the government contractor's employees, which were performing their duties subject to the military's planning, orders, and regulations. The court rejected plaintiffs' contention that there were judicially discoverable and manageable standards for resolving the questions in the suit. While their simplistic labeling of the case as a garden variety road wreck was superficially appealing, it ignored the true nature of the circumstances giving rise to the tragedy. The question was not just what a reasonable driver would do--it was what a reasonable driver in a combat zone, subject to military regulations and orders, would do. That question necessarily implicated the wisdom of the military's strategic and tactical decisions, a classic political question over which the court had no jurisdiction.

**OUTCOME:** The contractor's motion to dismiss was granted. The entire complaint was dismissed for lack of subject matter jurisdiction.

**LexisNexis(R) Headnotes**

*Military & Veterans Law > Warfare*
[HN1] Army regulations authorize the use of civilian contractors to perform selected services in wartime to augment Army forces. Army Reg. 700-137, at 1-1.

*Military & Veterans Law > Warfare*
[HN2] The purpose of the Logistics Civil Augmentation Program (LOGCAP) is to release military units for other missions or to fill shortfalls. Army Reg. 700-137, at 2-4 and 3-1. Contract employees are not under the direct supervision of the military. Army Reg. 700-137, at 3-2(d)(2) and Army Reg. 715-9, at 3-2(f). However, contractor employees are expected to work closely with military personnel. The Army will fight as part of a joint team. Motor transport units must be prepared to support the inland surface movement requirements of other services or nations and to integrate HN, LOGCAP, or other contract support. The Army will fight as a total force-active and reserve components and civilians. Army transportation headquarters units must be able to integrate all deployed mode operating units. The objective is

EXHIBIT 3

Case 1:06-cv-01616-CKK   Document 10-4   Filed 10/26/2006   Page 2 of 6

Page 2
2006 U.S. Dist. LEXIS 45708, *

a seamless transportation system that supports the movement requirements of the joint force and the Army. Army Motor Transport Units and Operations, Army Field Manual 55-30, at 1-1 (Sept. 15, 1999) Contractor employees are expected to adhere to all guidance and obey all instructions and general orders issued by the Theater Commander. Army Reg. 715-9, at 3-2(f). Furthermore, if a contractor employee violates the Theater Commander's orders, the Army may demand that the contractor replace that individual. Army Reg. 715-9, at 3-2(f).

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
[HN3] A court may review matters outside pleadings in deciding a *Fed. R. Civ. P. 12(b)(1)* motion.

*Military & Veterans Law > Warfare*
[HN4] The Army regulates all aspects of control, organization, and planning of Army convoy operations. Army Motor Transport Units and Operations, Army Field Manual (FM) 55-30. Army regulations provide that Logistics Civil Augmentation Program may be used for Army motor transport operations when contractor support is determined to be the most effective, expeditious, or cost effective. FM 55-30, at 1-11. A convoy commander oversees the preparation and planning of convoy operations, and convoy plans are made by military personnel pursuant to standing operating procedures, also developed by military personnel. FM 55-30, at 5-4 and 5-5. The convoy plans made by military personnel include, inter alia, placement of vehicles in the convoy, distance between vehicles in the convoy, rate of speed of the convoy, and convoy escort and security. FM 55-30, at 5-3 and 5-4. In preparing the convoy, the convoy commander must inspect convoy personnel and vehicles. FM 55-30, at 5-3 and 5-4.

*Civil Procedure > Justiciability > Political Questions > Separation of Powers*
[HN5] The political question doctrine is a function of the separation of powers, and it excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch.

*Civil Procedure > Justiciability > Political Questions > General Overview*
[HN6] In the Baker case, the United States Supreme Court has identified six hallmarks of political questions:

(1) a textually demonstrable constitutional commitment of the issue to a coordinate political department, (2) a lack of judicially discoverable and manageable standards for resolving it, (3) the impossibility of deciding without an initial policy determination of a kind clearly for non-judicial discretion, (4) the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government, (5) an unusual need for unquestioning adherence to a political decision already made, or (6) the potentiality of embarrassment from multifarious pronouncements by various departments on one question. At least one of those characteristics is required to invoke the political question doctrine.

*Civil Procedure > Justiciability > Political Questions > Separation of Powers*
[HN7] It is well accepted that, in general, soldiers injured at the hands of the military raise political questions. The United States District Court for the Middle District of Georgia, Columbus Division holds that a soldier injured at the hands of a contractor which is performing military functions subject to the military's orders and regulations also raises the same political questions.

