**United States Government Accountability Office**

# GAO

## Report to Congressional Committees

July 2005

# REBUILDING IRAQ

# Actions Needed to Improve Use of Private Security Providers

On August 5, 2005, the PDF file was revised to correct the graphic in Figure 7 of the report. The right-most bar was increased to represent 4 contracts instead of 3 contracts.



**G A O**
Accountability ★ Integrity ★ Reliability



EXHIBIT

7

GAO-05-737

**July 2005**

## G A O
Accountability · Integrity · Reliability

# Highlights

Highlights of GAO-05-737, a report to
congressional committees

# REBUILDING IRAQ

## Actions Needed to Improve Use of Private Security Providers

## Why GAO Did This Study

The United States is spending
billions of dollars to reconstruct
Iraq while combating an insurgency
that has targeted military and
contractor personnel and the Iraqi
people. This environment created a
need for those rebuilding Iraq to
obtain security services. GAO
evaluated the extent to which
(1) U.S. agencies and contractors
acquired security services from
private providers, (2) the U.S.
military and private security
providers developed a working
relationship, and (3) U.S. agencies
assessed the costs of using private
security providers on
reconstruction contracts.

## What GAO Recommends

GAO is making recommendations
to the Secretary of Defense to
enhance military procedures to
reduce incidences of the military
firing on security providers and to
provide training to U.S. military
forces on the role of security
providers. Also, GAO is making
recommendations to the
Secretaries of Defense and State
and the Administrator, USAID, to
assist contractors in obtaining
security services, and to enable
agencies to better plan for security
costs in future efforts. The State
Department disagreed with our
recommendation to explore
options to assist contractors in
obtaining security, citing potential
liability concerns, and did not take
a position on our recommendation
to account and plan for security
costs. DOD agreed with our
recommendations. USAID did not
comment on them.
www.gao.gov/cgi-bin/getrpt?GAO-05-737.

To view the full product, including the scope
and methodology, click on the link above.
For more information, contact William M. Solis
at (202) 512-8365 or solisw@gao.gov.

## What GAO Found

The civilian U.S. government agencies and reconstruction contractors in Iraq
that GAO evaluated had obtained security services, such as personal and
convoy security, from private security providers because providing security
to them is not the U.S. military's stated mission. U.S. military forces provide
security for those Department of Defense (DOD) civilians and contractors
who directly support the combat mission. In Iraq, the Department of State
and other federal agencies contract with several private security providers to
protect their employees. Under their contracts, contractors rebuilding Iraq
are responsible for providing their own security and have done so by
awarding subcontracts to private security providers. As of December 2004,
the agencies and contractors we reviewed had obligated more than $766
million for private security providers. The contractors' efforts to obtain
suitable security providers met with mixed results, as they often found that
their security provider could not meet their needs. Overall, GAO found that
contractors replaced their initial security providers on more than half the
2003 contracts it reviewed. Contractor officials attributed this turnover to
various factors, including the absence of useful agency guidance.

While the U.S. military and private security providers have developed a
cooperative working relationship, actions should be taken to improve its
effectiveness. The relationship between the military and private security
providers is one of coordination, not control. Prior to October 2004
coordination was informal, based on personal contacts, and was
inconsistent. In October 2004 a Reconstruction Operations Center was
opened to share intelligence and coordinate military-contractor interactions.
While military and security providers agreed that coordination has improved,
two problems remain. First, private security providers continue to report
incidents between themselves and the military when approaching military
convoys and checkpoints. Second, military units deploying to Iraq are not
fully aware of the parties operating on the complex battle space in Iraq and
what responsibility they have to those parties.

Despite the significant role played by private security providers in enabling
reconstruction efforts, neither the Department of State, nor DOD nor the
U.S. Agency for International Development (USAID) have complete data on
the costs of using private security providers. Even at the contract level, the
agencies generally had only limited information readily available, even
though agency and contractor officials acknowledged that these costs had
diverted a considerable amount of reconstruction resources and led to
canceling or reducing the scope of some projects. For example, in March
2005, two task orders for reconstruction worth nearly $15 million were
cancelled to help pay for security at a power plant. GAO found that the cost
to obtain private security providers and security-related equipment
accounted for more than 15 percent of contract costs on 8 of the 15
reconstruction contracts it reviewed.

# Contents

**Letter**                                                                          1

    Results in Brief                                            3
    Background                                                  6
    Security for Civilians and Contractors in Iraq Is Provided by a Mix of
        Military Forces, State Department Security Personnel, and Private
        Security Providers                                      10
    While the Relationship between Security Providers and the Military
        Has Improved, Actions Should Be Taken to Further Improve
        Effectiveness                                            20
    Agencies Have Limited Capabilities to Assess the Cost Impact of
        Using Private Security Providers                          29
    Expanded Use of Private Security Providers Does Not Appear to Be
        Increasing Attrition among Military Personnel             35
    Conclusions                                                 43
    Recommendations for Executive Action                        43
    Agency Comments and Our Evaluation                          45

**Appendixes**

    Appendix I:    **Scope and Methodology**                               49
    Appendix II:    **Comments from the Department of Defense**            58
    Appendix III:    **Comments from the Department of State**             61
    Appendix IV:    **Comments from U.S. Agency for International
        Development**                                          64
    Appendix V:    **GAO Contacts and Staff Acknowledgements**            65

**Table**

    Table 1:  Occupational Stop Loss Dates for the Military Services   38

**Figures**

    Figure 1:  The Complex Battle Space in Iraq                  8
    Figure 2:  Incidence of Attacks against Civilians and Infrastructure
        Targets between June 2003 and April 2005               15
    Figure 3:  Number of Security Providers Employed on
        Reconstruction Contracts Awarded in 2003 and Reviewed
        by GAO                                                 17
    Figure 4:  National Reconstruction Operations Center, Baghdad,
        Iraq                                                   23
    Figure 5:  Locations of the Regional Reconstruction Operations
        Centers in Iraq                                        24

Contents

Figure 6:  Process for Requesting Assistance through the ROC          26
Figure 7:  Percentage of Total Contract Billings Accounted for by
           Security Subcontractor Expenses as of December 31,
           2004                                                       33
Figure 8:  Average Attrition Rates for Military Occupational
           Specialties Preferred by Private Security Providers which
           Experienced Increased Attrition in Fiscal Year 2004        39
Figure 9:  Army Special Forces Attrition Rates                        41
Figure 10: Continuation Rates for Army Enlisted Special Operations
           Personnel with 14 through 19 Years of Service for Fiscal
           Years 2000 through 2004                                    42

## Abbreviations

| | |
|---|---|
| CENTCOM | U.S. Central Command |
| CPA | Coalitional Provisional Authority |
| DFARS | Defense Federal Acquisition Regulation Supplement |
| DMDC | Defense Manpower Data Center |
| DOD | Department of Defense |
| GAO | Government Accountability Office |
| MNC-I | Multi-National Corps-Iraq |
| MNF-I | Multi-National Force-Iraq |
| PCO | Project and Contracting Office |
| ROC | Reconstruction Operations Center |
| USAID | U.S. Agency for International Development |

This is a work of the U.S. government and is not subject to copyright protection in the United States. It may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.



**G A O**
Accountability ∗ Integrity ∗ Reliability

**United States Government Accountability Office**
**Washington, D.C. 20548**

July 28, 2005

Congressional Committees

The United States is spending billions of dollars to reconstruct Iraq while at the same time is engaged in combating an insurgency that has targeted military personnel, contractors, and the Iraqi people. According to the Department of Defense (DOD) and other sources, as of June 1, 2005, more than 1,600 U.S. and coalition military forces and 200 contractor personnel have been killed since major combat operations ended in May 2003. This uncertain security environment created a need for U.S. government agencies and contractors involved in rebuilding Iraq to obtain substantially more security services than is normally the case when operating in other countries. Creating a democratic Iraq and rebuilding its infrastructure is a U.S. national security and foreign policy priority, and, even without the need for enhanced security, is a challenging and complex effort.

Prior to the conflict, DOD and the U.S. government agencies responsible for the reconstruction of Iraq believed that reconstruction would take place in an environment with little threat from insurgents or terrorists. By June 2003 the security situation in Iraq began to worsen and it became clear in August 2003, with the bombing of the United Nations complex, that insurgents were targeting nonmilitary targets. The killings of four U.S. citizens working for a U.S. security provider in Iraq in March 2004 and the allegations of prisoner abuse at Abu Ghraib prison[1] resulted in significant congressional concern[2] over the use of private security providers in Iraq and raised a number of operational, legal, and contracting questions.

---

[1] We recently discussed breakdowns in the procurement process when contracting for interrogators and other services in Iraq. See GAO, *Interagency Contracting: Problems with DOD's and Interior's Orders to Support Military Operations*, GAO-05-201 (Washington, D.C.: Apr. 29, 2005).

[2] These concerns have been expressed in requests from numerous members of Congress that the Comptroller General review the operational, legal, and contracting issues involving the use of private security providers in Iraq. Congress has subsequently included several provisions in legislation designed to improve the management of and support and protection provided to contractor personnel who support deployed forces or who are in a combatant commander's area of responsibility. See Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2005, Pub. L. No. 108-375, section 1205 and 1206 (Oct. 28, 2004) and H.R. 1815, 109th Cong. title XVI (2005).

Because of the broad level of interest by Congress in issues dealing with Iraq, the Comptroller General initiated this review under his statutory authority. Specifically, we evaluated the extent to which (1) U.S. government agencies and contractors working in Iraq have acquired security services from private providers; (2) the U.S. military and private security providers in Iraq have developed a cooperative working relationship; and (3) U.S. government agencies assessed the costs associated with using private security providers on reconstruction contracts. Additionally, we assessed the impact of the increased use of private security providers on attrition in key military skills.

To identify the rules and regulations governing and assigning responsibility for protecting government and contractor personnel working in Iraq, we reviewed policies, regulations, instructions, guidance, and orders issued by DOD, the U.S. Central Command (CENTCOM),[3] and other DOD components relating to the use of contractors during wartime; orders and policies issued by the Coalition Provisional Authority (CPA) regarding contractor operations in Iraq; and Department of State policies regarding the protection of U.S. government employees working abroad, including the Foreign Affairs Manual. We also interviewed military officials who had been stationed in Iraq as well as selected private security providers to understand their responsibilities and collaborative working relationship in Iraq. To understand the process by which contractors obtained private security providers, we selected 16 reconstruction contracts using a non-probabilistic methodology that considered such factors as the awarding agency; the year awarded; the contract's expected dollar value; and the type, nature and location of the reconstruction activity. These 16 contracts were awarded by various DOD components, including the U.S. Army Corps of Engineers; the Department of State; and the U.S. Agency for International Development (USAID). Nine of these contracts were awarded in 2003 and 7 were awarded in 2004. As of December 2004, the agencies had obligated about $8.6 billion on these contracts. We also obtained and reviewed six contracts that had been awarded the U.S. Army Corps of Engineers, the Department of State, USAID, and by Army activities on behalf of the CPA for the protection of their personnel and facilities in Iraq. We then compared the type of security-related requirements incorporated within U.S. government contracts with those incorporated into contracts awarded to prime reconstruction contractors and, in turn, to subcontracts with security providers. We interviewed

---

[3] CENTCOM is the U.S. military command responsible for prosecuting the war in Iraq.

agency and contractor officials, reviewed agency guidance provided to the contractors, reviewed the reconstruction contracts and security subcontracts, and analyzed the vouchers and other billing information submitted by the reconstruction contractors and security providers. To assess the impact on military attrition caused by the use of private security providers we obtained and analyzed DOD attrition data and spoke with private security providers and representatives of the U.S. Special Operations Command and the military services. We determined that the information and data discussed in this report were sufficiently reliable for the purposes of the report. Appendix I contains more detail on our scope and methodology. We conducted our review from May 2004 to June 2005 in accordance with generally accepted government auditing standards.

## Results in Brief

All but one of the civilian U.S. government agencies and reconstruction contractors we evaluated that are operating in Iraq have obtained security services from private security providers. As of December 2004, the agencies and contractors we reviewed had obligated more than $766 million for private security providers. The use of private security providers reflects the uncertain security environment that was, and is still being encountered in Iraq, as well as the fact that providing security for agencies and contractors is not part of the U.S. military's stated mission. U.S. military forces in Iraq provide security only for those DOD civilians and contractors who directly support the military's mission. In Iraq, as elsewhere, the U.S. Ambassador, as Chief of Mission, has overall responsibility for the security of U.S. government executive branch employees, except for those under the force protection of the combatant commander. However, individual U.S. government agencies have had to arrange for their own security services. As neither DOD nor the Department of State is responsible for providing security to reconstruction contractors, the terms of their contracts require reconstruction contractors to provide for their own security; and, they typically have done so by awarding subcontracts to private security providers. The contractors' efforts to obtain suitable security providers met with mixed results, as many subsequently found that their initial security providers could not meet their needs. Overall, we found that contractors replaced their security providers on five of the eight reconstruction contracts awarded in 2003 that we reviewed.[4] Contractor officials attributed this turnover to

---

[4] On one additional 2003 contract, the contractor provided its own security.

various factors, including their lack of knowledge of the security market and of the potential security providers, and the absence of useful agency guidance.

