# Exhibit H

```
0001
 1            IN THE UNITED STATES DISTRICT COURT
 2             FOR THE MIDDLE DISTRICT OF ALABAMA
 3                       EASTERN DIVISION
 4
 5   JOHNNY POTTS and           )
 6   JANICE POTTS,              )
 7            Plaintiffs,       )
 8       vs.                    ) Civil Action No.
 9   DYNCORP INTERNATIONAL LLC, ) 3:06-cv-00124-WHA-CSC
10   JAMES McCANTS, et al.,     )
11            Defendants.       )
12       *       *       *       *       *
13
14
15           The deposition of PASCAL BUDGE was taken
16   on Wednesday, January 17, 2007, commencing
17   at 11:00 a.m., at the offices of M.A.R. Reporting
18   Group, 200 Little Falls Street, Suite 410, Falls
19   Church, Virginia, before Terri Duncan, RPR, CCR,
20   Notary Public.
21
22       *       *       *       *       *
0002
 1                 A P P E A R A N C E S
 2
 3   ON BEHALF OF THE PLAINTIFFS:
 4         NANCY L. EADY, ESQUIRE (via
 5              videoconference)
 6         Morris, Haynes & Hornsby
 7         131 Main Street
 8         Alexander City, Alabama  35011-1660
 9         (256) 329-2000
10
11   ON BEHALF OF THE DEFENDANTS:
12         WILLIAM STEELE HOLMAN, II, ESQUIRE
13         Ambrecht Jackson
14         1300 Riverview Plaza
15         63 South Royal Street
16         Mobile, Alabama 36602
17         (251)405-1218
18
19
20
21
22   (Appearances continued on the next page.)
0003
 1   APPEARANCES (continued):
 2
 3   ON BEHALF OF THE DEFENDANTS:
 4         WILLIAM LARKIN RADNEY, III, ESQUIRE
```

265153.1

Defendant 000193

```
10              BY MS. EADY:
11       Q.   Mr. Budge, my name is Nancy Eady, and I
12  represent the plaintiff, Johnny Potts, in this
13  action.  Could you please state your full name for
14  the record, sir.
15       A.   Pascal J. Budge.
16       Q.   Mr. Budge, have you ever given a
17  deposition before?
18       A.   Yes.
19       Q.   How many times?
20       A.   I don't recall.  Not very many.
21       Q.   Less than five?
22       A.   Yes.
0006
 1       Q.   Who are you currently employed with, sir?
 2       A.   DynCorp International.
 3       Q.   What is your position with DynCorp?
 4       A.   I'm a program manager.
 5       Q.   Which program do you currently manage?
 6       A.   It's called Worldwide Personal Protective
 7  Services.  It's a Department of State program.
 8       Q.   How long have you been with DynCorp?
 9       A.   About nine-and-a-half years now.
10       Q.   Is the Worldwide Protective Services
11  program the program with which Mr. McCants was
12  associated?
13       A.   No.
14       Q.   Can you tell me what program that was?
15       A.   I believe, as I recall, he was originally
16  on the Oil-for-Food Program, and later was
17  employed by our business management office in
18  Iraq, BIBM.
19       Q.   Before you were a program manager for
20  Worldwide Personal Protective Services, what did
21  you do for DynCorp?
22       A.   Just prior to that, I was in business
0007
 1  development.
 2       Q.   How long were you in business
 3  development?
 4       A.   I'm sorry?
 5       Q.   When did you start with business
 6  development?
 7       A.   October 2004.
 8       Q.   And when did you start as program manager
 9  for Worldwide Personal Protective Services?
10       A.   November 2006.
11       Q.   Before October 2004, what did you do for
12  DynCorp?
13       A.   I was the support manager for that same
14  WPPS program.
```

