EXHIBIT 1

MGB Reporting, Inc.

Page 1

1            UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF COLUMBIA

3                    Civil Division

4    ---------------------------x

5    RONALD WOOD,                    :

6            Plaintiff,             :

7    v.                             : Case No. 1:06-cv-1616

8    DYNCORP, et al.,               :

9            Defendants.            :

10   ---------------------------x          ORIGINAL

11                   McLean, Virginia

12              Thursday, July 19, 2007

13

14   Deposition of:

15            HOWARD MONTGOMERY HOUGEN,

16   the witness, called for examination by counsel for

17   the plaintiff at Wilson, Elser, Moskowitz,

18   Edelman & Dicker, LLP, 8444 Westpark Drive, Suite

19   510, McLean, Virginia, commencing at 2:00 p.m.

20   before Suzanne M. Enderson, Court Reporter and

21   Notary Public in and for the Commonwealth of Virgina,

22   and present on behalf of the respective parties:

MGB Reporting, Inc.

Page 6

1      Q.    What is your title?

2      A.    I'm vice president, secretary and deputy

3    general counsel.

4      Q.    I take it then you are an attorney?

5      A.    I am.

6      Q.    Where did you go to law school?

7      A.    University of Iowa.

8      Q.    When did you graduate?

9      A.    1960.

10     Q.    Are you a member of any bars?

11     A.    Virginia.

12     Q.    When did you join the Virginia bar?

13     A.    Early '70s.

14     Q.    Do you practice as an attorney?

15     A.    In-house.

16     Q.    In-house.  So as in-house counsel?

17     A.    Yes.

18     Q.    How long have you held your current

19    position as vice president?

20     A.    I came with DynCorp International LLC, in

21    March of 2003.

22     Q.    Did you acquire your title as corporate

Page 19

1      Q.    But it was affiliated at the time of the

2   incident --

3      A.    In 2004 it was affiliated.  It was a

4   parent company.

5      Q.    Correct.

6      A.    DynCorp International LLC, the former

7   first tier subsidiary of DynCorp, now the first

8   tier subsidiary of DynCorp International, Inc.

9      Q.    Correct.

10      A.    And the third entity listed on here is

11   DynCorp International FZ-LLC.

12      Q.    And what is the relationship to that?

13      A.    That is a wholly-owned subsidiaries of

14   DynCorp International LLC.

15      Q.    Now, during this deposition I am going to

16   refer to that company as FZ so that we're all

17   talking about the same thing because I definitely

18   cannot spit out the full name.

19          So you're saying that FZ is at the present

20   time a wholly-owned subsidiary of DynCorp

21   International LLC, correct?

22      A.    Correct.

MGB Reporting, Inc.

1    creation.

2            BY MS. HORVITZ:

3        Q.    **Are you aware of what its current**

4    **functions are?**

5        A.    Yes.

6        Q.    **What does it currently do?**

7        A.    It is an entity to hire employees

8    throughout the world to perform -- to lease to

9    DynCorp International LLC.

10        Q.    **What is the purpose of having a separate**

11    **company hire these employees as compared to DynCorp**

12    **International LLC, hiring them directly?**

13        A.    I know that it's more difficult for a U.S.

14    company to be hiring people overseas, but I can't

15    tell you for sure.

16        Q.    **What about with respect to U.S. citizens?**

17        A.    For U.S. citizens the reason that they're

18    hired by an offshore company is because of taxation

19    reasons.  These are expatriates.  And they want to

20    work for a foreign company.  They don't get clipped

21    for FICA, and we don't charge the government for

22    FICA.

MGB Reporting, Inc.

Page 23

1      Q.    I will periodically ask you a question

2  that you feel is outside your own province.  I may

3  not know that at the time I ask it.  You just have

4  to let me know, and then I'll redirect my question.