*Civil Procedure > Justiciability > Political Questions > Separation of Powers*
[HN8] One important function of the political question doctrine is to prevent the courts from deciding questions that were intended by the Constitution to be left to the political branches. There is a textually demonstrable constitutional commitment of oversight and control of military force to the legislative and executive branches, and those political branches receive deference in the area of military affairs. When the military seeks to accomplish its mission by partnering with government contractors who are subject to the military's orders, regulations, and convoy plan, the use of those civilian contractors to accomplish the military objective does not lessen the deference due to the political branches in this area.

*Civil Procedure > Justiciability > Political Questions > General Overview*
[HN9] One purpose of the political question doctrine is to prevent courts from attempting to resolve questions where there are no judicially discoverable and manageable standards for resolving the questions.

**COUNSEL:** [*1] For Anthony Whitaker, as Surviving Parent of Marquis A. Whitaker, Deceased, Jacqueline Williams, as Surviving Parent of Marquis A. Whitaker, Deceased, Anthony Whitaker, as Administrator of the

Estate of Marquis A. Whitaker, Plaintiffs: Charles Frederick Overby, Columbus, GA.

For Kellogg Brown & Root, Inc., Defendant: Jonathan R. Friedman, Atlanta, GA; Kurt J. Hamrock, Lisa M. Norrett, Raymond Biagini, McKenna Long & Aldridge LLP, Washington, DC.

**JUDGES:** Clay D. Land, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Clay D. Land

**OPINION:**

ORDER

Presently pending before the Court is Defendant Kellogg Brown & Root, Inc.'s ("KBR") Motion to Dismiss (Doc. 7). For the reasons set forth below, KBR's Motion to Dismiss is granted.

BACKGROUND ALLEGATIONS

Plaintiffs are the surviving parents of a U.S. soldier ("Whitaker") who served in Iraq as a member of a Supply and Transport Troop that provided armed escorts for military supply convoys operated by KBR. On April 27, 2004, Whitaker was killed while escorting a military supply convoy operated by KBR. Plaintiffs allege that, while the convoy was returning to Scania, Iraq after completing a delivery in Al Kut, Iraq, one of KBR's drivers hit the guard rail [*2] of a bridge over the Tigris River and went off the bridge. Whitaker, who was driving an Army escort vehicle following that KBR rig, stopped his vehicle on the bridge. Then, another KBR driver struck Whitaker's vehicle from behind, knocking it close to the edge of the bridge where the guard rail had been destroyed. When Whitaker tried to extricate himself from his vehicle, he fell off the bridge and into the Tigris River. Rescue attempts failed, and Whitaker drowned. Plaintiffs seek to hold KBR liable under the doctrine of *respondeat superior* for the negligence of its drivers. Plaintiffs also contend that KBR should be held liable for its negligence in hiring, training, and supervising those drivers.

KBR responds that this case presents a non-justiciable political question because the case turns on strategic and tactical military decisions made in a combat zone. n1 In support of its argument, KBR points to Army regulations regarding convoy operations and the use of civilian contractors. n2 U.S. [HN1] Army regulations authorize the use of "civilian contractors to perform selected services in wartime to augment Army forces." Logistics Civil Augmentation Program, U.S. Army Reg. 700-137, at [*3] 1-1 (Dec. 16, 1985) [hereinafter LOGCAP]. [HN2] The purpose of LOGCAP is to "release military units for other missions or [to] fill shortfalls." *Id.* at 2-4, 3-1. Contract employees are not under the direct supervision of the military. *Id.* at 3-2(d)(2); Contractors Accompanying the Force, U.S. Army Reg. 715-9, at 3-2(f) (Oct. 29, 1999) [hereinafter Army Reg. 715-9]. However, contractor employees are expected to work closely with military personnel:

> The Army will fight as part of a joint team. Motor transport units must be prepared to support the inland surface movement requirements of other services or nations and to integrate HN, LOGCAP, or other contract support. The Army will fight as a total force-active and reserve components and civilians. Army transportation headquarters units must be able to integrate all deployed mode operating units. The objective is a seamless transportation system that supports the movement requirements of the joint force and the Army.

Army Motor Transport Units and Operations, Army Field Manual 55-30, at 1-1 (Sept. 15, 1999) [hereinafter F.M. 55-30]. Contractor employees are "expected to adhere to all guidance and obey all instructions [*4] and general orders issued by the Theater Commander." Army Reg. 715-9, at 3-2(f). Furthermore, if a contractor employee violates the Theater Commander's orders, the Army may demand that the contractor replace that individual. *Id.*

---

n1 KBR also argues that Plaintiffs' claims are preempted by the combatant activities exception of the Federal Tort Claims Act. Because the Court finds that this case presents a non-justiciable political question, it is not necessary to reach this issue.

n2 The Court discerns no factual dispute regarding the authenticity of these regulations or their application to this case. The Court recognizes that the Army regulations are not referenced in or attached to Plaintiffs' Complaint. The key question presently before the Court is whether the case involves a political question beyond the subject matter jurisdiction of the Court. Therefore, the Court may review the Army regulations in determining whether it has the power to hear this case. *Cf. Lawrence v. Dunbar, 919 F.2d 1525, 1529 (11th Cir. 1990)* (noting that [HN3] court

may review matters outside pleadings in deciding *12(b)(1) motion)*.