Although the U.S. military and private security providers generally have developed a cooperative working relationship, actions can be taken to further improve its effectiveness. The relationship between the military in Iraq and employees of private security providers is one of coordination and cooperation, not control. Both U.S. Central Command officials and military personnel previously stationed in Iraq told us that there is no command and control relationship between the military and private security provider employees. At the same time, military and private security provider employees recognize the need to coordinate their actions. Prior to October 2004, coordination was informal, based on personal contacts often initiated by the contractors, and it was inconsistent. In October 2004, the Project and Contracting Office opened the Reconstruction Operations Center to share intelligence and coordinate military contractor interactions. While providers and the military agree that coordination has improved since the advent of the operations center, some problems remain. First, private security providers continue to report incidents occurring between themselves and the military when they approach military convoys and checkpoints. Second, the military may not have a clear understanding of the role of contractors, including private security providers, in Iraq and of the implications of having private security providers on the battle space.

Despite the significant role played by private security providers in enabling reconstruction efforts to proceed, neither the Department of State, nor DOD, nor USAID—the principal agencies responsible for Iraq reconstruction efforts—have complete data on the costs associated with using private security providers. In turn, the Department of State's quarterly report to Congress, which describes the status of projects, initiatives, and funding dedicated to Iraq reconstruction, does not provide information on the costs associated with using private security providers. Our discussions with agency officials found that the financial management and information systems used to prepare the reports are not set up to track security costs that are incurred under reconstruction contracts. Even at the contract level, the agencies generally had only limited information readily available on the costs associated with private security providers. While agencies do not specifically track such costs, both agency and contractor officials acknowledged that security costs had diverted a considerable amount of reconstruction resources and led to canceling or reducing the scope of certain reconstruction projects. For example, in

March 2005, USAID cancelled two electrical power generation-related task orders totaling nearly $15 million to help pay for increased security costs being incurred at another power generation project in southern Baghdad.

Our review of 16 reconstruction contracts found that the cost to obtain private security providers and security-related equipment can be considerable. Overall, these costs accounted for more than 15 percent on 8 of the 15 reconstruction contracts for which data were available. On only 4 of those 8 contracts, however, did the agencies receive security cost information. Agency officials noted that increased costs or delays in reconstruction projects also reflect non-security-related factors, such as changes in planned funding levels or higher material costs.

While both Special Forces and military police officials believe that attrition is increasing in their military specialties, partially because of increased employment opportunities with private security providers, our review of DOD data shows that the attrition levels in fiscal year 2004 increased compared to fiscal years 2002 and 2003, but are similar to the levels seen in fiscal years 2000 and 2001, prior to the establishment of stop loss.[5] This similarity indicates that former military members in the Special Forces and military police communities are leaving in the same proportions as before the attacks of September 11, 2001 but, according to Army officials, have a wider range of employment opportunities today. However, given that stop loss policies depress attrition rates, we are unable to determine whether the increase in attrition rates in fiscal year 2004 compared to fiscal years 2002 and 2003 was due to the end of stop loss or to actual increases in attrition. Moreover, DOD data does not indicate why personnel are leaving the military—only the fact that they are doing so.

We are making recommendations to the Secretary of Defense to enhance military procedures to reduce incidences of the military firing on private security providers and provide training to U.S. military forces on the role of private security providers in Iraq. Additionally, we are making recommendations to the Secretary of Defense, the Secretary of State and the Administrator, USAID, which would enable contractors to obtain adequate security services, as well as enable government agencies to more efficiently plan for security costs in future reconstruction efforts.

---

[5] Stop loss prevents servicemembers from leaving the service even though they may have reached the end of their enlistment or service obligation.

DOD agreed with each of the recommendations, noting that it welcomed our assistance in improving how DOD and its contractors can plan for and effectively execute contracts in a complex and changeable security environment. DOD's comments appear in appendix II.

The Department of State disagreed with our recommendation to explore options to assist contractors in obtaining private security services, citing concerns that the government could be held liable for performance failures and noting it was unclear that a government-managed security contractor program would result in enhanced contractor security. While our work found that contractors had difficulty in obtaining security providers that met their needs and that they would have benefited from the agencies' assistance, we did not recommend a particular course of action nor recommend a government-managed security program. Rather, we recommended that the Department, working jointly with DOD and USAID, explore options to assist contractors that are unfamiliar with obtaining the type of security services needed in Iraq. Such an effort would necessarily entail a thorough assessment of the advantages, disadvantages and risk mitigation strategies of the potential options. The Department did not indicate whether it agreed with our recommendation to establish a means to account and plan for security costs. The Department's comments appear in appendix III.

USAID found the report factually correct, but did not comment on the recommendations. USAID's letter appears in appendix IV.

## Background

The United States, along with its coalition partners and various international organizations and donors, has continued to support efforts to rebuild Iraq in the aftermath of the war that replaced Iraq's previous regime. From April 2003 to June 28, 2004, the CPA served as Iraq's interim government and was responsible for overseeing, directing, coordinating, and approving rebuilding efforts. With the establishment of Iraq's interim government, the CPA ceased to exist and its responsibilities were transferred to the Iraqi government or to other U.S. agencies. The Department of State is now responsible for overseeing U.S. efforts to

rebuild Iraq. DOD's Project and Contracting Office (PCO)[6] and the U.S. Army Corps of Engineers have played a significant role in awarding and managing reconstruction contracts. USAID has been responsible for various reconstruction and developmental assistance efforts, including those related to capital construction projects, local governance, economic development, education, and public health.

As figure 1 demonstrates, the battle space in Iraq can best be described as complex. A complex battle space is one where military forces, civilian U.S. government agencies, international organizations, contractors, nongovernmental organizations, and the local population share the same geographical area.

---

[6] In May 2004, the President signed National Security Presidential Directive 36, which established the PCO as a temporary organization within DOD. The PCO provides acquisition and project management support for the reconstruction effort in Iraq. PCO personnel in Iraq are permanently or temporarily assigned under the Chief of Mission authority.

**Figure 1:  The Complex Battle Space in Iraq**



Source: GAO.

Included on the complex battle space are private security providers.  While there is no mechanism in place to track the number of private security providers doing business in Iraq or the number of people working as private security employees, DOD estimates that there are at least 60 private security providers working in Iraq with perhaps as many as 25,000 employees.  The providers may be U.S. or foreign companies and their staffs are likely to be drawn from various countries, including the United States, the United Kingdom, South Africa, Nepal, Sri Lanka, or Fiji, and may

include Kurds and Arabs from Iraq. Generally, private security providers provide the following services:

- Static security – security for housing areas and work sites.

- Personal security details – security for high-ranking U.S. officials.

- Security escorts – security for government employees, contractor employees, or others as they move through Iraq.

- Convoy security – security for vehicles and their occupants as they make their way into Iraq or within Iraq.

- Security advice and planning.

The CPA issued a number of orders or memoranda to regulate private security providers and their employees working in Iraq. Among these are CPA Order number 3, (Revised)(Amended) which described the types of weapons that can be used by private security providers; CPA Order number 17 (Revised), which stated that contractors (including private security providers) will generally be immune from the Iraqi legal process for acts performed in accordance with the terms and conditions of their contracts; and CPA memorandum number 17, which stated that private security providers and their employees must be registered and licensed by the government of Iraq.

According to security industry representatives we contacted, there are no established U.S. or international standards that identify security provider qualifications in such areas as training and experience requirements, weapons qualifications, and similar skills that are applicable for the type of security needed in Iraq. Some security industry associations and companies have discussed the need for and desirability of establishing standards, but as of March 2005 such efforts are only in the preliminary stages of development.

# Security for Civilians and Contractors in Iraq Is Provided by a Mix of Military Forces, State Department Security Personnel, and Private Security Providers

U.S. civilian government agencies and reconstruction contractors have had to contract with private security providers because it is not part of the U.S. military's stated mission to provide security to these organizations. U.S. forces in Iraq provide security to contractors and DOD civilians who support military operations. The Ambassador is charged with generally ensuring the security of most executive branch employees in Iraq. Government agencies have contracted with a number of private security providers to provide personnel, escort, and site security. Reconstruction contractors are generally responsible for providing for their own security according to the terms of their contracts, and they have generally done so by contracting with private security providers. The contractors' efforts to obtain suitable security providers have met with mixed results. More than half of the contractors awarded contracts in 2003 replaced their security providers. Contractor officials attributed this turnover to various factors, including the contractors' need to acquire security services quickly, their lack of knowledge of the security market and potential security providers available to provide the type of security services required in Iraq, and the absence of useful agency guidance. Finally, while the U.S. military is not responsible for providing security for civilian agencies and reconstruction contractors, it does provide some services, such as emergency medical support, to U.S. government-funded contractors.

## The U.S. Military Provides Security for Civilians and Contractors Who Deploy with the Force

The stated mission of U.S. military forces in Iraq is to establish and maintain a secure environment, allow the continuance of relief and reconstruction efforts, and improve the training and capabilities of the Iraq Security Forces. As part of this mission, U.S. forces in Iraq provide security for DOD civilians who deploy with the force, non-DOD U.S. government employees who are embedded with the combat forces and contractors who deploy with the combat force. Among the contractors who deploy with the force are those that provide maintenance for weapon systems, those who provide linguistic and intelligence support to combat forces, and those who provide logistics support. Contractors who deploy with the force generally live with and directly support U.S. military forces and receive government-furnished support similar to that provided to DOD civilians.

According to CENTCOM officials, the military uses soldiers rather than private security providers to provide security to contractors, civilians, facilities, or convoys which support combat operations because of concerns regarding the status of security personnel under the law of international armed conflict. This body of law considers contractors who

deploy with the force generally to be noncombatant civilians accompanying the force who may not take a direct part in hostilities. CENTCOM is concerned that using armed private security employees to protect clearly military activities would risk a change in status for these contractors from noncombatants to illegal combatants. Thus, the private security employees could lose the protections otherwise granted contractors accompanying the force under international law.

At the time we published our report, DOD was in the process of establishing its first departmentwide policy on the military's security responsibilities for contractor personnel. The draft directive and instruction specify that the military shall develop a security plan for protection of contractor personnel and the contracting officer shall include in the contract the level of protection to be provided to contractor personnel. In appropriate cases, the combatant commander shall provide security through military means, commensurate with security provided DOD civilians. In May 2005, DOD also issued a new standard contract clause in the Defense Federal Acquisition Regulation Supplement (DFARS), to be included in all DOD contracts involving support to deployed forces stating that the Combatant Commander (for example, the CENTCOM Commander) will develop a security plan to provide protection, through military means, of contractor personnel engaged in the theater of operations unless the terms of the contract place the responsibility with another party.[7] Prior to the issuance of the new contract clause, the Army's policy expressly required Army commanders to provide security for deployed contractors, while the Air Force's policy gave the Air Force the option of whether or not to provide force protection to Air Force contractors. It is important to note, however, that the proposed DOD departmentwide policy, procedures and standard contract clause do not cover non-DOD government contractors who may be in a military theater of operations. As discussed in the following, these contractors are responsible for providing their own security.[8]

---

[7] DFARS Subpart 225.74.

[8] In response to public comments on the proposed new DFARS clause for contractor personnel supporting a force outside the United States, DOD stated that the new clause does not apply to nation building efforts such as the reconstruction of Iraq. See 70 *Fed. Reg.* 23791.

**Civilian U.S. Government Agencies Provide for Their Own Security in Iraq**

The State Department is responsible for the security of most of the executive-branch U.S. Government employees located in Iraq.[9] According to the President's Letter of Instruction, the U.S. Ambassador, as Chief of Mission, is tasked by the President with full responsibility for the safety of all United States government personnel on official duty abroad except those under the security protection of a combatant commander or on the staff of an international organization. The embassy's Regional Security Officer is the Chief of Mission's focal point for security issues and as such establishes specific security policies and procedures for all executive branch personnel who fall under the Chief of Mission's security responsibility.