265153.1

Defendant 000195

```
 7  to Iraq would receive a threat recognition class,
 8  threat mitigation, personal defensive tactics, and
 9  some historical and political perspective
10  information about Iraq in general.
11       Q.  Do you know if there were any DynCorp
12  International employees over in Iraq?
13       A.  I'm sorry.  I'm not sure I understand
14  your question.
15       Q.  You said that the pre-deployment
16  candidates who went through the pre-deployment
17  training were paid either by DynCorp International
18  or DynCorp International Free Zone.
19       A.  Yes.
20       Q.  Do you know by which entity Mr. McCants
21  was paid for pre-deployment training?
22       A.  I believe he was a DIFZ employee.
0015
 1       Q.  And you base that on what documentation,
 2  sir?
 3       A.  His Foreign Service agreement.
 4       Q.  And you've reviewed his Foreign Service
 5  agreement?
 6       A.  Yes.
 7       Q.  The Foreign Service agreement, then,
 8  would tell you who would be paying -- who paid for
 9  the pre-deployment training?
10       A.  Yes.
11       Q.  You mentioned the process begins with
12  defining the requirements of the position and
13  establishing a labor category.  Do you know what
14  criteria were used for hiring personnel such as
15  Mr. McCants for Iraq?
16       A.  No, I don't.
17       Q.  So you don't know what criteria were used
18  in the decision to hire Mr. McCants?
19       A.  No, I don't.
20       Q.  Who would?
21       A.  It would have been either a program
22  manager or a business development person involved
0016
 1  in securing that contract.  It's likely that the
 2  criteria was largely defined by the contract
 3  itself.
 4       Q.  You said the resumes were vetted.  What
 5  does that mean?
 6       A.  An individual at DynCorp would receive
 7  the candidate resume, and whoever was assigned
 8  would review that resume to ensure that the
 9  candidate's experience matched the qualification
10  criteria.
11       Q.  Do you know who reviewed Mr. McCants'
```

```
12   resume in order to ensure that his experience
13   matched the qualifications for the position?
14        A.   I'm sorry.  I don't.
15        Q.   Do you know where the office -- where
16   that person would have been located?
17        A.   In that time frame, it should have been
18   Fort Worth.
19        Q.   And the person that reviewed the resume
20   would have been employed by whom?
21        A.   DynCorp International.
22        Q.   Let me backtrack a minute.  The person
0017
 1   who defines the criteria for the contract, you
 2   said you did not know who that individual
 3   specifically was.  But do you know who that
 4   individual would have been employed by?
 5        A.   I don't.
 6        Q.   Do you know where that individual's
 7   office would have been based?
 8        A.   I don't know that either.
 9        Q.   Do you know who would?
10        A.   Again, it would either be the individual
11   responsible for the business development -- that's
12   where we will put together the approach and the
13   plan.  So somebody in business development or --
14   who else would know -- that's probably the best
15   place, somebody in business development.
16        Q.   Do you have any way of knowing who would
17   have contacted Mr. McCants as part of the initial
18   contact with the potential candidate?
19        A.   No, I don't.
20        Q.   Do you know where that person's office
21   would have been based?
22        A.   It would have been Fort Worth.
0018
 1        Q.   And would that have been a DI employee?
 2        A.   Yes.
 3        Q.   Do you know if, for the Oil-for-Food
 4   Program, a credit and criminal history check was
 5   necessary?
 6        A.   I don't know if that was a requirement.
 7        Q.   If it had been necessary, what office
 8   would have performed that duty?
 9        A.   The same recruiting office in Fort Worth.
10        Q.   Does the recruiting office in Fort Worth
11   have an official title or --
12        A.   At the time, we just called it
13   recruiting.
14        Q.   Was there somebody in charge of it during
15   the time period in which Mr. McCants was hired?
16        A.   Yes.
```

```
17        Q.   Who was that individual?
18        A.   I believe it was -- now I just lost his
19   name.  I'm sorry.  I can't remember his name.
20   He's no longer employed by DynCorp.  Oh, yes.
21        Q.   Do you know when he left?
22        A.   Michael Sousanes is his name.
0019
 1             MR. HOLMAN:  How do you spell his name?
 2             THE WITNESS:  His last name is spelled
 3   S-O-U-S-A-N-E-S.
 4             BY MS. EADY:
 5        Q.   The recruiting office was a part of
 6   DynCorp International; is that correct?
 7        A.   Yes.
 8        Q.   And the employees at the recruiting
 9   office were employees of DynCorp International; is
10   that correct?
11        A.   Yes.
12        Q.   But you have no idea what criteria they,
13   the recruiting office, used in order to identify
14   Mr. McCants as a viable candidate; is that
15   correct?
16        A.   Yes.
17        Q.   Is it all right that when we talk about
18   the FZ entity, we just call it DynCorp Free Zone
19   for shorthand?
20        A.   That's fine with me.
21        Q.   If an entity was going to be employed by
22   DynCorp Free Zone and he or she was from the
0020
 1   United States, is it fair to say that he or she
 2   would have been recruited by DynCorp
 3   International?
 4        A.   Employees employed by DynCorp
 5   International, if that's what you mean, yes.
 6        Q.   No.  Like Mr. McCants.  He was
 7   purportedly an employee of DynCorp Free Zone; is
 8   that correct?
 9        A.   Yes.
10        Q.   But he would have been recruited and
11   identified as a candidate of DynCorp
12   International; is that correct?
13        A.   Yes.
14        Q.   Are you familiar with the various forms
15   of advertisements used to help locate candidates
16   for DynCorp positions?
17        A.   I know some of them that we used.  But
18   I'm not sure I'm familiar with all of them.
19        Q.   Can you tell me, just list some of the
20   ones that were used by you at the time that
21   Mr. McCants was hired?
```