5      A.    I will.

6      Q.    I can't stay exactly within 2, 3 and 4,

7  necessarily.  I may accidentally step over into

8  somebody else's function.  We do have other

9  corporate designees that will be filling in.

10         It's your understanding that with respect

11  to the prime contract that's at hand in this case

12  that there were certainly some U.S. employees who

13  were working for FZ but servicing the task and the

14  scope of work of the prime contract for DynCorp

15  International LLC; is that correct?

16      A.    Yes.

17      Q.    Under the prime contract, would the

18  governmental entity with whom the contract was

19  entered make payments to DynCorp International LLC?

20      A.    Yes.

21      Q.    How would the employees who were servicing

22  that contract get paid?

Page 24

1      A.   I can't answer -- I can't respond to that

2   question of how they got paid.

3      Q.   **So you're not familiar with whether or**

4   **not, then, the moneys that were paid to DynCorp**

5   **International LLC were then, in turn, paid to FZ**

6   **for payment of the employees --**

7      A.   I believe that to be the case, but I

8   wasn't involved in the direct financing.

9      Q.   **But that's your general --**

10     A.   I've seen the leasing agreement, and

11  that's what the leasing agreement said is supposed

12  to happen.  So I assume that's what happened.

13          MS. HORVITZ:  Well, let's mark this.

14          (Deposition Exhibit Number 2 was marked

15  for identification.)

16          BY MS. HORVITZ:

17     Q.   **Can you identify this document that's just**

18  **been labeled?**

19     A.   This is a letter agreement between DynCorp

20  International LLC and the company we call FZ.

21     Q.   **Have you seen this document before?**

22     A.   Yes.

MGB Reporting, Inc.

Page 25

1          Q.     **Where have you seen it?**

2          A.     I have a copy in my file.

3          Q.     **Is it something you refer to in the course**

4     **of your work for DynCorp International LLC?**

5          A.     I referred to it in drafting the

6     subsequent agreement.

7          Q.     **And when was the subsequent agreement put**

8     **into place?**

9          A.     Late in 2005.  Maybe 2006, somewhere in

10    that time frame.

11         Q.     **How does it differ in terms of the**

12    **substance?**

13         A.     It's just different.  It has more detail

14    in it.

15         Q.     **Is the basic concept the same?**

16         A.     The concept is the same.  Employees will

17    be leased by FZ to DynCorp International LLC and

18    the cost reimbursement -- the concept is the same.

19    It just has more words.

20         Q.     **Do you know how many pages the --**

21         A.     Maybe four pages.

22         Q.     **So it's a much longer contract.**

MGB Reporting, Inc.

Page 26

1      A.    Yes.

2      Q.    **Double the size, right?**

3      A.    Double the size, yes.

4      Q.    **In your earlier answer you said that based**

5   **on your familiarity with the lease agreement, that**

6   **it was your understanding that the salaries would**

7   **somehow get transferred or paid to FZ; is that**

8   **correct?**

9      A.    The language here is DI -- I'm sorry --

10  that DIFZ -- for all services provided, DI, DIFZ

11  will be reimbursed for all actual costs incurred,

12  including labor costs.

13         To me that includes the costs of those

14  employees.

15     Q.    **So it's your understanding that all of the**

16  **salaries of the relevant FZ employees who were**

17  **servicing the DynCorp International LLC contract**

18  **would be paid by DynCorp International LLC to FZ,**

19  **correct?**

20     A.    Salaries would be paid by FZ to employees.

21  The cost of those salaries would be reimbursed by

22  DI.

MGB Reporting, Inc.

Page 27

1    Q.    Dollar for dollar?

2    A.    Dollar for dollar, yes.

3    Q.    FZ would not make a profit for, say, off

4    of those employees?

5    A.    Only the fee that's referred to here, the

6    $500 fee.

7    Q.    And that's $500 per month regardless of

8    the amount of services provided?