[*5]

[HN4] The Army regulates all aspects of control, organization, and planning of Army convoy operations. *See generally* F.M. 55-30. Army regulations provide that LOGCAP may be used for Army motor transport operations "when contractor support is determined to be the most effective, expeditious, or cost effective." *Id.* at 1-11. A convoy commander oversees the preparation and planning of convoy operations, and convoy plans are made by military personnel pursuant to standing operating procedures, also developed by military personnel. *Id.* at 5-4, 5-5. The convoy plans made by military personnel include, *inter alia*, placement of vehicles in the convoy, distance between vehicles in the convoy, rate of speed of the convoy, and convoy escort and security. *Id.* at 5-3, 5-4. In preparing the convoy, the convoy commander must inspect convoy personnel and vehicles. n3 *Id.*

>   n3 The parties agree that the KBR driver who drove off the bridge was observed having difficulty operating his truck shortly before the convoy mission began. The convoy commander permitted him to drive anyway.

[*6]

DISCUSSION

The central question in this case is whether the political question doctrine applies to bar wrongful death and survivor claims by the family of a U.S. soldier killed during the war in Iraq due to the alleged negligence of a government contractor. [HN5] The political question doctrine is "a function of the separation of powers," *Baker v. Carr, 369 U.S. 186, 210, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962)*, and it "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Asso. v. American Cetacean Soc., 478 U.S. 221, 230, 106 S. Ct. 2860, 92 L. Ed. 2d 166 (1986)*.[HN6] In *Baker*, the Supreme Court identified six hallmarks of political questions:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department;
>
> [2] a lack of judicially discoverable and manageable standards for resolving it;
>
> [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion;
>
> [4] the impossibility of a court's undertaking independent resolution [*7] without expressing lack of the respect due coordinate branches of government;
>
> [5] an unusual need for unquestioning adherence to a political decision already made; or
>
> [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker, 369 U.S. at 217*. At least one of these characteristics is required to invoke the political question doctrine. *Aktepe v. United States, 105 F.3d 1400, 1403 (11th Cir. 1997)*.

The Eleventh Circuit applied the *Baker v. Carr* analysis in *Aktepe*. In *Aktepe*, two live missiles from a U.S. ship struck a Turkish ship during a NATO training exercise, and the Turkish Navy sailors sued the United States for damages. The training exercise was under the command of a U.S. Navy Admiral, and the U.S. ship was under the command of a U.S. Navy Vice Admiral. The complaint alleged negligence relating to Navy communication, training, and drill procedures. The Eleventh Circuit found that most, if not all, of *Baker's* indicia of political questions were met. *Aktepe, 105 F.3d at 1403*. First, the court found that the legislative and executive [*8] branches have responsibility for military training procedures because there is a "textually demonstrable constitutional commitment" of military strategy to the political branches of the government: the Constitution confers upon the legislative and executive branches responsibility for oversight and control of military force. *Id.*; *accord* U.S. Const. art. I, § 8, cls. 11-16; U.S. Const. art. II, § 2; *Gilligan v. Morgan, 413 U.S. 1, 10, 93 S. Ct. 2440, 37 L. Ed. 2d 407 (1973)*. As noted by the Eleventh Circuit, the political branches are accorded "a particularly high degree of deference in the area of military affairs." *Aktepe, 105 F.3d at 1403*. Second, the court in *Aktepe* found that there were no judicially discoverable and manageable standards for resolving the questions raised by the suit because the court would have to determine how a reasonable military force would have conducted the training exercise. *Id. at 1404*. Third, the court found that it would have to make policy decisions "of a kind appropriately reserved for military discretion." *Id.* Fourth, the court found that adjudicating the case would