In June 2004, representatives[10] from the Department of State and DOD signed two memoranda of agreement to clarify each department's security responsibilities in Iraq. Among other things the agreements specify that

- In general, the Chief of Mission is responsible for the physical security, equipment, and personnel protective services for U.S. Mission Iraq;[11]

- The Commander, CENTCOM is responsible for providing for the security of the International Zone as well as regional embassy branch offices throughout Iraq;

- Military capabilities may be requested by the Chief of Mission to provide physical security, equipment, and personal protective services only when security requirements exceed available Marine Security Guard Detachment, Department of State Diplomatic Security Service, and Department of State contracted security support capabilities;

---

[9] We recently discussed the Department's efforts to protect U.S. officials working abroad. See GAO, *Overseas Security: State Department Has Not Fully Implemented Key Measures to Protect U.S. Officials from Terrorist Attacks Outside of Embassies*, GAO-05-642 (Washington, D.C.: May 9, 2005).

[10] One memorandum was signed by the Deputy Secretary of Defense and the Deputy Secretary of State, the second was signed by the Ambassador to Iraq and the Combatant Commander, U.S. Central Command. The first memorandum deals with security assistance, the second with security responsibilities.

[11] All executive branch agencies in Iraq are part of U.S. Mission Iraq except those which fall under the command of the CENTCOM commander.

- U.S. forces will provide force protection and Quick Reaction Force support outside the International Zone, to the extent possible, for Embassy personnel and activities; and

- The Ambassador has security responsibility for DOD personnel under the authority of the Chief of Mission. This includes the Marine Security Detachment and personnel working for the PCO.

In Iraq, the State Department, USAID, the U.S. Army Corps of Engineers, and the CPA[12] contracted with commercial firms to provide security. Our review of six agency-awarded security contracts, awarded between August 2003 and May 2004, showed that as of December 31, 2004, the agencies had obligated nearly $456 million on these contracts. In turn, the private security providers had billed the agencies about $315 million by that date for providing various services, including personal security details; security guards; communications; and security management. The companies providing security for U.S. government agencies may be U.S. or foreign. For example, while USAID contracted with a U.S. firm, the U.S. Army Corps of Engineers and the PCO are using British companies to meet their security requirements. Security for the Ambassador is provided by a U.S. company, and only U.S. citizens are used to provide protection.

Security providers who provide security for executive branch employees follow the procedures and policies established by the Regional Security Officer. For example, one security provider told us that the Regional Security Officer recently increased the number of cars required for moving people within Iraq. The provider's representative told us that they were obligated to comply with the Regional Security Officer's instructions even though the contract was not awarded by the State Department and the company does not provide security for State Department personnel.

## Contractors Rebuilding Iraq Obtained Their Own Security with Little Assistance from the Agencies

Contractors engaged in reconstruction efforts were generally required to provide for their own security, and they have done so by awarding subcontracts to private security providers. Contractors did not anticipate the level of violence eventually encountered in Iraq and found themselves needing to quickly obtain security for their personnel, lodgings, and work sites. As of December 31, 2004, our review of 15 reconstruction contracts

---

[12] A U.S. Army contracting activity awarded several security contracts on behalf of the CPA.

for which we had data found that the contractors had obligated more than $310 million on security subcontracts, and in turn, the security providers had billed the contractors more than $287 million. The contractors' efforts to obtain suitable security providers met with mixed results, as many subsequently found that their security provider could not meet their needs. Overall, we found that contractors replaced their security providers on five of the eight reconstruction contracts awarded in 2003 that we reviewed.[13] This was attributable, in part, to the contractors' need to acquire security services quickly, their lack of knowledge of the security market and potential security providers available for the type of security services required for Iraq, and the absence of useful agency guidance. Information reflected in the agencies' own contracts for security, such as training and weapons qualifications requirements, could have assisted the contractors in identifying potential criteria for evaluating security providers and in structuring their subcontracts.

Agency officials expected that the post-conflict environment in Iraq would be relatively benign and would allow for the almost immediate beginning of reconstruction efforts. During a discussion with DOD we were told that this expectation was based on determinations made at the most senior levels of the executive branch and the contracting officials were bound to reflect that expectation in their requests for proposals. Consequently, they made few or no plans for any other condition. Reconstruction contractors shared this perspective, relying upon the language in the agency requests for proposals and the comments of agency representatives at pre-proposal and other meetings. Our discussions with contractor officials found that they anticipated providing for only a minimal level of security under their contracts, such as hiring guards to prevent theft and looting at residential and work sites. In one case, the contractor expected that the military would provide security for its personnel.

Our review of the agencies' request for proposals and other documents found that they were consistent with this expectation. For example, our review of five contracts awarded by late July 2003, including four awarded by USAID and one awarded by the U.S. Army Corps of Engineers, found that

- USAID's requests for proposals instructed the contractors that work was to begin only when a permissive environment existed. Contractors

---

[13] On one additional 2003 contract, the contractor provided its own security.

were given little guidance concerning security for their personnel and facilities and were not asked to estimate security costs as part of their proposals.

- The U.S. Army Corps of Engineers' request for proposal noted that the military was expected to provide security for the contractor and, thus, the contractor was not required to propose any security costs.

According to agency and contractor officials, the Iraqi security environment began to deteriorate by June 2003, although two contractors noted that the bombing of the United Nations compound in August 2003 made it apparent that the insurgency was beginning to target nonmilitary targets (see figure 2).

**Figure 2: Incidence of Attacks against Civilians and Infrastructure Targets between June 2003 and April 2005**



Source: GAO Analysis of data supplied by DOD.

Contractor officials told us that as the security environment worsened they unexpectedly found themselves in immediate need of enhanced security services. These officials told us that they received little guidance from the agencies relative to possible security providers. We found that the contractors' efforts to obtain security providers often met with mixed results. For example:

- One contractor, awarded a contract by the U.S. Army Corps of Engineers, expected that the U.S. military would provide security for its personnel. That contractor expressed concern, however, that the military protection being provided was insufficient to ensure its employees' safety and to allow for the performance of its mission and subsequently stopped work at one of its locations. In June 2003, the Army finally told the contractor that it did not have adequate forces to continue to provide security as promised, and advised the contractor to acquire its own security,[14] the contractor awarded a subcontract to a security provider in June 2003. In this case, the contractor has been satisfied with the services provided and retained the security provider when the contractor was subsequently awarded another reconstruction contract in June 2004.

- One USAID reconstruction contractor told us it quickly awarded a non-competitive subcontract to a security provider in July 2003. Within three months, the security company notified the reconstruction contractor that it was pulling its employees out of the country. As a former prisoner-transport service firm trying to expand into the protective services area, it discovered it lacked sufficient capacity to fulfill its contract requirements in Iraq. The reconstruction contractor subsequently conducted a competition among security providers already operating in Iraq to meet its needs.

- Another reconstruction contractor initially hired a security service provider in October 2003. A contractor official stated that it soon became apparent that the security provider did not have the capacity to meet its security needs. As a result, the contractor awarded another subcontract, on a sole-source basis, to a security provider to augment the security services provided to its personnel.

---

[14] Pursuant to FAR Part 44, subcontracts are generally required to be awarded competitively, to the maximum practicable extent. The contractor prepared a justification, which was, in turn, approved by the contracting office.

- Three of the reconstruction contractors we reviewed hired a newly established security provider company that was marketing itself in Iraq in mid- to late 2003. Officials representing one contractor told us that the provider was the only known provider capable of meeting their needs; officials for another contractor told us that they selected the provider based, in part, on its reputation. Each of the contractors, however, for various reasons, replaced the security provider. Subsequently, this security provider has been suspended from receiving further government contracts due to allegations of fraudulent billing practices.

Overall, we found that five of the eight reconstruction contractors that were awarded contracts in 2003 that we reviewed replaced their initial or second security provider with another company, while in other cases, the contractors needed to augment the security services provided by their initial provider. As shown in figure 3, two contractors have awarded up to four contracts for security services.

**Figure 3: Number of Security Providers Employed on Reconstruction Contracts Awarded in 2003 and Reviewed by GAO**



Source: GAO analysis of security provider subcontracts provided by reconstruction contractors.

Contractor officials attributed this turnover to various factors, including the urgent need to obtain security, the increasing threat level, their lack of knowledge of potential sources and the security market, and the absence of useful agency guidance. In this latter regard, the detailed standards and requirements in their own agency security contracts may have provided useful assistance to reconstruction contractors in identifying potential criteria for evaluating security providers and in structuring their subcontracts. For example, the USAID security services contract, awarded in August 2003, contained

- a detailed and required organization structure to be used by the contractor, with titles, duties and responsibilities of various levels of security providers specified;

- requirements for background checks on potential employees and provisions for agency approval and acceptance of those employees;

- detailed standards of conduct for contractor employees;

- language, health, and training requirements;

- weapons capability requirements; and

- instructions regarding providing armored vehicles.[15]

Our review of five other agency security contracts awarded directly to private security providers from December 2003 through May 2004 for the protection of agency personnel in Iraq found that, to varying degrees, most of the cited areas were addressed. Conversely, our review of the subcontracts awarded by the reconstruction contractors to their security providers generally contained far less information.

According to most contractor officials with whom we spoke, information similar to that included in the agency's contracts would have assisted them in defining their security needs and structuring their security subcontracts.

---

[15] USAID awarded its security contract on a sole-source basis citing an urgent and compelling need. In January 2005, the USAID Inspector General found, however, that in its efforts to award the contract quickly, USAID failed to adequately document the selection of the security provider and the purchase of armored vehicles that did not meet U.S. government standards. USAID generally agreed with the Inspector General's findings and is taking corrective actions.

Some contractor officials also noted that agency assistance with identifying and vetting potential security provider companies would have been very useful or would be useful in future similar situations. They discussed the possibility of a qualified vendors list, or, if time permitted, the establishment of a multiple award schedule of qualified security providers, which contractors could use to quickly contract for their security needs through competitive task orders.[16]

Agency officials believed that information regarding personnel qualifications and competent providers could be made available to contractor personnel in future efforts, especially if the information was provided for the contractor's consideration, rather than being a contract requirement. For example, one agency official noted that his agency's requests for proposals for security services are publicly available. Some officials believed that making information a contractual requirement would infringe upon the contractor's privity of contract with its subcontractors and might pose a potential government liability should such requirements later prove inadequate. Other officials believed that it should be the contractor's responsibility to research and decide for itself its own needs and sources of security services without assistance from the government.

## DOD Provides Emergency Quick Reaction Forces and Other Services to Contractors in Iraq

According to U.S. officials and contractor personnel we interviewed, U.S. military forces in Iraq will provide, when assets are available, emergency quick reaction forces to assist contractors who are engaged in hostile fire situations. The military is also providing other support services to U.S. government-funded contractors, to include private security providers. For example, U.S. military forces will assist with the recovery and return of contractor personnel who have been kidnapped or held hostage. Additionally, the U.S. military also provides medical services above the primary care level to contractors. These services include hospitalization, as well as laboratory and pharmaceutical services, dental services, and evacuation services, should the patient require them. In addition, military is providing medical support to private citizens, third country nationals, and foreign nationals when necessary to save life, limb, or eye-sight. Finally, contractors are entitled to receive mortuary affairs services. DOD is providing these services pursuant to authorities under Title 10,

---

[16] For example, the General Services Administration currently maintains a multiple award schedule that federal agencies can use to obtain various types of security services within the United States.

United States Code, as well as a variety of DOD Directives, a June 2004 support agreement between DOD and the Department of State, National Security Presidential Directive 36 (which governs the operations of the U.S. government in Iraq) and specific contract provisions.

# While the Relationship between Security Providers and the Military Has Improved, Actions Should Be Taken to Further Improve Effectiveness

The military and the private security providers in Iraq have an evolving relationship based on cooperation and coordination of activities and the desire to work from a common operating picture. However, U.S. forces in Iraq do not have a command and control relationship with private security providers or their employees. Initially, coordination between the military and private security providers was informal. However, since the advent of the Reconstruction Operations Center in October 2004, coordination has evolved into a structured and formalized process. While contractors and the military agree that coordination has improved, some problems remain. First, private security providers continue to report incidents between themselves and the military when approaching military convoys and checkpoints. Second, military units may not have a clear understanding of the role of contractors, including private security providers, in Iraq or of the implications of having private security providers in the battle space.

## U.S. Forces Do Not Have Command and Control over Private Security Providers Working In Iraq

According to CENTCOM officials and military personnel who have been stationed in Iraq, U.S. military forces in Iraq do not have a command and control relationship with private security providers or their employees. According to a DOD report[17] on private security providers working in Iraq, U.S. military forces in Iraq have no command and control over private security providers because neither the combatant commander nor his

---

[17] DOD report to Congressional Defense Committees as required by the Ronald W. Reagan National Defense Authorization Act for fiscal year 2005, Pub. L. No. 108-375, section 1206 (Oct. 28, 2004).

forces have a contractual relationship with the security providers.[18] Instead, military and security provider personnel who served in Iraq described a relationship of informal coordination, where the military and private security providers meet periodically to share information and coordinate and resolve conflicts in operations.