265153.1

Defendant 000201

```
22        A.    We have our own recruiting website.  I
0021
 1   was aware that we did some internet postings and
 2   things like Monsterjobs.com or just very
 3   mainstream internet postings.
 4             On occasion, we might use other media
 5   like newspaper articles or, you know, want ads or
 6   that kind of thing.  We've posted, on occasion, in
 7   trade journals.  We also do -- what do you call
 8   those things -- we'll send a business development
 9   team or a representative team to conferences.
10        Q.    What about something called Blueline.com;
11   is that something you're familiar with?
12        A.    No, I'm not.
13             MR. HOLMAN:  Did you say Blueline?
14             MS. EADY:  B-L-U-E-L-I-N-E.
15             THE WITNESS:  I'm not familiar.
16             BY MS. EADY:
17        Q.    Was it the recruiting office in Irving,
18   Texas, that would place these various ads?
19             MR. HOLMAN:  I don't think he said it was
20   in Irving.
21             MS. EADY:  I'm sorry.  In Texas.
22             THE WITNESS:  Yes, it was the recruiting
0022
 1   office that placed those ads.
 2             BY MS. EADY:
 3        Q.    Who would have conducted pre-deployment
 4   training of a candidate for a candidate that would
 5   have been hired in December of 2003?
 6        A.    Let me make sure.  I think you said who
 7   would have conducted pre-deployment training?  Is
 8   that right?
 9        Q.    Yes.  Yes.
10        A.    That would have been the Crucible.
11        Q.    Who did the Crucible have an agreement
12   with for conducting pre-deployment training?
13        A.    DynCorp International.
14             MS. EADY:  Ms. Duncan, if you could
15   please hand Mr. Budge what is marked or will be
16   marked as Exhibit G.
17             BY MS. EADY:
18        Q.    Mr. Budge, if you would just take a
19   minute to look that over.
20        A.    (Reviewing document).  Okay.
21        Q.    In the course of your duties as a program
22   manager, have you ever had occasion to review the
0023
 1   subcontract between DynCorp and Crucible?
 2        A.    Yes.
 3        Q.    When is it that you review that document?
```