9    A.    That's my understanding.

10   Q.    And, in fact, the reverse is the same.   FZ

11   actually is paying $500 a month back to DynCorp

12   International LLC, correct?

13   A.    That's correct.

14   Q.    So there is a net of zero in terms of the

15   fixed price of the contract, correct?

16   A.    Except that DynCorp International FZ would

17   have had also some overhead costs that probably

18   would have passed.  When you say the services

19   provided by DIFZ, there would have been the people

20   who are leased, and there would have been overhead

21   expenses of DIFZ that would have been reimbursed

22   also.

MGB Reporting, Inc.

Page 30

1    We want 500 civilian police, and they go recruit

2    500 civilian police.

3        Q.    So DI would be the one that would dictate

4    the basic criteria of prospective employees?

5        A.    That's correct.

6        Q.    Then Worldwide Recruiting and Staffing

7    would perform the task of finding such persons?

8        A.    That's correct.

9        Q.    Would Worldwide Recruiting and Staffing

10   also be charged with actually training those

11   individuals?

12       A.    I don't know.

13       Q.    Okay.  And how does it work with respect

14   to the future FZ employees?  Similar arrangements?

15       A.    For the rest -- for the U.S. employees,

16   they would be hired here.  FZ does, I believe,

17   their own direct hire offshore.

18       Q.    So even if there was a U.S. citizen

19   presently in, say Afghanistan, it might be that

20   that person finds FZ directly?

21       A.    That's correct.

22       Q.    Or it might be that there is a U.S.

Page 31

1    citizen in Alabama who is hired through Worldwide

2    Recruiting and Staffing --

3        A.    They place an ad and get hired by

4    Worldwide Recruiting, and they're handed off to,

5    depending on who the company is, DI or FZ.

6        Q.    With respect to the FZ hires, though, who

7    determines what the requirements are for

8    prospective FZ employees?

9        A.    Eventually DynCorp would tell FZ who it

10   wants to hire.  It wants to hire 100 mechanics.  FZ

11   would recruit 100 mechanics.  Of those mechanics,

12   it might be U.S. citizens, it might be South

13   Africans, it might be Brits, whatever.

14       Q.    When you say "DynCorp," which entity?

15       A.    In the case you're talking about -- I

16   think we're talking about FZ, I believe.  It

17   depends.  I mean, if it's a person to be hired

18   directly by DI -- for convenience I'm calling

19   DynCorp International LLC DI.

20       Q.    Correct.

21       A.    If it's DI that's going to hire the

22   people, DI would say to Worldwide Recruiting, we

1    need 100 aviation mechanics.  If it's DI -- if DI

2    wants offshore employees that do not have to have,

3    for example, security clearance -- normally you

4    can't bring security clearance people through the

5    FZ.

6              They just want 100 porter guards, not

7    security-cleared people.  It would say we want 100

8    porter guards.  And FZ might say, Well, I can get

9    20 Gerkos.  I can get 20 South Africans.  I have to

10   have 20 U.S. expats.  For the 20 U.S. expats --

11   expatriates, they would come to Worldwide and say,

12   Give us 20 of this category.

13        Q.    But if the prime contract is being

14   serviced by FZ, isn't a DI contract --

15        A.    FZ does not have any prime contracts.

16        Q.    Right.  So in the circumstance where the

17   prime contract happens to be with DI --

18        A.    Right.

19        Q.    -- would DI be the ones to say to

20   Worldwide Recruiting and Staffing Services, we need

21   the following categories of employees, and then

22   they would eventually be hired by FZ?

Page 34

1              MR. WALLACE:  Object to form.

2              THE WITNESS:  -- the people needs are

3    different.  Therefore, it's not the same

4    instruction.  One instruction is, Give me so many

5    civilian police.  And the other is, Give me so many

6    drivers, mechanics, whatever.

7              BY MS. HORVITZ:

8         Q.    **But in all circumstances if the prime**

9    **contract is with DI, DI is the one that determines**

10   **how many mechanics it needs?**

11        A.    But if -- DI would determine how many

12   mechanics they need, that's correct.