Case 1:06-cv-01616-CKK    Document 10-4    Filed 10/26/2006    Page 5 of 6

Page 5
2006 U.S. Dist. LEXIS 45708, *

express a lack of respect for the political branches [*9] of the government. *Id.* n4

n4 *Cf. Gilligan v. Morgan*, 413 U.S. 1, 3, 93 S. Ct. 2440, 37 L. Ed. 2d 407 (1973). The situation in *Gilligan* is somewhat distinguishable from the instant case because the plaintiffs, students of Kent State University, were seeking *injunctive* relief against the governor of Ohio and the Ohio National Guard. The case is nonetheless instructive. Because Congress and the President had responsibility for oversight of various aspects of the National Guard, the *Gilligan* court found that the plaintiffs' "broad call on judicial power to assume continuing regulatory jurisdiction over the activities of the Ohio National Guard" would "embrace critical areas of responsibility vested by the Constitution in the Legislative and Executive Branches of the Government." *Id.* at 6-7. The Supreme Court also found that there was a lack of judicially discoverable and manageable standards for resolving the issue because it would require a judicial evaluation of military procedures and policies. *Id.* at 8. The Court recognizes that *Gilligan* and later cases suggest that a damages suit against the United States for unlawful conduct by military personnel would not be barred by political question doctrine in some circumstances, but these cases focus on injury to *civilians*-"injury resulting from military intrusion into the *civilian* sector." *Koohi v. United States*, 976 F.2d 1328, 1332-33 (9th Cir. 1992) (emphasis added); *see also Gilligan*, 413 U.S. at 11-12. None of these cases suggest that political question doctrine does not apply in cases such as the instant case, where a member of the military was injured in the course of military operations.

[*10]

The Court recognizes that the claims in *Aktepe* were against the United States and not a government contractor. The Court nonetheless finds that the same principles apply in this case and that the same indicia of a political question exist here. At the time of his death, Plaintiffs' son was working in cooperation with government contractor employees to achieve military objectives in a wartime convoy operation that was planned and executed by the military. He was killed due to the alleged negligence of the government contractor's employees, which were performing their duties subject to the military's planning, orders, and regulations. [HN7] It is well accepted that, in general, soldiers injured at the hands of the military raise political questions. *See Bentzlin v. Hughes Aircraft Co.*, 833 F. Supp. 1486, 1498 (C.D. Cal. 1993). The Court finds that a soldier injured at the hands of a contractor which is performing military functions subject to the military's orders and regulations also raises the same political questions. An examination of the purposes of the political question doctrine supports this conclusion.

As discussed *supra*, [HN8] one important function of the political [*11] question doctrine is to prevent the courts from deciding questions that were intended by the Constitution to be left to the political branches. *See Gilligan*, 413 U.S. at 10-11. There is a textually demonstrable constitutional commitment of oversight and control of military force to the legislative and executive branches, and those political branches receive deference in the area of military affairs. *See Aktepe*, 105 F.3d at 1403. n5 When the military seeks to accomplish its mission by partnering with government contractors who are subject to the military's orders, regulations, and convoy plan, the use of those civilian contractors to accomplish the military objective does not lessen the deference due to the political branches in this area.

n5 *See also Gilligan*, 413 U.S. at 10 ("The complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject *always* to civilian control of the Legislative and Executive Branches.").

[*12]

[HN9] Another purpose of the political question doctrine is to prevent courts from attempting to resolve questions where there are no judicially discoverable and manageable standards for resolving the questions. Plaintiffs contend that there are judicially discoverable and manageable standards for resolving the questions in this suit. The Court does not agree. While Plaintiffs' simplistic labeling of this case as a "garden variety road wreck" is superficially appealing, it ignores the true nature of the circumstances giving rise to this tragedy. This wreck occurred in a combat zone during wartime while Plaintiffs' son, along with his Supply and Transport Troop and a group of civilian contractors, transported supplies from one military camp to another. The convoy operation was planned by the military, which determined the placement of vehicles in the convoy, the speed of the convoy, and the distance between vehicles in the convoy. Clearly, these circumstances differ dramatically from driving on an interstate highway or county road in the United States without any constraints other than ordinary skill, judgment, and prudence. The question here is not just what a reasonable driver would do-it [*13] is what a reasonable driver in a combat zone, subject to military regulations

and orders, would do. That question necessarily implicates the wisdom of the military's strategic and tactical decisions, a classic political question over which this Court has no jurisdiction.

For all of these reasons, the Court finds that this case presents a non-justiciable political question. Accordingly, KBR's Motion to Dismiss is granted based upon lack of subject matter jurisdiction. n6

n6 For the same reasons described in this Order, the Court also finds that it does not have subject matter jurisdiction over Plaintiffs' claims against the remaining individual Defendants. Accordingly, Plaintiffs' entire Complaint is dismissed for lack of subject matter jurisdiction.

IT IS SO ORDERED, this 5th day of July, 2006.

S/ Clay D. Land

UNITED STATES DISTRICT JUDGE