Despite a lack of command and control over private security providers and their employees, commanders always have authority over contractor personnel, including private security provider personnel, when they enter a U.S. military installation. Commanders are considered to have inherent authority to protect the health and safety, welfare, and discipline of their troops and installation.[19] This authority allows the commander to establish the rules and regulations in effect at each installation. For example, an installation commander may determine traffic regulations, weapons policies, force protection procedures, and visitor escort policies. Contractors, including private security providers, who fail to follow the military's rules and regulations while they are on the installation can be prohibited from entering the installation and using its facilities. As an example, one Army official told us that his unit had barred some private security employees from using the unit's dining facilities because the private security employees insisted on carrying loaded weapons into the dining facility. The unit did not allow loaded weapons in the dining facility for safety reasons.

---

[18] Although DOD does not have an explicit command and control relationship with private security providers, there are sanctions that can be imposed in response to acts of misconduct. DOD points out in its report to Congress that private security providers, in the absence of a formal declaration of war by Congress, are generally not subject to prosecution under the Uniform Code of Military Justice, but they remain subject to prosecution by the Department of Justice under applicable U.S. federal laws, to include the Military Extraterritorial Jurisdiction Act (18 U.S.C. 3261), the special maritime and territorial jurisdiction provisions of 18 U.S.C. 7(9), and the War Crimes Act (18 U.S.C. 2441). To date, DOD reports that there have been no disciplinary actions brought against private security providers for acts of criminal misconduct.

[19] See Department of Defense Directive 5200.8, Security of DOD Installations and Resources (Apr. 25, 1991).

## Coordination Between the Military and Private Security Providers in Iraq Has Evolved Since the Beginning of Reconstruction

Coordination between the military and the private security providers has evolved from an informal coordination based on personal relationships to a more structured, although voluntary, mechanism established by the Project and Contracting Office (PCO). According to military officials, contractors, and security providers coordination between the military and security providers was initially done informally. When a private security provider arrived in a unit's area of operation, the security provider would try to meet with key officials of the unit and establish a relationship. A private security provider we spoke with told us that the results of this informal coordination varied based on the individual personalities of the military and provider personnel. According to some security providers, although many military commanders were very interested in establishing a relationship with the security providers, others were not. Additionally, coordination was inconsistent. For example, one officer who had served with the 4th Infantry Division in Iraq told us that coordination in his area was mixed. According to the officer, some security providers, such as the one providing security for the Iraqi currency exchange program, would always coordinate with the division before moving through the division's area of operations but another contractor rarely coordinated with the division. This is similar to information we obtained from officials of the 2nd Armored Cavalry Regiment. One officer from one of the regiment's squadrons told us that contractors that worked within the unit's area of operation generally coordinated with the regiment while those who were traveling in or through his unit's area of operation generally did not coordinate with the regiment. He also told us that on one occasion security providers escorted the CPA administrator into their area of operation without the squadron's knowledge and while the squadron was conducting an operation in Najaf. According to the officer, a fire fight broke out at the CPA administrator's location and the squadron had to send troops to rescue the CPA administrator and his party. This had a significant impact on its operation, according to the officer. Another officer, who served on the Combined Joint Task Force-7[20] staff, told of instances when contractors died and the division commander did not know that the contractors were operating in his area of operations until he was instructed to recover the bodies. Finally, according to a military officer serving with the PCO at the time of our review, the genesis of the Reconstruction Operations Center

---

[20] Combined Joint Task Force-7 was a subordinate command of CENTCOM and was responsible for the daily prosecution of the war. It was succeeded by Multi National Force-Iraq (MNF-I) in May 2004.

(ROC) (discussed next) was the need to improve coordination between contractors and the major subordinate commanders.

The ROC serves as the interface between the military and the contractors in Iraq and is located within the PCO. In May 2004, the Army awarded a contract to a private security provider to provide security for PCO personnel and to operate the ROC, shown in figure 4. The goal of the ROC, which became operational in October 2004, is to provide situational awareness, develop a common operating picture for contractors and the military, and facilitate coordination between the military and contractors.

**Figure 4: National Reconstruction Operations Center, Baghdad, Iraq**



Source: Used with permission of the ROC contractor and the PCO.

The national ROC is located in Baghdad and six regional centers are co-located with the military's major subordinate commands, to enhance coordination between the military and the private security providers. Figure 5 shows the locations of the regional centers.

**Figure 5: Locations of the Regional Reconstruction Operations Centers in Iraq**



Source: DOD.

Participation in the ROC is voluntary (although some DOD officials told us that participation should be mandatory) and is open (at no cost) to all U.S. government agencies, contractors, and nongovernmental organizations operating in Iraq. The ROC and the regional centers are staffed with a combination of military, U.S. government civilian, and contractor personnel who provide a number of services for private security providers and others. Among the services the ROC provides are:

- Intelligence information. The military provides unclassified intelligence information to the ROC for dissemination to contractors. Intelligence information is updated daily and information is available on a password-protected Web site and through daily intelligence briefings. In addition, contractors can request specific threat assessments on future building sites and planned vehicle routes. Contractors use the ROC to pass on information about incidents and threats to coalition forces as well.

- Military assistance. The ROC serves as the 911 for contractors who need military assistance. Contractors who need assistance contact either the national ROC or the regional ROCs and ROC personnel contact the closest military unit and ask it to provide assistance. Assistance, such as a quick reaction force or medical assistance, is provided if military assets are available. Security providers we spoke with said that they rarely call for a quick reaction force because incidents with insurgents are usually over within a matter of minutes but on some occasions the quick reaction forces have proved to be very helpful. For example, one after action report described an incident in February 2005 in which a private security team was ambushed by 20 insurgents and attacked by small arms fire and three rocket-propelled grenades. The contractors contacted both the regional ROC in Mosul and the national ROC in Baghdad. The military responded with fixed wing assets within 15 minutes and a rotary wing quick reaction force escorted the team safely back to Mosul. Contractors more frequently receive medical assistance from the military and described the assistance they received as excellent. Figure 6 depicts the process used to request assistance through the ROC or the regional ROCs.

**Figure 6: Process for Requesting Assistance through the ROC**



Source: GAO from data provided by ROC contractor.

- **Improved communications.** Communications with the military can be difficult in Iraq because of a lack of radio interoperability between the military and contractors. The ROC facilitates communications between the military and contractors. First, the ROC provides contact numbers for the military to private security providers to use when they are moving around in Iraq. Second, the ROC will ensure that the military is aware of contractor movements. Security providers who so choose can provide the ROC with information on convoy movements, which the ROC will forward to the appropriate military commands. Third, the ROC can contact the military to provide assistance to contractors, and finally, the ROC can track convoys through a real-time tracking system that uses the global positioning system and includes a communications link with the ROC if assistance is needed.

## Some Coordination Problems Remain between Private Security Providers and the U.S. Military

While security providers, reconstruction contractors, and military representatives of the PCO believe that the ROC has improved coordination on the complex battle space in Iraq, both the private security providers and the military believe that several coordination issues remain to be resolved. Security providers and military officials expressed continuing concern about incidents between security providers and the military when approaching military convoys and checkpoints and the need

for a better understanding of the complex battle space by both private security providers and the military.

**Blue on White Incidents Are of Major Concern to the Military and Private Security Providers**

One of the coordination issues that contractors and the military continued to be concerned about is blue on white violence. Blue on white violence is the term used by contractors and the military to describe situations when the military fires at friendly forces (such as contractors) or, as happens less frequently, when private security employees fire at military forces. An analysis of incident reports completed by the ROC indicates that these incidents happen most frequently when contractors encounter a military checkpoint or a military convoy. Private security providers have told us that they are fired upon by U.S. forces so frequently that incident reports are not always filed with the ROC. According to some incident reports filed with the ROC, some contractors believe that U.S. forces have fired on private security provider vehicles without provocation. For example, one security company official reported that his convoy was traveling on a route in Iraq when a U.S. military convoy approached. According to the report, the security convoy identified itself using generally recognized identification procedures and pulled off the road to allow the military convoy to pass. After about half of the 20-vehicle convoy had passed, a gunner in the military convoy began firing at the security convoy. According to the after incident report filed with the ROC, no injuries or damage resulted from this incident. A similar incident happened on the road from the International Zone to the Baghdad airport. As in the previous incident, part of a U.S. military convoy passed the private security convoy without incident when a gunner in the fourth vehicle of the convoy began to fire at the lead vehicle in the private security convoy. After this incident, the private security team leader received an apology from the servicemember who had fired on the security company vehicle. As a result of this incident, the company's vehicle was rendered unserviceable.

In another incident report, a private security provider documented an incident at a U.S. military checkpoint. According to the report, a security convoy had slowed to approach the checkpoint, and was then fired on by a U.S. soldier. The report went on to say that no verbal or hand warnings were given and no reason was given for the shooting. According to representatives of the security providers and the former director of security for the PCO, many of these incidents happen because of the military's concerns over insurgents using vehicle-borne improvised explosive devices, as well as the inexperience of some U.S. troops.

Reducing the number of blue on white incidents is a high priority for the U.S. military, the PCO, private security providers, and the Private Security Company Association of Iraq, a Baghdad–based association that works with both the U.S. government and the Iraqi government to resolve issues related to private security providers. In late December 2004, in an effort to reduce the number of blue on white incidents, the Multi National Corps-Iraq (MNC-I) issued an order to major subordinate commands in Iraq establishing procedures for private security providers to use when approaching military convoys and military checkpoints. MNC-I directed the subordinate commanders to implement the procedures detailed in the order and to educate all private security providers and military on the procedures. Among the procedures were (1) a prohibition on nontactical vehicles (such as the vehicles used by private security providers) passing moving military convoys; (2) a requirement that warning shots, when fired, be aimed away from a vehicle and demonstrate a clear intention to do harm if directions are not obeyed; and (3) a requirement that vehicles should maintain a distance of a least 200 meters from a military convoy.

In early 2005, MNC-I completed an analysis of friendly-fire incidents that occurred between November 1, 2004 and January 25, 2005 to determine the top 10 lessons learned from such incidents. Among the top 10 lessons was the need for U.S. forces to comply with the rules of engagement, which require that U.S. troops determine that a person's intent is hostile before the military uses deadly force. The other lessons learned were similar to the procedures included in the order. According to a PCO official, the top 10 list was provided to the private security providers.

Despite the MNC-I order, blue on white incidents continue to occur and security providers remain concerned about the frequency of the attacks. In the 5 months (January to May 2005) since the order was issued, the ROC has received reports on 20 blue on white incidents and the number of actual incidents is likely to be higher since, as we noted previously, some providers no longer report these types of incidents. Data on the number of incidents for the 5 months before the order was issued was not available because the ROC did not start collecting information on blue on white incidents until November 2004. A ROC official noted that blue on white incidents had decreased in April 2005. He believed that the reduction was due, in part, to the adoption of the procedures outlined in the order. However, he also noted that the number of incidents could increase again as troops rotate in and out of Iraq or if terrorist attacks increase.

| | |
|---|---|
| **Units Do Not Receive Specific Training or Guidance about Working with Private Security Providers before Deploying** | Military units that deployed to Iraq received no guidance or training regarding the relationship between private security providers and the military prior to deploying. Representatives from the 2nd Armored Cavalry Regiment, the 82nd Airborne Division, and the 1st Marine Expeditionary Force all told us that they received no guidance from either CENTCOM or Combined Joint Task Force-7 and that their units had not developed any written procedures for dealing with private security providers. Furthermore, a representative of a unit that is preparing to deploy, the 101st Airborne Division, told us that it had not received any guidance on how to work with private security providers nor had it been directed to include information on private security providers, the PCO, or the ROC in its pre-deployment training, even though the 101st will be co-located with a regional ROC. To highlight the lack of training and guidance, representatives from one unit told us that they did not know there were private security providers in their battle space until the providers began calling for assistance. They also noted that any information about who would be in the battle space and the support the military should be providing would be useful.