265153.1

Defendant 000202

```
 9          A.   Yes.
10          Q.   What kinds of training was that?
11          A.   They would -- they had mobile training
12   teams that would provide training in Iraq or other
13   areas, Afghanistan, other places that may have
14   been required based on a number of factors.
15          Q.   The contract for Crucible to provide
16   training, was it between DynCorp -- I'm sorry --
17   was it with DynCorp International or DynCorp Free
18   Zone?
19          A.   DynCorp International.
20          Q.   And who would have negotiated with
21   Crucible to establish the requirements for the
22   contract, DynCorp Free Zone or DynCorp
0026
 1   International?
 2          A.   DynCorp International.
 3          Q.   So if there are types of training that
 4   are omitted from the subcontract with Crucible,
 5   DynCorp International would have been the entity
 6   to decide that that training did not need to be
 7   included; is that correct?
 8               MR. HOLMAN:   Object to the form of the
 9   question.
10               Go ahead and answer.
11               THE WITNESS:   I'm not sure I understood
12   your question.  I'm sorry.
13               BY MS. EADY:
14          Q.   DynCorp International would have
15   negotiated with Crucible to set out the contract
16   specifications for training, correct?
17          A.   Yes.
18          Q.   If they chose to leave certain types of
19   training out of the contract, that would have been
20   an agreement between DynCorp International and
21   Crucible; is that correct?
22          A.   Yes.
0027
 1          Q.   DynCorp Free Zone did not contract with
 2   Crucible to provide training of any kind?
 3          A.   Not that I know of.
 4          Q.   Do you know if Crucible provided DynCorp
 5   International or DynCorp Free Zone with any
 6   evaluations of Mr. McCants' performance during his
 7   training?
 8          A.   I don't know that.
 9          Q.   Would it be customary for such
10   evaluations to be provided to either DynCorp
11   International or DynCorp Free Zone?
12          A.   Yes.
13          Q.   And that would have been the evaluations
```

265153.1

Defendant 000204

```
19  Nancy.
20            MS. EADY:  He said that written
21  evaluations were forwarded to DynCorp, but he
22  didn't specify which entity, DynCorp International
0030
 1  or DynCorp Free Zone that received the written
 2  evaluations.
 3            THE WITNESS:  It would -- again,
 4  dependent on where the employee is hired.  If
 5  they're a DynCorp International employee, then
 6  that information would go to the specific program.
 7  If it's a DynCorp Free Zone, it would go to the
 8  DynCorp Free Zone manager.
 9            BY MS. EADY:
10       Q.   The manager of that particular program?
11       A.   Yes.
12       Q.   Can you explain what DynCorp Free Zone,
13  what it performs with respect to its employees?
14            MR. HOLMAN:  Nancy, it skipped again.
15  You're going to need to repeat that, please.
16            BY MS. EADY:
17       Q.   Sure.  What does DynCorp Free Zone do
18  with respect to its employees?
19       A.   It's really a forward deployed or forward
20  located administrative office providing human
21  resource financial support or financial accounting
22  and finance support for field programs.
0031
 1            MS. EADY:  Ms. Duncan, would you please
 2  mark Exhibit G.
 3            (Plaintiff's Exhibit Letter G was marked
 4  for identification.)
 5            BY MS. EADY:
 6       Q.   Mr. Budge, if you would look at page 9 of
 7  Exhibit G, it's the very last page.
 8       A.   Yes, ma'am.
 9       Q.   Can you summarize for me what a statement
10  of work is?
11       A.   This is a definition, description of the
12  work to be performed.
13       Q.   Is it a definition or description of the
14  work to be performed as agreed to between Crucible
15  and DynCorp International?
16       A.   Yes.
17       Q.   On this statement of work, does it
18  explain what training Crucible is to provide for
19  DynCorp International?
20       A.   Under the mission statement on that page,
21  there is a description of what is required of
22  Crucible for training without being specific about
0032
```

Defendant 000206