13        Q.    **Would DI determine what the minimum**

14   **requirements, if any, are for such mechanics?**

15        A.    Yes.  I believe so.

16        Q.    **Because DI is intimately familiar with the**

17   **requirements of its prime contract, correct?**

18        A.    It knows what it needs to serve the

19   contract.  It needs guards.  It needs drivers.  It

20   needs cooks.  It needs whatever.

21        Q.    **Would DI dictate what educational level**

22   **was required, for example, for a particular**

Page 38

1        Q.    Have there been any individuals, to your

2    knowledge, who have served as officers or directors

3    of DI that have also served as officers or

4    directors of FZ, not necessarily concurrently?

5        A.    I'm trying to figure out how to answer

6    that question.  You have too many negatives in

7    there.  I can --

8        Q.    Have there been --

9        A.    -- tell you --

10        Q.    -- individuals who have served in both

11    companies?

12        A.    I know who the current directors of FZ

13    are.

14        Q.    All right.  Let's start there.

15        A.    Three of them are employees and officers

16    of DI.

17        Q.    As well.

18        A.    Yes.  They are officers and employees of

19    DI, and they are also directors of FZ.  The

20    managing director of FZ is not and never has been

21    an employee or officer of DI.

22        Q.    How many directors are there?

MGB Reporting, Inc.

Page 39

1        A.    Four.

2        Q.    Do they have board meetings?

3        A.    No.

4        Q.    So what are the functions of the

5    directors, if you know?

6        A.    They would occasionally do a written

7    action to give a power of attorney or authorize the

8    opening of a bank account, that sort of thing.

9        Q.    So there are currently four, one of whom

10   is the managing director of FZ?

11       A.    Yes.

12       Q.    The other three are DI employees?

13       A.    Correct.

14       Q.    Who are the three DI employees?

15       A.    Herb Lanese, L-A-N-E-S-E, our chief

16   executive officer; Mike Thorne, our chief financial

17   officer.

18       Q.    Does that have an E at the end?

19       A.    Yes, an E.  And Curtis Schehr,

20   S-C-H-E-H-R, our general counsel.

21       Q.    Where are they located?

22       A.    Mr. Lanese and Mr. Schehr are located in

MGB Reporting, Inc.

Page 40

1    Falls Church, Virginia, and Mr. Thorne is located

2    in Irving, Texas.

3        **Q.   How long have they been directors of FZ,**

4    **if you know?**

5        A.    Not more than six months because I put

6    them on after Mr. Schehr came aboard, and he came

7    aboard the 1st of November.  So it was not earlier

8    than 1 November.

9        **Q.   How were they selected and by whom?**

10       A.    By title, by their position.  By me, if

11   you will, because I decided who it should be, and

12   my boss concurred.

13       **Q.   Who is your boss?**

14       A.    Mr. Schehr, general counsel.

15       **Q.   What gave you the authority to decide who**

16   **to put on the board of directors of FZ?**

17       A.    Nobody.  But I suggested that these were

18   the people that should be on it, and nobody

19   disagreed.

20       **Q.   Was there some kind of formal action?**

21       A.    Yes.  It was a shareholder action

22   designating them.  I use the term "shareholder"

MGB Reporting, Inc.

Page 42

1       Q.    Now, prior to this six-month changeover in

2   director, who served as directors of FZ?

3       A.    The last -- the named directors were Steve

4   Canlor, our former chief executive officer.

5       Q.    What do you mean by "our former chief

6   executive" --

7       A.    DI's former CEO.  And Jay Gorman, DI's

8   former chief operating officer.  And I believe John

9   Supina was a director and Jeff Casperaites.

10      Q.    Were they affiliated with DI?

11      A.    Jeff Casperaites was an employee of FZ,

12  not affiliated with DI.

13      Q.    So he must have been the managing

14  director?