Several private security providers we spoke with told us that they believed it would be helpful if U.S. forces who deployed to Iraq received information on private security providers in Iraq. For example, the providers believed that U.S. troops needed more information on why private security providers are in Iraq, the impact of having private security providers there, and the operational styles of the private security providers. Army officials we spoke with believed that this type of information would be helpful and suggested that private security providers could use additional information about working with the U.S. military as well. |
| **Agencies Have Limited Capabilities to Assess the Cost Impact of Using Private Security Providers** | Despite the significant role played by private security providers in enabling reconstruction efforts to proceed, neither the Department of State, DOD, nor USAID has complete data on the cost associated with using private security providers. For example, the quarterly report submitted by the Department of State to Congress on the status of reconstruction projects and funding does not provide information on security costs that are incurred under reconstruction contracts. Even at the contract level, the agencies generally had varying degrees of information on the costs associated with private security providers. On 15 reconstruction contracts we found that the cost to obtain private security providers and security-related equipment at the reconstruction contract level can be considerable, as it accounted for 15 percent or more on 8 of the 15 contracts we |

reviewed; on only 4 of those 8 contracts, however, did the agencies formally track security costs under a separate task order or contract line item. Agency and contractor officials acknowledged that security costs had diverted planned reconstruction resources and led to canceling or reducing the scope of certain reconstruction projects, though they also noted that other factors have affected reconstruction projects.

## Agencies Do Not Comprehensively Track Costs Associated with Private Security Providers

The Secretary of State is responsible for submitting a quarterly report to Congress that outlines the current status of programs, initiatives, and funds dedicated to the Iraq reconstruction efforts.[21] These quarterly reports provide information at the project and sector level—such as oil or electricity—and acknowledge the challenges and costs associated with the security environment in Iraq. For example, in its April 2005 report, the State Department noted that nearly $1.3 billion in funding has been, or will be, used in part to (1) cover unanticipated post-battle reconstruction costs, (2) cover indirect cost increases of contractors operating on cost-plus contracts that allow them to continue billing even during delays, and (3) account for increased security costs. The reports, however, do not identify the magnitude or impact of the costs associated with security providers on reconstruction efforts or available funding. Discussions with DOD and USAID personnel found that the financial and management information systems used to help prepare the report are not able to track costs incurred by reconstruction contractors for security services. Agency officials noted that to obtain such information would currently require the agencies to request such information from the contractors and manually prepare the information. Agency officials noted they have made inquiries on an ad hoc basis in the past, but cautioned that such requests can be burdensome for both the contractors and agency officials.

Contractor officials acknowledge that the cost of private security services and security-related equipment, such as armored vehicles, has exceeded what they originally envisioned. In some cases, increased security costs resulted in reducing or canceling the scope of some reconstruction projects. For example:

---

[21] Emergency Supplemental Appropriations Act for Defense and for the Reconstruction of Iraq and Afghanistan for FY 2004, Pub. L. No. 108-106, section 2207 (Nov. 6, 2004) as amended by Pub. L. No. 108-309, section 135 (Sep. 30, 2004).

- Contractor officials noted they were originally tasked to rehabilitate 23 electrical substations and had conducted site surveys and procured equipment for all 23 substations. According to contractor officials, however, the U.S. Army Corps of Engineers concluded that securing 14 of the substations would not be cost effective, and therefore reduced the scope to 9 substations. Contractor officials indicated that the equipment and materials procured for the 14 substations have been or will be turned over to the Iraqi Ministry of Electricity.

- In February 2004, USAID obligated an additional $33 million on one of its contracts to pay for unanticipated increases in security costs that left it short of funds to pay for construction oversight and quality assurance, as well as fund administrative costs.

- In March 2005, USAID cancelled two electrical power generation-related task orders totaling nearly $15 million to help pay for increased security costs being incurred at another power generation project in southern Baghdad.

Contractor officials noted, however, that other factors also affected reconstruction progress, such as changes in priorities or higher material costs. For example, officials at one contractor noted that security had not been a significant factor delaying their work; rather, they pointed to delays in reviewing and approving projects and slower than anticipated release of funding. Similarly, USAID officials noted that, among other materials, the cost of concrete is significantly higher than anticipated, driving up the cost of many reconstruction projects.

We found that at the contract level, agency personnel did not have consistent insight into security costs and their impact on reconstruction efforts. For example, agencies often did not require prospective bidders to propose meaningful security costs as part of their contract cost proposal nor require contractors to prepare a baseline security cost estimate at the time of contract award. Many of the contracts, including those awarded after the security environment began to deteriorate, were indefinite delivery contracts, in which the work to be accomplished was often described in general terms, with the specific work to be accomplished determined as task orders are issued. In several cases, agency personnel provided prospective contractors a sample task order to use in preparing their proposals. While the contractors' cost and technical proposals described how they would approach security issues and provided an associated cost estimate, such estimates were only for evaluation purposes

and did not reflect meaningful security costs. Overall, in only 3 of the 16 contracts we reviewed did contractors prepare an initial security cost estimate for the entire contract.

Further, we found that in only 7 of the 16 contracts did the contractors regularly provide security-related cost information in either monthly progress reports or in separate contract line items or task orders. The level of information and insight provided varied greatly depending on the approach taken. For example, on three contracts, the contractor provided security cost-related information for each of its projects, but did not provide information at the total contract level. In one contract, security costs were reported on both the task order and contract level. In one contract, the security cost information was reported under a separate contract line item with other expenses, and visibility was more limited. In the remaining two contracts, the agency established separate task orders specifically to track security-related expenses at the contract level.

In 15 of the 16 reconstruction contracts that we reviewed, we were able to obtain data on the costs of acquiring private security services and related security equipment[22] by reviewing invoices that private security providers and security equipment providers submitted to contractors. Our analysis of this data found that at the reconstruction contract level there was considerable variation in estimated security costs as a percentage of total contract billings (see figure 7).[23] Eight of the 15 contracts had security costs that exceeded 15 percent of total contract billings as of December 31, 2004; on 4 contracts, the percentage of contract billings accounted for by the cost of security subcontractors was more than 25 percent.[24] On only 2 of those 8 contracts in which security costs exceeded 15 percent did agency personnel require the contractors to formally track and report security costs under a separate task order or contract line item. Though

---

[22] One contractor did not specifically track or report the security costs it incurred under the contract.

[23] Overall, the costs to obtain private security services and related security equipment for the 15 reconstruction contracts that we were able to obtain and review were about $334 million, or about 7 percent of total contract billings as of December 31, 2004.

[24] Several contractor officials noted the cost of security relative to total contract costs can vary over time. For example, they noted that initial security costs, such as for mobilizing and equipping security personnel and purchasing armored vehicles, can be considerable in relation to the amount of reconstruction work authorized. As additional work is authorized, the relative percentage accounted for by security costs could decrease considerably.

not required, one contractor reported incurred security costs on two contracts on its own initiative.

**Figure 7:  Percentage of Total Contract Billings Accounted for by Security Subcontractor Expenses as of December 31, 2004**



Source: GAO analysis of contractor supplied information.

While our analysis indicates that at the reconstruction contract level the cost of obtaining private security services can account for a significant percentage of the contract's total cost, it does not reflect total private security costs.  For example, reconstruction contractors did not always specifically track security-related costs incurred by their subcontractors or lower tier suppliers.  According to contractor officials, in seven of the sixteen reconstruction contracts that we reviewed, at least one of their subcontractors provided for their own private security; in five of those seven contracts, all of the subcontractors were required to provide for their own security.[25]  The cost for a subcontractor to obtain private security

---

[25] In three other contracts, the contractors indicated that they provided security for their subcontractors; one contractor did not hire subcontractors; and in the five remaining contracts, the contractor did not know about or did not provide information on subcontractor security needs.

services can be considerable. For example, in one case, the costs incurred by a major subcontractor amounted to almost $10 million, or nearly one-third of what the reconstruction contractor was paying for security. In another case, the costs incurred $3.5 million, or about 8 percent of what the reconstruction contractor was paying for security.

Our analysis and discussions with agency and contractor officials identified several factors that influenced security costs, including (1) the nature and location of the work; (2) the type of security required and the security approach taken; and (3) the degree to which the military provided the contractor security services. For example, projects that took place in a fixed, static location were generally less expensive to secure than a project that extended over a large geographic location, such as electrical transmission lines. In other cases, contractors relied on former military personnel or other highly-trained professionals to provide security to their employees. Conversely, some contractors made more extensive use of local Iraqi labor and employed less costly Iraqi security guards. Lastly, some contractors were able to make use of security provided by the U.S. military or coalition forces. For example, several contractors had facilities within or near U.S.-controlled locations, such as Baghdad's International Zone or on military bases, which reduced their need to obtain private security services. In another case, the contractor was provided a limited degree of protection by the U.S. Army.

Agency and contractor officials had mixed opinions on the value of establishing separate reporting or tracking mechanisms. For example, some agency officials believed that having visibility into security-related costs enabled them to provide more effective contract oversight, and identify security cost trends and their impact on the project. Other officials noted that many factors affect the cost and progress of reconstruction efforts, including changes in planned funding or projects, material costs, and the inability to find qualified workers willing to work in Iraq. Consequently, they indicated that they generally try to manage the projects at a total project level, rather than by individual elements, such as security. For example, they noted that when reviewing project status reports with the contractors, they will question the contractors on the factors causing delays or cost increases. They were not certain that having specific insight into security costs would help them better manage or oversee their projects. Agency program and financial management officials noted that from a budgeting perspective, tracking security cost information could enable staff to provide better estimates of future funding requirements.

Contractor officials generally indicated that establishing a separate task order or contract line item for security enabled them to more efficiently account for and bill security costs and to more accurately report reconstruction progress. For example, officials at one contractor noted that they often had several projects under way which required security. Prior to establishing a separate task order, the security provider would be required to allocate costs to each of the projects even though the security was provided for a given location, often resulting in lengthy and complex vouchers, higher potential for error, and increased administrative expenses. Once a separate task order was established, its security provider charged the costs incurred for providing security to the location, rather than each project, simplifying the billing and review process. Other contractor officials noted that the need to obtain security providers and security-related equipment often occurred during the early stages of the contract when the agencies had issued only a few task orders for specific reconstruction projects. Consequently, contractor officials told us they found themselves incurring considerable security-related expenses during the mobilization phase that had to be allocated to subsequent task orders, thereby increasing costs. These officials noted that allocating security costs to existing task orders would have resulted in the task's cost exceeding the government's estimate. Contractor officials indicated that a separate task order for security would have enabled them to better explain to agency personnel the cost of the reconstruction effort and the impact of security costs and enable them to account for and bill security costs more efficiently.

## Expanded Use of Private Security Providers Does Not Appear to Be Increasing Attrition among Military Personnel

Data from the Defense Manpower Data Center (DMDC)[26] show that in fiscal year 2004, the attrition rates for the occupational specialties preferred by private security providers returned to the same or slightly lower levels than those seen prior to the institution of occupational stop

---

[26] DMDC collects and maintains an archive of DOD's automated manpower, training, and financial databases.

losses[27] in September 2001 despite the increased use of private security providers. Private security providers working in Iraq are hiring former servicemembers with a variety of skills, including servicemembers with military police or Special Operations experience. Military officials told us that they believe that servicemembers with these skills are separating from the military earlier than in prior years. We are unable to determine from this data whether servicemembers are leaving the military for positions with private security providers as the data can only demonstrate trends in attrition, not explain why people are leaving the military or what they intend to do after leaving the military.

Private security providers prefer to hire former military members, particularly Special Operations forces, for their unique skills and experience. Servicemembers with Special Operations background are often hired to fill key positions, such as security advisors and project managers, and to provide personal security to high ranking government officials. These positions may pay as much as $33,000 a month. Other servicemembers may be hired to provide security to civilians in vehicle convoys with salaries between $12,000 and $13,000 per month, while some may be hired to provide site security for buildings and construction projects at somewhat lower salaries. For the most part, employees only receive these salaries when they are working in Iraq, typically 2 to 3 months at a time. All of the U.S.-based private security providers we spoke with told us that they do not actively recruit current servicemembers; however, they do recruit at military-sponsored transition job fairs, through the Internet, and with advertisements in military magazines and newspapers.

## Officials from the Special Operations Command and Army Military Police Believe Attrition Is Increasing Due, in Part, to Security-Related Job Opportunities

Both Special Forces and military police personnel officials believe that attrition is increasing in their military specialties. For example, during a July 2004 hearing before the House Armed Services Committee, Subcommittee on Terrorism, Unconventional Threats and Capabilities, representatives from the U.S. Special Operations Command and the military services' Special Operations commands noted that the number of Special Forces enlisted personnel retiring at 20 years (the first time they are eligible) has been increasing due, in part, to the increased opportunities available in civilian government and with contractors. In addition, representatives of the Naval Special Operations Command and the Air

---

[27] Stop losses are short-term measures that increase force availability by retaining active or reserve component members on active duty beyond the end of their obligated service.

Force Special Operations Command also noted that they were seeing increased attrition rates among those servicemembers with 8 to 12 years of service. According to these representatives, servicemembers leaving at this point in their careers are also leaving for opportunities with contractors.