15      A.    He was the managing director, that is

16  correct.

17      Q.    And John Supina was not, but he is a DI

18  employee?

19      A.    He's a DI employee, yes.

20      Q.    Is he still with the company?

21      A.    Yes.

22      Q.    What happened to Mr. Casperaites?

Page 47

1    that's different than FZ's arrangement to provide

2    staff?

3        A.    That's correct.

4        Q.    Explain to me why that is.

5        A.    Because WWNS was presumably -- again, I

6    don't know the contract -- was presumably

7    subcontracted to provide -- there's signal

8    capability or construction or IT or whatever.  They

9    were to provide a piece of the services that are

10   required for prime contract.  They are to provide a

11   finished product service.

12       Q.    Whereas FZ is simply providing the staff

13   necessary for DI to do its own job --

14       A.    That's correct.

15       Q.    -- under the prime contracts?

16       A.    Under the prime contracts.

17       Q.    Is DynCorp International LLC contending

18   that it's not responsible for the actions or

19   admissions of James McCants because he was an

20   employee of FZ in this case?

21       A.    I can't tell you that --

22            MR. WALLACE:  To the extent it calls for a

Page 50

1          Q.    Okay.  Well, why don't we switch gears for

2     a little while and do that.  In order to do that, I

3     think you might benefit from having -- we'll start

4     with the answer to the amended complaint.

5               (Hougen Deposition Exhibit Numbers 3 and 4

6     were marked for identification.)

7               BY MS. HORVITZ:

8          Q.    Before we actually turn to the documents

9     that were marked as Exhibits 3 and 4, I have a

10    couple of follow-up questions on the last topic.

11              Does FZ get reimbursed by DI for overhead

12    expenses it may incur?

13         A.    I believe that's the case.

14         Q.    So if it, say, does --

15         A.    It has no other income source.  Logic

16    would say FZ gets reimbursed for all its overhead

17    expenses.

18         Q.    So is its exclusive income source the

19    relationship it has with DI?

20         A.    I believe that to be true.

21         Q.    In fact, FZ operates essentially at a

22    break-even basis, correct?

**MGB Reporting, Inc.**

Page 51

1       A.    I believe that to be true.

2       **Q.    Now, you have been handed exhibits that**

3  **are marked 3 and 4.  3, I will represent on the**

4  **record, is the answer to the amended complaint in**

5  **this action, and 4 is the amended complaint itself.**

6            **The reasons I'm handing these to you is to**

7  **determine which of the defenses that are asserted**

8  **by the DynCorp defendants are ones that you are**

9  **prepared to testify about today.**

10           MR. WALLACE:  Of the affirmative defenses?

11           MS. HORVITZ:  Well, I don't know.  My

12  deposition notice said defenses.  I don't know

13  whether you interpreted that to be solely

14  affirmative defenses.

15           MR. WALLACE:  Let's look at it this way:

16  When you go to the amended complaint, the first

17  time the word "defense" appears is after

18  paragraph 81.  So I would say that based on your

19  30(b)(6) notice and the answers, that you should

20  start with the first defense.

21           MS. HORVITZ:  We can certainly start

22  there, but we will not end there.

Page 65

1      Q.    And that just sits there.  Is it --

2      A.    It's paid in capital.  It just sits there

3   in the books.  I have not seen the balance sheet of

4   this company.  So I can't tell you what the total

5   capital is, but the paid in capital would have been

6   500,000 dinars.

7      Q.    That is based on Exhibit 6?

8      A.    Right.

9      Q.    Now, do you know on an annual basis how

10   much money is transferred from DI to FZ?

11      A.    I do not.

12      Q.    Do you have any idea?

13      A.    I have no idea.

14      Q.    The managing director of FZ where, does

15   the money come to pay him?  Where does it come

16   from?