Army officials have also expressed concerns about attrition in the military police force. For example, officials from the military police personnel office at the Army's Human Resources Command told us that they have seen a significant number of senior noncommissioned officers leave the military police for positions with private security providers. These officials also told us they have seen the average length of service for colonels in the military police branch decrease from 28 to 25 years. Furthermore, in an e-mail provided by the Army's Human Resources Command, a senior noncommissioned officer at the 16th Military Police Brigade noted that the brigade did not meet its reenlistment targets in fiscal year 2004. Finally, the Army Central Command's Provost Marshall in July 2004 told us that he had lost four of his eight senior noncommissioned officers to higher paying private security providers within the last year and was expecting to lose two more senior noncommissioned officers. He also noted that he had lost more than half of his company grade officers as well.

Efforts are being taken by both the military police and Special Forces communities to address retention concerns. For example, the Army plans to double the size of its military police force from 15,500 to 30,000 by 2006 and the Special Operations Command plans to increase its force size from 13,200 to 15,900 over the next 5 to 6 years. Increasing the size of the Army military police and Special Operations will decrease the high operational tempo[28] and relieve some of the stress on military personnel, which these communities believe contributed to higher attrition. In addition, DOD recently began to offer reenlistment bonuses to Special Operations personnel with 19 or more years of experience which range from $8,000 to those who reenlist for one year to as much as $150,000 for those who reenlist for an additional 6 years.

---

[28] In this report, operational tempo refers to the total days military personnel spend participating in normal drills, training, and exercises, as well as domestic and overseas operational missions.

**Attrition Rates for 2004
Returned to Level Seen
Prior to Stop Loss Issuance**

While data from several sources indicate increased attrition in fiscal year 2004 compared to fiscal years 2002 and 2003 in the military skills sought by private security providers, these data also showed that attrition rates in fiscal year 2004 had returned to the levels seen in fiscal years 2000 and 2001, prior to the majority of the stop loss policies that have been instituted by the services at various times since September 2001. Table 1 shows the dates of occupational stop losses for each of the services.

**Table 1: Occupational Stop Loss Dates for the Military Services**

| Service | Stop Loss Began | Stop Loss Ended |
|---|---|---|
| Army | December 2001 | November 2003[a] |
| Navy | September 2001 | August 2002 |
| Air Force | September 2001 | June 2003 |
| Marine Corps | January 2002 | May 2003 |

Source: GAO from DOD data.

[a]Although the Army terminated its occupational stop loss program, at the time we issued this report the Army had a unit stop loss program in effect. The Army's unit stop loss policy applies to soldiers in units preparing to deploy. It applies to all soldiers in a unit and prevents soldiers from leaving the Army within 90 days of their unit's deployment, during the unit's deployment, and 90 days after the unit has returned from its deployment.

Each of the services added and released occupations from stop loss as the needs of the service dictated. For example, the Air Force placed all occupational specialties under a stop loss in September 2001 and then released a number of occupations from the stop loss in January and June 2002. As we noted, the Air Force ended all stop loss activities in June 2003. In the Army, Special Operations forces were placed under stop loss in December 2001 and were released from the stop loss in June 2003, while enlisted servicemembers who served as military police were placed under stop loss in February 2002 and were released from the stop loss in July 2003. Army officers serving as military police were placed under the stop loss in February 2002 and were released from the stop loss in June 2003.

Data obtained from DMDC on the military occupational specialties preferred by private security providers revealed that several of these specialties show increased attrition in fiscal year 2004 over the attrition rates in fiscal year 2003. These specialties include:

- Air Force:  Officer military police

- Army:  Enlisted and Officer Infantry, military police, and Special Forces

- Marine Corps:  Enlisted and Officer Infantry and military police

- Navy:  Enlisted military police, Officer Special Forces, and Enlisted SEALs.

For the specialties listed, the average attrition rates for each fiscal year are shown in figure 8.  As seen in figure 8, the attrition rates for these specialties decreased in fiscal year 2002 and 2003 from their 2000 and 2001 levels and showed an increase in attrition in fiscal year 2004.  These data also show that the levels of attrition seen in fiscal year 2004 were actually lower than those seen in fiscal years 2000 and 2001.

**Figure 8:  Average Attrition Rates for Military Occupational Specialties Preferred by Private Security Providers which Experienced Increased Attrition in Fiscal Year 2004**



Source: GAO analysis of DOD data.

The decrease in attrition rates seen in fiscal years 2002 and 2003 as compared to the rates seen in fiscal years 2000 and 2001 reflect attrition patterns that are seen during stop losses. Service officials told us that stop loss policies affect attrition rates; they can temporarily delay separations and artificially decrease attrition rates for the year of the stop loss. Officials at the Army Human Resources Command also found that stop loss policies can also increase attrition rates for the year preceding the stop loss. For example, the Army saw increased separations in 2002 for military police colonels in anticipation of their occupation-specific stop loss. Given the impact of stop loss policies on attrition, data may not accurately convey the typical personnel losses that would have occurred had the stop loss not been in effect as people left the military both in anticipation of stop loss and after stop loss was lifted. Thus, we are unable to determine whether the increase in attrition rates in fiscal year 2004 was due to the lifting of the stop loss policy or true increases in military attrition.

Figure 9 shows a pattern of decline in attrition rates during the stop loss period followed by a rebound for Army Special Forces in fiscal year 2004. Attrition rates for enlisted Army Special Forces were almost identical in fiscal years 2000 and 2001, and declined through 2003 during the Army Special Forces specific stop loss, which was in effect from December 2001 to June 2003. However, after the stop loss was lifted, attrition rates for the enlisted Army Special Forces almost doubled from 6.5 percent in fiscal year 2003 to 12.9 percent in fiscal year 2004, a level which was about 25 percent higher than the fiscal year 2000 rate. Attrition rates for Army Special Forces officers also declined during the stop loss period and returned to just below the fiscal years 2000 and 2001 levels in fiscal year 2004.



**Figure 9: Army Special Forces Attrition Rates**

Percent attrition rate

Fiscal year

—— Army Special Forces enlisted attrition

- - - Army Special Forces officer attrition

Source: GAO analysis of DOD data.

The Special Operations Command also provided us with continuation rates calculated by DMDC for the Army, Navy, and Air Force Special Operations Commands. Continuation rates were calculated by determining which personnel remained on active duty from one year to the next and are an alternative method used to demonstrate retention and attrition. The continuation rates showed an increase in losses in 2004 for the Army Special Operations and Navy Special Warfare Commands senior noncommissioned officers, as well as Army Special Operations warrant officers. Similar to the DMDC data provided to us, these commands also saw a decrease in losses (or a decrease in attrition rates) in 2002 after a stop loss was issued and, with the exception of the Navy Special Warfare warrant officers, an increase in losses (or an increase in attrition rates) after the stop loss was lifted.

Additionally, as shown in figure 10, the continuation data for Army Enlisted Special Operations personnel with 14 through 19 years of service separated at only a slightly higher rate in 2004 than in the pre-stop loss years — fiscal years 2000 and 2001. In the July 2004 hearing before the House Armed

Services Committee, Subcommittee on Terrorism, Unconventional Threats and Capabilities, the Senior Enlisted Advisor for the United States Special Operations Command stated that the loss of these mature, operationally experienced personnel creates critical operational risk for the Special Forces. According to the Special Operations Command officials with whom we spoke, because the command is losing some of its most experienced personnel, younger less experienced servicemembers are being promoted to leadership positions more quickly than in the past. This need to rely on less experienced personnel has created some concerns for the command.

**Figure 10: Continuation Rates for Army Enlisted Special Operations Personnel with 14 through 19 Years of Service for Fiscal Years 2000 through 2004**



| | | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|
| ☐ | Loss | 116 | 104 | 43 | 31 | 116 |
| ▨ | Con't | 1,225 | 1,229 | 1,257 | 1,245 | 1,121 |
| —○— | Con't | 91.4 | 92.2 | 96.7 | 97.6 | 90.6 |

Source: Special Operations Command.

Note: Con't = continuation.

## Many Factors Influence the Decision to Separate from the Military

While available data indicate that attrition, in almost all of the military specialties favored by private security providers, has returned to pre-September 11, 2001 levels, the data do not indicate why personnel are leaving the military and what they are doing after they leave. Exit surveys conducted with servicemembers leaving the military do not include questions on the servicemembers' future employment plans. Officials at the Army Human Resources Command told us that after September 11, 2001, the opportunities for employment in the security field became more widespread as government agencies as well as private companies and organizations recognized the need to improve their security. These officials as well as officials from the Special Operations Command noted that they are losing personnel not only to private security firms operating in Iraq but also to security management companies operating in the United States, and security operations in other government agencies. Service officials at these commands also attributed the attrition rates to other factors, such as the attraction of a strong civilian economy, high operational tempo, and concerns about various quality of life conditions.

## Conclusions

The reconstruction effort in Iraq is complex, costly, and challenging, in part, due to an urgent need to begin and execute reconstruction projects in an uncertain security environment. The extensive use of private security providers has raised a number of issues, particularly regarding how to facilitate methods contractors use to obtain capable providers. And, once security providers are actively working in an area, they must determine how best to establish effective coordination mechanisms with nearby military forces. While the experience in Iraq was certainly unique relative to historical reconstruction and assistance efforts, it is far less certain whether or not the future will find the United States engaged in reconstruction and assistance efforts in other hostile environments with costs that are likely to be significant. Much has been learned in Iraq over the past two years on this subject that can serve the United States and its contractors well in planning for and executing future reconstruction or assistance efforts.

## Recommendations for Executive Action

We are making four recommendations to address a number of immediate and long term issues:

- To assist contractors operating in hostile environments in obtaining security services required to ensure successful contract execution, we

recommend that the Secretary of State, the Secretary of Defense, and the Administrator, U.S. Agency for International Development, explore options that would enable contractors to obtain such services quickly and efficiently. Such options may include, for example, identifying minimum standards for private security personnel qualifications, training requirements and other key performance characteristics that private security personnel should possess; establishing qualified vendor lists; and/or establishing contracting vehicles which contractors could be authorized to use.

- To ensure that MNF-I has a clear understanding of the reasons for blue on white violence, we recommend that the Secretary of Defense direct the Combatant Commander, U.S. Central Command, to direct the Commander, MNF-I, to further assess all of the blue on white incidents to determine if the procedures outlined in the December 2004 order are sufficient. Furthermore, if the procedures have not proven to be effective, we recommend that the Commander, MNF-I, develop additional procedures to protect both U.S. military forces and private security providers.

- To ensure that commanders deploying to Iraq have a clear understanding of the role of private security providers in Iraq and the support the military provides to them, we recommend that the Secretary of Defense develop a training package for units deploying to Iraq which provides information on the Reconstruction Operations Center, typical private security provider operating procedures, any guidance or procedures developed by MNF-I or MNC-I applicable to private security providers (such as procedures outlined in the December 2004 order to reduce blue on white incidents), and DOD support to private security provider employees. The training package should be re-evaluated periodically and updated as necessary to reflect the dynamic nature of the situation in Iraq.

- To improve agencies' ability to assess the impact of and manage security costs in future reconstruction efforts, we recommend that the Secretary of State, the Secretary of Defense, and the Administrator, U.S. Agency for International Development, establish a means to track and account for security costs to develop more accurate budget estimates.

## Agency Comments and Our Evaluation

DOD, the Department of State and USAID provided written comments on a draft of this report. Their comments are discussed below and are reprinted in appendixes II, III, and IV, respectively.

DOD concurred with each of our recommendations, noting that it welcomed our assistance in improving how DOD and its contractors can plan for and effectively execute contracts in a complex and changeable security environment. Moreover, DOD described the steps it would take to implement some of our recommendations.

The Department of State disagreed with our recommendation to explore options to assist contractors in obtaining private security services, citing concerns that the government could be held liable for performance failures. For example, while the Department noted that it could provide the criteria it utilizes to select its contractors on a non-mandatory basis, it expressed concern that contractors relying on government minimum standards could assert that performance failures were the result of the government establishing poor standards. The Department also noted it was unclear that a government-managed security contractor program would result in enhanced contractor security, compared to a contractor-managed security program. While our work found that contractors had difficulty in obtaining security providers that met their needs and that they would have benefited from the agencies' assistance, we did not recommend a particular course of action nor recommend a government-managed security program. Rather, we recommended that the Department, working jointly with DOD and USAID, explore options to assist contractors that are unfamiliar with obtaining the type of security services needed in Iraq. Such an effort would necessarily entail a thorough assessment of the advantages, disadvantages and risk mitigation strategies of the potential options. Given the significance of contractors in accomplishing reconstruction objectives and the mixed results that they encountered when selecting their security providers, we continue to believe that thoroughly exploring potential options would be prudent.