17      A.    Part of the overhead.

18      Q.    Overhead of DI?

19      A.    Overhead of FZ.

20      Q.    Then that's passed along to DI?

21      A.    Passed to DI for cost of services.

22      Q.    Who would have provided the 150,000 in

Page 85

1    employed by DI, both stationed in Iraq?

2        A.    It might have been different.  I can't

3    tell you for sure it would have been the same.  It

4    would have been similar, but not necessarily the

5    same.

6        Q.    Which company would enter into, say, the

7    health insurance contract for an employee that's

8    FZ?  Which --

9        A.    Who would have negotiated the contract?

10       Q.    No.  Would FZ be the party to that?

11       A.    No.  The --

12            MR. WALLACE:  It's an unclear question.

13   You said one was negotiated.  One was the party.

14   Which one are you asking?

15            MS. HORVITZ:  I'll restate the question.

16            BY MS. HORVITZ:

17       Q.    If an FZ employee U.S. citizen has health

18   insurance, which entity contracts with the health

19   insurance provider?

20       A.    I believe in the -- in Exhibit 2 it says

21   that DI will provide accounting and IT support and

22   risk management and insurance claim processing

MGB Reporting, Inc.

Page 86

1    services.  Risk management would purchase the

2    insurance on behalf of FZ.  And risk management, DI

3    risk management, would process the claim.

4            So if a claim arose -- if a person is

5    killed or injured, the claim would have gone to FZ.

6    FZ would have said, DI, process this with the area.

7        Q.    Okay.  So when DI is contracting with FZ

8    under Exhibit 2 for the insurance claim

9    processing -- that's what you're referring to?

10       A.    Yes.

11       Q.    So DI would handle that matter for --

12       A.    DI would have negotiated with the carriers

13   and processed the claim.

14       Q.    Even though the employee might be a FZ

15   employee?

16       A.    Well, that is a group policy.  So the

17   policy would have covered everybody, and they would

18   have added names.  And the premiums would have been

19   based on payroll.

20       Q.    So the group policy for health insurance

21   would be -- encompass a group of -- subgroup of DI

22   employees and another subgroup of FZ employees, all

Page 87

1    **within the same health insurance?**

2        A.    Probably different coverages because -- I

3    would say -- I'm not a risk management person, but

4    I would assume that there is a coverage based on FZ

5    payroll because that's what -- it's based on

6    numbers of bodies and so on.  So there would have

7    been a discrete report for the FZ people.

8            And it could be -- I can't tell you for

9    sure.  It could be the insurance came from a single

10   carrier.  Minnesota Mutual insured all of these.

11       Q.    **But in any event, regardless of whether**

12   **it's one group or another, DI would be the one that**

13   **was processing the claim?**

14       A.    DI was processing the claims under

15   Exhibit 2.

16       Q.    **And DI -- we're on the same document,**

17   **Exhibit 2.  DI would also be providing orientation**

18   **sessions for prospective FZ employees?**

19       A.    That's what it says.

20       Q.    **And making travel arrangements?**

21       A.    Yes.

22       Q.    **And performing physical exams?**

MGB Reporting, Inc.

Page 88

```
 1        A.   Yes.

 2        Q.   And drug screens as required?

 3        A.   Yes.

 4        Q.   And interviewing the applicants?

 5        A.   That's back in 2002.  That's not --

 6        Q.   2003?

 7        A.   '03.  That's not the case now.

 8        Q.   Right.  Interviewing the applicants?

 9        A.   Yes.

10        Q.   And recommending them over to FZ for hire?

11        A.   Right.

12        Q.   And advertising in the US papers?

13        A.   Yes.

14        Q.   All of which was intended to service the

15   needs of FZ employees?

16        A.   The domestic side of it.  Since FZ does

17   not do anything in the U.S., DI would have been

18   handling these.

19        Q.   But that domestic effort might result in a

20   U.S. citizen going to Iraq?

21        A.   Yes.

22        Q.   In other words, it's where the applicant
```