The Department of State did not indicate whether it agreed with our recommendation to establish a means to track and account for security costs in order to develop more accurate budget estimates. It noted that it can capture costs associated with direct security providers and work with prime reconstruction contractors to determine the feasibility of providing subcontract security costs. It is not clear to us from the Department's comments how it intends to work with DOD and USAID to establish a

uniform means to track and account for private security costs, which is essential given that DOD and USAID are the principal agencies responsible for awarding and managing the majority of reconstruction contracts.

In written comments on a draft of this report, USAID found the report factually correct, but did not comment on the recommendations.

We are sending copies of this report to the Chairman and Ranking Minority Member, House Committee on Government Reform; the Chairman and Ranking Minority Member, House Committee on Energy and Commerce; the Chairman and Ranking Minority Member, Senate Committee on Governmental Affairs; and other interested congressional committees. We are also sending a copy to the Secretary of Defense; the Secretary of State; the Administrator, U.S. Agency for International Development; and the Director, Office of Management and Budget, and will make copies available to others upon request. In addition, the report will be available at no charge on the GAO Web site at http://www.gao.gov.

If you or your staff have any questions, please contact Bill Solis at 202-512-8365 or by e-mail at solisw@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs are found on the last page of this report. GAO staff who made major contributions to this report are included in appendix V.

William Solis
Director,
Defense Capabilities and Management

David Cooper
Director,
Acquisition and Sourcing Management

*List of Congressional Committees*

The Honorable Richard G. Lugar
Chairman
Joseph R. Biden, Jr.
Ranking Minority Member
Committee on Foreign Relations
United States Senate

The Honorable John Warner
Chairman
The Honorable Carl Levin
Ranking Minority Member
Committee on Armed Services
United States Senate

The Honorable Henry Hyde
Chairman
The Honorable Tom Lantos
Ranking Minority Member
Committee on International Relations
House of Representatives

The Honorable Duncan L. Hunter
Chairman
The Honorable Ike Skelton
Ranking Minority Member
Committee on Armed Services
House of Representatives

Appendix I

# Scope and Methodology

To determine the extent to which U.S. government agencies and contractors working in Iraq at the behest of the U.S. government have acquired security services from private security providers, we reviewed a wide array of documents to determine who was responsible for providing security to those types of organizations, including

- warning orders and fragmentary orders issued by the U.S. Central Command (CENTCOM), Combined Joint Task Force-7, Multi National Forces–Iraq, and Multi National Corps-Iraq to determine if any orders had been issued regarding providing security to U.S. government employees or contractors rebuilding Iraq;

- contracting documents such as statements of work, requests for proposals and contracts and contact modifications;

- Department of Defense (DOD) regulations and instructions that relate to the management of contractors during contingency operations;

- Departments of State and Defense memoranda of understanding regarding security and support;

- proposed guidance between the Department of State and the Department of Defense regarding contractor support;

- guidance to contractors prepared by the Coalition Provisional Authority (CPA) regarding contractor operations in Iraq; and

- Department of State rules and regulations, including the Foreign Affairs Manual.

We also met with officials from CENTCOM to obtain the command's position on the extent of the military's responsibility to provide security to civilian government employees and contractors, including both contractors supporting military forces and those engaged in rebuilding Iraq. In addition, we met with or obtained information from Army and Marine Corps units that served in Iraq to discuss their understanding of the military's responsibility to provide security to contractors and civilian government employees and interviewed representatives of the State Department's Office of Diplomatic Security to discuss the State Department's use of private security providers in Iraq as well as representatives of other government agencies working in Iraq who have

contracted with private security providers to provide security to employees and facilities.

To determine how agencies addressed security needs when planning for and awarding Iraq reconstruction contracts, we interviewed officials at the CPA; DOD, including the U.S. Army Corps of Engineers and the Project and Contracting Office (PCO); the Department of State; and the U.S. Agency for International Development (USAID). We discussed the guidance and direction they received prior to awarding contracts and how such information was provided to the contractors. We reviewed various acquisition documents, including agency acquisition plans, requests for proposals, price negotiation memoranda, correspondence between contractors, and other relevant documents. We met with agency and contractor officials to discuss the nature and type of guidance provided relative to the expected security environment, the need for obtaining security services, and requirements and standards for security personnel or security-related equipment.

We identified how security-related requirements were reflected in reconstruction contracts by selecting 16 contracts that were awarded to 10 reconstruction contractors. We selected these contracts using a nonprobabilistic methodology that considered such factors as the awarding agency; the year awarded; the contract's expected dollar value; and the type, nature and location of the reconstruction activity. Nine of these contracts were awarded in 2003 and 7 were awarded in 2004. For each of these contracts, we obtained the contract and contract modifications issued as of December 31, 2004, totaling about $8.6 billion; relevant sections of the contractor's cost and technical proposal; security plans; security-related subcontracts; and other pertinent documents. We also obtained and reviewed 6 contracts that had been awarded by the U.S. Army Corps of Engineers, the Department of State, USAID and by an Army contracting agency for the CPA, for the protection of their personnel and facilities in Iraq to compare the type of security-related requirements incorporated within U.S. government contracts with those incorporated into contracts awarded to reconstruction contractors and, in turn, to subcontracts with security providers.

We identified whether there are existing government or international standards relative to security providers that were applicable to the Iraqi security environment. We also spoke with agency security personnel, including the Department of State's Office of Diplomatic Security and the Overseas Security Advisory Council. We also contacted representatives

from relevant industry associations, including the International Peace Operations Association, International Security Management Association, and the American Society for Industrial Security. We also researched European security-provider standards and conducted a literature review of articles relating to the security provider industry.

To assess the military's relationship with private security providers, we met with or spoke to representatives of CENTCOM, Army Central Command, and the PCO (at the Pentagon and in Baghdad) to discuss issues related to the military's authority over private security providers and reviewed a Department of Defense report to Congress addresses the use of private security providers in Iraq. We also met with or contacted representatives of Army and Marine Corps units that had been stationed in Iraq to determine if they had been provided guidance on working with private security providers and discussed issues related to command and control of private security providers.

To assess the level of cooperation and coordination between the military and private security providers both before and after the advent of the Reconstruction Operations Center (ROC), we spoke with 9 private security providers working in Iraq as well as representatives of military units which had served in Iraq to determine the state of coordination prior to and after the ROC became operational. We spoke with representatives of the PCO to discuss the ROC's role in coordinating the interactions between the military and private security providers and any actions the PCO was taking to improve coordination between private security providers and U.S. military forces. We also discussed coordination issues with the executive director of the Private Security Company Association of Iraq and several reconstruction contractors. We also reviewed information posted on the ROC Web site related to security and reviewed documents developed by the ROC to explain its operations and functions.

To determine the extent to which government agencies assessed the costs associated with using private security providers and security-related costs, we reviewed various contractual documents, including the 16 reconstruction contracts and subsequent modifications, consent to subcontract requests, and monthly cost and progress reports submitted by the contractors we reviewed. We also met with agency and contractor officials to determine the means by which they maintained visibility over security providers and security-related expenses, as well as their general experiences in Iraq, the impact of security on reconstruction efforts, and the process by which they obtained security providers.

Appendix I
Scope and Methodology

We collected data on the costs associated with acquiring and using private security providers or in-house security teams; and the cost associated with acquiring security-related equipment, such as armored vehicles, body armor, communication equipment, and other security-related costs. We did not attempt to quantify the impact of the security environment on increased transportation or administrative expenses, on the pace of reconstruction efforts caused by security-related work stoppages or delays, or the cost associated with repairing the damage caused by the insurgency on work previously completed. We also excluded the cost associated with the training and equipping of Iraqi security forces, or the costs borne by DOD in maintaining, equipping, and supporting U.S. troops in Iraq.

For the 16 contracts we reviewed, we identified whether the agencies or the contractors had initially projected the cost of obtaining private security services. We reviewed various documents, including agency acquisition strategy plans and price negotiation memoranda; the contractor's cost proposals and security plans; and interviewed agency and contractor officials. We identified the actual costs incurred for security services and equipment by reviewing various cost documentation, including invoices, vouchers, and billing logs submitted by the contractors and their security provider(s) through the period ending December 31, 2004. We analyzed this information to determine

- the total amount billed by the contractor to the government;

- the amount billed by security subcontractors to the contractor; and

- the amount billed for other security-related expenses, such as armored vehicles, body armor, communication, transportation costs, lodging, and other security-related equipment.

We estimated the percentage of costs accounted for by private security providers and for security-related equipment by comparing the combined amount billed for these activities to the total amount billed by the reconstruction contractor to the government. We did not attempt to comprehensively identify costs that may have been incurred by subcontractors or lower tier contractors. We did, however, request information from the contractors as to whether their subcontractors required security above that which would typically be required, and if so, whether the subcontractor arranged for its own security or relied on security provided by the reconstruction contractor. We obtained examples

Appendix I
Scope and Methodology

and cost information on selected cases in which subcontractors provided their own security.

As part of our efforts, we reviewed pertinent sections of the Federal Acquisition Regulation, and in particular, the subcontractor competition and notification requirements provided for under Part 44; and relevant CPA, DOD, State Department, and USAID acquisition regulations, policy memoranda and guidance. We coordinated our work with and reviewed reports prepared by the Inspectors General for DOD, State, and USAID; the Special Inspector General for Iraq Reconstruction; and the Defense Contract Audit Agency.

To determine whether private security providers were hiring former military servicemembers, we interviewed three private security providers from the United States that are working in Iraq and discussed the skill sets they hire. Additionally, we spoke with officials at the Marine Corps and Navy human resources commands; the Air Force's Deputy Chief of Staff, Personnel; the Army's Human Resources Command Military Police Branch and the Special Operations Command Personnel Division to ascertain whether certain military occupational specialties and ranks were seeing increased attrition and if private security providers were affecting military attrition. We also reviewed a transcript of a congressional hearing on Special Operations Forces personnel issues held in July 2004.

To assess the extent to which military occupational specialties utilized by private security providers in Iraq are seeing increased attrition we obtained attrition information from the Defense Manpower Data Center's Active Duty Military Officer and Enlisted Master Files, which is an inventory of all individuals on active duty in the services. Our analysis was limited to active duty personnel and did not include reservists. The Center provided information on personnel numbers and losses for fiscal years 2000, 2001, 2002, 2003, and 2004. Attrition for the purposes of this report is an active duty member who is on active duty at the start of a given fiscal year and is no longer on active duty in the same service in the same pay category at the end of that fiscal year. An enlisted member who becomes a warrant or commissioned officer (or vice versa) or a member who changes services is considered to be a loss. The fiscal year lasts from October 1st of the previous year to September 30th of the named year. For example, fiscal year 2000 lasted from October 1, 1999 to September 30, 2000. Personnel numbers were calculated as the total number of members at the start of the fiscal year (for example, October 1, 1999 for fiscal year 2000). Losses are the endforce members who have attrited during the fiscal year (For

example, for fiscal year 2000, losses would be the number of personnel attrited from October 1, 1999 to September 30, 2000.).

We received data from the Defense Manpower Data Center on active duty attrition rates for five military occupational specialties: special forces, military police, infantry, para-rescue, and combat controller. These military occupational groupings were selected because they represented military occupational skills most sought after by private security providers working in Iraq, as determined through interviews with officials at the human resources commands and private security companies. These data were then analyzed to determine whether attrition rates had increased in the past five years and whether servicemembers were separating from the military at increasing rates in certain ranks or number of years of service.

We assessed the reliability of the Defense Manpower Data Center's Active Duty Military Personnel Master file by (1) reviewing existing information about the data and the system that produced them, and (2) interviewing agency officials knowledgeable about the data. We determined that the data were sufficiently reliable for the purpose of this report.

We visited or interviewed officials from the following organizations during our review:

Department of State

- Bureau of Diplomatic Security, Washington, D.C.;

- U.S. Embassy, Amman, Jordan;

- The U.S. Agency for International Development, Washington, D.C., Baghdad, Iraq; and Amman, Jordan.

Department of Defense

- Office of the Under Secretary of Defense, Personnel and Readiness, Military Personnel Policy, the Pentagon;

- The Defense Contract Audit Agency, Fort Belvoir, Virginia.

**Appendix I**
**Scope and Methodology**

Department of the Air Force

- Office of the Deputy Chief of Staff, Personnel, Force Management Division.

Department of the Army

- United States Army Human Resources Command Military Police Branch, Alexandria, Virginia;

- United States Army Central Command (Rear), Fort McPherson, Georgia;

- Project and Contracting Office (Rear), the Pentagon;

- U.S. Army Corps of Engineers, Washington, D.C.;

    - Southwestern Division, Dallas, Texas;

    - Transatlantic Program Center, Winchester, Virginia;

    - Gulf Regional Division, Baghdad, Iraq;

- The Army Contracting Agency, Fort Eustis, Virginia;

- 1st Armored Division, Wiesbaden, Germany;

- 82nd Airborne Division, Fort Bragg, North Carolina;

- 2nd Armored Cavalry Regiment, Fort Polk, Louisiana;

- 1st Cavalry Division, Fort Hood, Texas.

Department of the Navy

- Naval Personnel Command, Millington, Tennessee;

- Marine Corps Manpower Plans and Policy Division, Washington, D.C.;

- 1st Marine Corps Expeditionary Force, Camp Pendleton, California.

Unified Combatant Commanders

- United States Central Command, MacDill Air Force Base, Florida;

- United States Special Operations Command Personnel Division, MacDill Air Force Base, Florida.

Contractors

- Aegis Defence Services, Ltd., London, United Kingdom;

- ArmorGroup, London, United Kingdom;

- BearingPoint Inc., McLean, Virginia;

- Bechtel National, Inc., San Francisco, California;

- Blackwater USA, Moyock, North Carolina;

- CONTRACK International, Inc., Arlington, Virginia;

- Control Risk Group, London, United Kingdom;

- Creative Associates International, Inc., Washington, D.C.;

- DynCorp International, Irving, Texas;

- Fluor Intercontinental, Inc., Greenville, South Carolina;

- General Electric, Atlanta, Georgia;

- Global Risk Strategies, London, United Kingdom;

- Kellogg Brown and Root Services, Inc., Houston, Texas;

- Olive Security, London, United Kingdom;

- Parsons Corporation, Pasadena, California;

- Perini Corporation, Framingham, Massachusetts;

- Research Triangle Institute, Research Triangle Park, North Carolina;

**Appendix I**
**Scope and Methodology**

- Triple Canopy, Lincolnshire, Illinois;

- The Hart Group, London, United Kingdom; and

- Washington Group International, Inc., Boise, Idaho; and Princeton, New Jersey.

Industry Associations

- American Society for Industrial Security International, Alexandria, Virginia;

- International Peace Operations Association, Washington, D.C.;

- International Security Management Association, Buffalo, Iowa;

- Private Security Company Association of Iraq, Baghdad, Iraq;

- Professional Services Council, Arlington, Virginia.

We conducted our review from May 2004 through June 2005 in accordance with generally accepted government auditing standards.

Appendix II

# Comments from the Department of Defense



**OFFICE OF THE UNDER SECRETARY OF DEFENSE**
3000 DEFENSE PENTAGON
WASHINGTON, DC 20301-3000

ACQUISITION,
TECHNOLOGY
AND LOGISTICS

JUL 1 8 2005

Mr. William M. Solis
Director, Defense Capabilities and Management
U.S. General Accountability Office
441 G Street, N.W.
Washington, D.C. 20548

Dear Mr. Solis:

This is the Department of Defense (DoD) response to the GAO draft report, "REBUILDING IRAQ: Actions Needed To Improve Use Of Private Security Providers," dated June 15, 2005 (GAO Code 350554/GAO-05-737). We welcome your assistance in improving how the DoD and its contractors can plan for and effectively execute contracts for reconstruction or assistance efforts in a complex and changeable security environment. Enclosed are DoD's detailed comments regarding the recommendations on pages 45 and 46 of your draft report.

We appreciate the opportunity to review and comment on your findings.

Sincerely,

Deidre A. Lee
Director, Defense Procurement
and Acquisition Policy

Enclosure:
As stated



Appendix II
Comments from the Department of Defense

GAO DRAFT REPORT - DATED JUNE 15, 2005
GAO CODE 350554/GAO-05-737

"REBUILDING IRAQ: ACTIONS NEEDED TO IMPROVE USE OF
PRIVATE SECURITY PROVIDERS"

DEPARTMENT OF DEFENSE COMMENTS
TO THE RECOMMENDATIONS

**RECOMMENDATION 1:** The GAO recommended that the Secretary of State, the
Secretary of Defense, and the Administrator, Agency for International Development,
explore options that would enable contractors to obtain security services quickly and
efficiently. Such options might include identifying minimum standards for security
personnel qualifications, training requirements and other key performance characteristics
that security personnel should possess. (pages 45 & 46/GAO Draft Report)

**DOD RESPONSE:** Concur.

**RECOMMENDATION 2:** The GAO recommended that the Secretary of Defense
direct the Combatant Commander, U.S. Central Command, to direct the Commander,
Multi-National Force-Iraq (MNF-1), to further assess all of the blue on white incidents to
determine if the procedures outlined in the December 2004 order are sufficient. If the
procedures have not proven to be effective, the GAO recommends that the Commander,
MNF-I, develop additional procedures to protect both U.S. military forces and private
security providers. (p. 46/GAO Draft Report)

**DOD RESPONSE:** Concur. DoD's current approach, which leverages the
Reconstruction Operations Center (ROC) to improve coordination between military
forces and Private Security Companies (PSC), is proving effective. There is value in
re-evaluating its effectiveness in reducing blue-on-white engagements after a period of
time. The Joint staff will develop an approach for assessing and improving procedures
for coordination between military forces and PSCs.

**RECOMMENDATION 3:** The GAO recommended that the Secretary of Defense
develop a training package for units deploying to Iraq which provides information on the
Reconstruction Operations Center, typical private security provider operating procedures,
any guidance or procedures developed by MNF-I or MNF-C applicable to private
security providers, and DoD support to private security provider employees. (p. 46/GAO
Draft Report)

Appendix II
Comments from the Department of Defense

**DOD RESPONSE:** Concur. Training materials would benefit both operational military forces and PSCs. The Joint Staff will develop an appropriate training strategy.

**RECOMMENDATION 4:** The GAO recommended that the Secretary of State, the Secretary of Defense, and the Administrator, U.S. Agency for International Development, establish a means to track and account for security costs in order to develop more accurate budget estimates. (p. 46/GAO Draft Report)

**DOD RESPONSE:** Concur. The Secretary of State is responsible for submitting a quarterly report to Congress that outlines the current status of programs, initiatives and funds dedicated to the Iraq reconstruction efforts. As such, the Department of Defense will support the Department of State's efforts to collect security cost data, since the Department of State is the lead organization responsible for directing and reporting on U.S. reconstruction efforts in Iraq. The Department of Defense will collect readily available data on incurred security costs under existing contracts and will establish procedures on accounting for security costs under future reconstruction contracts. Additionally, the Under Secretary of Defense (Comptroller) will work collaboratively with the Department of State and the Administrator, U.S. Agency for International Development to establish a uniformed means to track and account for costs incurred by reconstruction contractors for private security costs in order to develop more accurate budget estimates in the future.

Appendix III

# Comments from the Department of State



**United States Department of State**

*Assistant Secretary and Chief Financial Officer*

*Washington, D.C. 20520*

JUL 1 5 2005

Ms. Jacquelyn Williams-Bridgers
Managing Director
International Affairs and Trade
Government Accountability Office
441 G Street, N.W.
Washington, D.C. 20548-0001

Dear Ms. Williams-Bridgers:

We appreciate the opportunity to review your draft report,
"REBUILDING IRAQ: Actions Needed to Improve Use of Private Security
Providers," GAO Job Code 120354 and 350544.

The enclosed Department of State comments are provided for
incorporation with this letter as an appendix to the final report.

If you have any questions concerning this response, please contact
Corey Rindner, Procurement Executive, Bureau of Administration,
at (703) 516-1689.

Sincerely,

Sid Kaplan (Acting)

cc:    GAO – Tim DiNapoli
       A – Frank Coulter
       State/OIG – Mark Duda

Appendix III
Comments from the Department of State

Department of State Comments on GAO Draft Report
REBUILDING IRAQ: Actions Needed to Improve
Use of Private Security Providers
(GAO-05-737, GAO Code 120354)

Thank you for the opportunity to comment on your draft report entitled
*Rebuilding Iraq: Actions Needed to Improve Use of Private Security
Providers*. Where the Department of State has additional comments they are
outlined after the recommendation as noted below.

GAO Draft Recommendation 1: To assist contractors operating in hostile
environments in obtaining security services required to ensure successful
contract execution, we recommend that the Secretary of State, the Secretary
of Defense, and the Administrator, U.S. Agency for International
Development, explore options that would enable contractors to obtain such
services quickly and efficiently. Such options might include, for example,
identifying minimum standards for *[Recommend GAO insert* "private"]
security personnel qualifications, training requirements and other key
performance characteristics that *[Recommend GAO insert* "private"]
security personnel should possess, establishing qualified vendor lists, and/or
establishing contracting vehicles which contractors could be authorized to
use.

Department of State Comment: State disagrees with the recommendation.
The Department can make available to contractors the criteria it utilizes to
select its contractors, but would be reluctant to mandate the use by
contractors selecting their own security providers. Contractors relying on
government minimum standards could assert that performance failures are
the result of poor standards established by the government.

Government established contracts and qualified vendor lists also subject the
government to claims in the event of poor performance. The government
would have to determine that all vendors are responsible and capable of
performance. Failure to perform could be alleged to be the result of poor
government selection.

Furthermore, the Department of State is unclear from GAO's report what
evidence exists that a Government-managed security contractor program for
private contractors would result in enhanced contractor security, compared
to a contractor-managed security program. Yet, the Department of State

does recognize that the additional administrative costs and potential liability from a Government-managed security contractor program could be substantial.

GAO Recommendation 4: To improve agencies' ability to assess the impact of and manage security costs in future reconstruction efforts, we recommend that the Secretary of State, the Secretary of Defense, and the Administrator, U.S. Agency for International Development, establish a means to track and account for security costs in order to develop more accurate budget estimates.

Department of State Comment: For those contracts that are direct security providers, State can capture those contract costs. For contracts that would require a prime contractor to subcontract for security services, State can work with prime contractors to determine the feasibility of providing the subcontracting costs for security services.

Appendix IV

# Comments from U.S. Agency for International Development



July 8, 2005

Mr. William S. Solis
Director
Defense Capabilities and Management
U.S. Government Accountability Office
441 G Street, N.W.
Washington, D.C.  20548

Dear Mr. Solis:

I am pleased to provide the U.S. Agency for International Development's (USAID) formal response on the draft GAO report entitled Rebuilding Iraq: Actions Needed to Improve Use of Private Security Providers [GAO-05-737].

USAID has reviewed the report and finds it to be factually correct.  We have no further comments on the report.

Thank you for the opportunity to respond to the GAO draft report and for the courtesies extended by your staff in the conduct of this review.

Sincerely,

Steven G. Wisecarver
Acting Assistant Administrator
Bureau for Management

U.S. Agency for International Development
Office of Iraq Reconstruction        Tel: 202-712-0448
1300 Pennsylvania Ave. N.W.           Fax 202-216-3872
Washington DC  20523

Appendix V

# GAO Contacts and Staff Acknowledgements

## GAO Contacts

William Solis (202) 512- 8365

David Cooper (617) 788-0555

## Acknowledgments

In addition to the contacts named above, Steve Sternlieb, Timothy DiNapoli, Carole Coffey, Gary Delaney, John Heere, William Petrick, Timothy Wilson, Moshe Schwartz, Kate Walker, Robert Ackley, David Mayfield, and Sylvia Schatz made key contributions to this report.

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday, GAO posts newly released reports, testimony, and correspondence on its Web site. To have GAO e-mail you a list of newly posted products every afternoon, go to www.gao.gov and select "Subscribe to Updates." |
| Order by Mail or Phone | The first copy of each printed report is free. Additional copies are $2 each. A check or money order should be made out to the Superintendent of Documents. GAO also accepts VISA and Mastercard. Orders for 100 or more copies mailed to a single address are discounted 25 percent. Orders should be sent to: U.S. Government Accountability Office 441 G Street NW, Room LM Washington, D.C. 20548 To order by Phone:  Voice: (202) 512-6000 TDD: (202) 512-2537 Fax: (202) 512-6061 |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact: Web site: www.gao.gov/fraudnet/fraudnet.htm E-mail: fraudnet@gao.gov Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Congressional Relations** | Gloria Jarmon, Managing Director, JarmonG@gao.gov (202) 512-4400 U.S. Government Accountability Office, 441 G Street NW, Room 7125 Washington, D.C. 20548 |
| **Public Affairs** | Paul Anderson, Managing Director, AndersonP1@gao.gov (202) 512-4800 U.S. Government Accountability Office, 441 G Street NW, Room 7149 Washington, D.C. 20548 |

 **PRINTED ON** ♲ **RECYCLED PAPER**